To be argued by
MANDY E. JARAMILLO

SUPREME COURT OF THE STATE OF NEW YORK

APPELLATE DIVISION: FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

-against-

GUILLERMO VILLA,

*Defendant-Appellant.*

BRIEF FOR DEFENDANT-APPELLANT

CHRISTINA SWARNS
Attorney for Defendant-Appellant

ANASTASIA HEEGER
Supervising Attorney

By:  MANDY E. JARAMILLO
Senior Staff Attorney

OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100
mjaramillo@appellatedefender.org

## TABLE OF CONTENTS

Table of Contents ........................................................................................i

Table of Authorities......................................................................vi

Questions Presented......................................................................1

Preliminary Statement ................................................................2

Introduction................................................................................3

Statement of Facts ......................................................................6

    I.    Jury Trial Waiver Allocution................................................6

    II.   The *Wade* Hearing ........................................................8

    III.  *Sandoval* and the Decision to Testify ...........................13

    IV.  The Shooting at 1240 Burke Avenue ...........................15

    V.   The Fight Seen by Sedrick Sambolah's Mother........................18

    VI.  The Single Eyewitness Account of Seyquana Rambert............18

          1. Ms. Rambert Provides Testimony Inconsistent with Her Prior Accounts, and Contradictory to Other Evidence.........25

                  a. Description of the Perpetrator...........................26
                  b. Timing of the Ambulance ..................................27
                  c. Position of Mr. Sambolah's Body ......................27
                  d. O.G.'s Involvement ...........................................28
                  e. Number of Shots Fired ......................................29
                  f. Other Details ....................................................29

VII.   The Defense's Arguments on Legal Insufficiency and Summation .................................................................. 31

VIII.  The Prosecutor's Misstatement of Key Evidence in Summation 34

IX.    The Verdict and Sentence .......................................... 36

Argument .................................................................... 39

POINT I

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT MURDER IN THE SECOND DEGREE AND CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE BECAUSE THE SOLE EYEWITNESS WAS INCREDIBLE AS A MATTER OF LAW; ADDITIONALLY, THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE. ......................................................... 39

A. The Sole Eyewitness Testimony Was Incredible as a Matter of Law, and Therefore, the Prosecution Did Not Prove That Mr. Villa Was the Shooter Beyond a Reasonable Doubt. .... 40

1. Seyquana Rambert's testimony was inconsistent, contradictory, and unbelievable. ........................ 42

2. The prosecution falsely claimed to have proven Mr. Villa's motive for the shooting to bolster this single eyewitness identification case. ................. 44

3. The prosecution argued against the credibility of a police officer, relying on a fact not in evidence, to bolster this single eyewitness identification case. .................................................... 46

4. The single eyewitness identification of Mr. Villa was patently unreliable. ..................................... 48

B. Even If This Court Finds That the Evidence Was Legally Sufficient to Support the Conviction, the Verdict Was Against the Weight of the Evidence Where the Sole Eyewitness's Testimony Completely Contradicted the Testimony of Law Enforcement at the Scene of the Crime. 51

POINT II

GUILLERMO VILLA DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHT TO A JURY TRIAL OR HIS RIGHT TO TESTIFY, AND DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO PROTECT HIS CLIENT'S RIGHTS. ................................................54

A. Where Mr. Villa's Request to Speak with His Family for Advice on Waiving a Jury Trial Was Not Honored, the Court Abused Its Discretion by Failing to Follow Through on the Inquiry to Ensure that the Waiver Was Knowing, Intelligent, and Voluntary .....................................................55

B. Where Defense Counsel, During a Mid-Trial *Sandoval* Hearing, Improperly and Unilaterally Waived Mr. Villa's Right to Testify, Without Advising Mr. Villa that It Was Mr. Villa's Personal Right and Decision, the Court Abused Its Discretion by Failing to Inquire to Determine Whether the Waiver Was Knowing, Intelligent, and Voluntary...............59

C. Mr. Villa's Right to the Effective Assistance of Counsel Was Violated by Defense Counsel's Failure to Object and Insist on a Further Inquiry into the Jury Trial Waiver, and by His Usurpation of his Client's Personal and Fundamental Decision to Testify.................................................64

1. Defense counsel failed to object and request that the court honor Mr. Villa's request to speak to his family and to further inquire as to whether Mr. Villa was knowingly, intelligently, and voluntarily waiving his right to a jury trial ....... 65

2. Defense counsel improperly and unilaterally waived Mr. Villa's right to testify, without advising Mr. Villa that it was his personal right and ultimately his decision, rather than a strategic choice for defense counsel to make ...... 66

<u>POINT III</u>

SEYQUANA RAMBERT'S PHOTO ARRAY, LINEUP, AND IN-COURT IDENTIFICATIONS OF MR. VILLA SHOULD HAVE BEEN SUPPRESSED WHERE THE PHOTO ARRAY WAS UNDULY SUGGESTIVE; ADDITIONALLY, THE COURT ERRED FOR FAILING TO FOLLOW THE PROPER STATUTORY PROCEDURES, AND DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT ........................... 71

A. <u>Ms. Rambert's Pre-Trial and In-Court Identifications of Mr. Villa Should Have Been Suppressed Where She Initially Described the Shooter as White, and Mr. Villa's Photo Depicted His Skin Tone as Much Lighter Than the Skin Tones of the Other Men</u> ....................................................... 72

B. <u>The Court Erred and Defense Counsel Was Ineffective for Allowing Trial Testimony to Be Presented Before the Court Made a Decision on a Case-Dispositive Motion in Which the Court Failed to Put Forth on the Record Its Findings and Conclusions</u> ........................................................................... 74

<u>POINT IV</u>

MR. VILLA WAS DEPRIVED OF HIS RIGHT TO A FAIR
TRIAL DUE TO THE PROSECUTION'S IMPROPER
SUMMATION, INCLUDING A MISSTATEMENT OF KEY
EVIDENCE AND A FALSE ASSERTION THAT MOTIVE HAD
BEEN PROVEN

BEEN PROVEN ................................................................... 77

A. <u>The Prosecution Misstated Officer Solomon's Testimony
Regarding the Amount of Time It Took for the Ambulance to
Arrive</u> ................................................................. 78

B. <u>The Prosecution Misled the Factfinder Stating Motive Had
Been Proven Without a Basis in the Evidence</u> ..................... 80

<u>POINT V</u>

MR. VILLA'S SENTENCE IS EXCESSIVE ...................................... 82

Conclusion ............................................................... 85

Addenda .................................................................. 1

Statement Pursuant to Rule 5531 ......................................... 1

Printing Specification Statement ........................................ 2

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997) .......................... 60, 66, 67, 69

*Campos v. United States*, 930 F. Supp. 787 (E.D.N.Y. 1996) ........... 66-67

*Chang v. United States*, 250 F.3d 79 (2d Cir. 2001) ............................... 63

*Darden v. Wainwright*, 477 U.S. 168 (1986) ........................................... 81

*Dunaway v. New York*, 442 U.S. 200 (1979) ........................................... 74

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................ 41

*People ex rel. Rohrlich v. Follette*, 20 N.Y.2d 297 (1967) ....................... 56

*People v. Ahl*, 243 A.D.2d 985 (3d Dep't 1997) .......................... 57, 58, 59

*People v. Anderson*, 216 A.D.2d 257 (1st Dep't 1995) ............................ 57

*People v. Ashwal*, 39 N.Y.2d 105 (1976) ......................... 44, 77, 78, 79, 81

*People v. Benevento*, 91 N.Y.2d 708 (1998) .................... 64, 66, 70, 74, 75

*People v. Bleakley*, 69 N.Y.2d 490 (1987) ............................................... 52

*People v. Boone*, 2017 N.Y. LEXIS 3722 (2017) ..................................... 48

*People v. Brown*, 45 N.Y.2d 852 (1978) .................................................. 64

*People v. Bussey*, 276 A.D.2d 331 (1st Dep't 2010) ................................ 67

*People v. Cahill*, 2 N.Y.3d 14 (2003) ...................................................... 51

*People v. Calabria*, 94 N.Y.2d 519 (2000) ........................................ 44, 77

*People v. Calabria*, 3 N.Y.3d 80 (2004) .............................................. 41, 50

*People v. Carroll*, 303 A.D.2d 200 (1st Dep't 2003) ................................ 73

*People v. Chipp*, 75 N.Y.2d 327 (1990) .................................................. 72

*People v. Davis*, 49 N.Y.2d 114 (1979) .................................................. 56

*People v. Delamota*, 18 N.Y.3d 107 (2011) ........................................ 51, 52

*People v. Delgado*, 80 N.Y.2d 780 (1992) .............................................. 83

*People v. Denti*, 44 A.D.2d 44 (1st Dep't 1974) ...................................... 75

*People v. Forte*, 223 A.D.2d 358 (1st Dep't 1996) ................................... 41

*People v. Foster*, 64 N.Y.2d 1144 (1985) ............................... 39, 41, 42, 50

*People v. Gilliam*, 36 A.D.3d 1151 (3d Dep't 2007) ................................. 53

*People v. Golliver*, 132 A.D.2d 618 (2d Dep't 1987) ........................... 75-76

*People v. Gonzalez*, 173 A.D.2d 48 (1st Dep't 1991) ................... 72, 73, 74

*People v. Hemmingway*, 240 A.D.2d 328 (1st Dep't 1997) ..................... 80

*People v. Jackson*, 221 A.D.2d 964 (4th Dep't 1995) ........................ 74, 75

*People v. Ledwon*, 153 N.Y. 10 (1897) .................................................... 41

*People v. Logue*, 35 N.Y.2d 658 (1974) ................................................... 41

*People v. Mason*, 263 A.D.2d 73 (1st Dep't 2000) . 60, 62-63, 66, 67-68, 70

*People v. McMitchell*, 110 A.D.3d 923 (2d Dep't 2013) ........................... 53

*People v. McQueen*, 52 N.Y.2d 1025 (1981) ...................................... 57, 65

*People v. Medina*, 67 A.D.3d 548 (1st Dep't 2009), *rev'd on other grounds*, 18 N.Y.3d 98 (2011) .................................................................. 83

*People v. Mercado*, 147 A.D.3d 613 (1st Dep't 2017) ....................... 60, 66

*People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977) .................................... 56

*People v. Notey*, 72 A.D.2d 279 (2d Dep't 1980) ................................ 83-84

*People v. Page*, 88 N.Y.2d 1 (1996) .................................................... 57, 59

*People v. Perry*, 266 A.D.2d 151 (1st Dep't 1999) ............................. 67, 69

*People v. Reed*, 40 N.Y.2d 204 (1976) ................................................ 41, 46

*People v. Rosen*, 81 N.Y.2d 237 (1993) ..................................................... 60

*People v. Rosenthal*, 305 A.D.2d 327 (1st Dep't 2003) ............................ 83

*People v. Sandoval*, 34 N.Y.2d 371 (1974) ............................................... 68

*People v. Saunders*, 19 A.D.3d 744 (3d Dep't 2005) ............................... 56

*People v. Smith*, 6 N.Y.3d 827 (2006) ................................................ 56, 65

*People v. Stewart*, 40 N.Y.2d 692 (1976) ................................................. 41

*People v. Walsh*, 101 A.D.3d 614 (1st Dep't 2012) .................................. 83

*People v. Watson*, 162 A.D.2d 360 (1st Dep't 1990) ................................ 58

*People v. Wong*, 81 N.Y.2d 600 (1993) ..................................................... 41

*People v. Zephyrin*, 52 A.D.3d 543 (2d Dep't 2008) ................................ 53

*Rock v. Arkansas*, 483 U.S. 44 (1987) ................................................ 60, 66

*Strickland v. Washington*, 466 U.S. 668 (1984) .............. 64, 66, 70, 74, 75

*United States v. Eltayib*, 88 F.3d 157 (2d Cir. 1996) ..............................72

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000).............. 60-61, 63

*United States v. Wade*, 388 U.S. 218 (1967) ...........................................72

*Wong Sun v. United States*, 371 U.S. 471 (1963)....................................74

## Constitutional Provisions

N.Y. Const. art. I, § 2.............................................................................56

N.Y. Const. art. I, § 6..........................41, 44, 60, 64, 66, 70, 72, 74, 75, 77

U.S. Const. amend. V ........................................................ 44, 60, 66, 77

U.S. Const. amend. VI................................................. 60, 64, 66, 70, 74, 75

U.S. Const. amend. XIV ....................41, 44, 60, 64, 66, 70, 72, 74, 75, 77

**Statutory Provisions**

N.Y. C.P.L. § 60.15 ................................................................... 60

N.Y. C.P.L. § 320.10 ............................................................ 56, 57

N.Y. C.P.L. § 330.30 ................................................................. 37

N.Y. C.P.L. § 470.15 ................................................................. 52

N.Y. C.P.L. § 710.40 ............................................................ 71, 74

N.Y. C.P.L. § 710.60 ............................................................ 71, 74

N.Y. Penal Law § 125.25(1) ..................................................... 2, 40

N.Y. Penal Law § 265.03(1) ..................................................... 2, 40

**Other Authorities**

C.A. Morgan III, et al., *Misinformation Can Influence Memory for Recently Experienced, Highly Stressful Events*, 36 Int'l J. L. & Psychiatry 11 (2013) ........................................................ 49, 50

## QUESTIONS PRESENTED

1)     Was the evidence legally sufficient to support the conviction for murder in the second degree and criminal possession of a weapon in the second degree where the sole eyewitness's testimony wholly contradicted police testimony and was inconsistent with her prior statements, rendering it incredible as a matter of law? Additionally, was the verdict against the weight of the evidence?

2)     Did Guillermo Villa knowingly, intelligently, and voluntarily: (a) waive his right to a jury trial where the court failed to inquire after Mr. Villa asked to speak with his family; and (b) waive his right to testify where defense counsel stated repeatedly on the record mid-*Sandoval* hearing that defense counsel had made the decision that his client would not testify? In addition, was defense counsel ineffective for failing to protect his client's rights?

3)     Did the court err in declining to suppress Seyquana Rambert's identifications of Mr. Villa where she highlighted the characteristic of skin tone to law enforcement and where Mr. Villa's skin tone in his photo was noticeably lighter than the skin tones of the fillers, and, in failing to follow the proper statutory procedures? Was defense counsel ineffective for allowing trial testimony to be presented before the court made a decision on a case-dispositive motion?

4)     Did the prosecution's improper summation, which included a misstatement of key evidence and a false assertion that motive had been proven, deprive Guillermo Villa of his right to a fair trial?

5)     Is Mr. Villa's sentence excessive?

1

Supreme Court of the State of New York
Appellate Division: First Department

---

The People of the State of New York,

Respondent,

— against —                          Ind. No. 3376-2011

Guillermo Villa,

Defendant-Appellant.

---

## PRELIMINARY STATEMENT

This is an appeal from a judgment rendered on April 23, 2014, by Supreme Court, Bronx County (Massaro, J., at pre-trial suppression hearing, trial, and sentencing). Guillermo Villa was convicted after a bench trial of one count of murder in the second degree, N.Y. Penal Law § 125.25(1), and one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03(1)(b). He was sentenced as a second violent felony offender to an indeterminate term of 25 years to life for the count of murder in the second degree and a determinate term of 15 years incarceration and five years of post-release supervision for the count of criminal possession of a weapon in the second degree. The sentences are running concurrently.

Timely notice of appeal was filed. No stay of execution has been sought. Mr. Villa is currently serving his sentence.

## INTRODUCTION

Guillermo Villa's conviction rests on the testimony of a single stranger eyewitness. Nothing else tied Mr. Villa to the shooting of Sedrick Sambolah in the Bronx on September 24, 2011. There was no evidence of motive. There were no other witnesses. There was no forensic evidence linking him to the crime. Seyquana Rambert, Mr. Sambolah's girlfriend, was the prosecution's star witness. But, her testimony was flawed and incompatible with police officer testimony. In fact, her testimony was incredible as a matter of law.

Although Ms. Rambert placed herself at the scene of the shooting and claimed that she had stared into the face of the would-be murderer, Ms. Rambert did not tell police during the long wait for the ambulance that she had allegedly witnessed the entire incident. Further, Ms. Rambert, who testified at trial that the shooter was a black, possibly Dominican, Hispanic man, denied that she had previously described the shooter to the police just hours after the incident as a white Hispanic man. Despite her previous statements that the shooter was wearing a blue shirt, Ms. Rambert acknowledged at trial that she did not know

whether the shooter's top was a shirt, a jacket, or a sweater; what shade of blue it was; and whether it was long or short-sleeved.

Ms. Rambert and a first responding officer testified to what happened at the scene of the crime in the moments immediately following the shooting. Problematically, they described two different series of events. First, Ms. Rambert described watching EMS workers attempt to aid Mr. Sambolah and place him in the ambulance just minutes after the shooter walked away and while she was still on the phone with 911. The officer, conversely, explained that even though she attempted to put a rush on the ambulance, it took 30 to 45 minutes to arrive. Similarly, Ms. Rambert testified in detail about dropping in front of her boyfriend, looking into his open eyes, and placing her hands on his chest. The officer, however, found Mr. Sambolah face down on the ground, evidence that was corroborated by the medical examiner's testimony that Mr. Sambolah suffered facial injuries consistent with falling onto his face.

In this error-ridden bench trial, Mr. Villa unwittingly, involuntarily, and without the effective assistance of counsel, waived two fundamental rights—his right to a jury trial and his right to testify.

Simultaneously, the prosecution, rather than perform its truth-seeking function, committed egregious misconduct. Not only did the prosecution present one eyewitness, who was incredible as a matter of law, but the prosecution also misstated key evidence in summation: insisting that the police officer's testimony was mistaken, conflating motive and intent, and arguing, without a basis in the evidence, that motive had been proven. In addition, the court erred in failing to suppress the unduly suggestive pre-trial identifications by Ms. Rambert, and her subsequent in-court identification.

Mr. Villa's convictions should be reversed where the sole eyewitness offered testimony that was incredible as a matter of law, the verdict was against the weight of the evidence, the identifications were unduly suggestive, Mr. Villa did not knowingly, intelligently, and voluntarily waive his rights to a jury trial or to testify, Mr. Villa did not receive the effective assistance of counsel, and the prosecutor acted improperly.

## STATEMENT OF FACTS

Guillermo Villa was charged, under indictment 3376-2011, of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree. *See* Indictment No. 3376-2011. The charges arose out of the mid-day September 24, 2011 fatal shooting of Sedrick Sambolah in a chaotic scene in front of a Bronx apartment building.

I.   Jury Trial Waiver Allocution

On January 30, 2014, Justice Dominic Massaro questioned Guillermo Villa after a bench conference with counsel, as to whether Mr. Villa wanted to waive a jury trial. W. 3-5.[1] Mr. Villa answered affirmatively, and the court cautioned him that waiving a jury would "shrink" his odds "a little bit" stating that "[n]ow you're only one on one as opposed to one to twelve." W. 4. Other than inquiring as to whether Mr. Villa understood that he would be giving up his right to pick a jury and to argue to a jury, the court did not ask any questions about

---

[1]   Citations to "W" refer to the minutes from the jury trial waiver allocution on January 30, 2014. A copy of the January 30, 2014 minutes, as part of the record before the lower court, are being provided to this Court. Citations to "T" refer to the pre-trial hearings and trial on January 31, February 5, February 11, February 18, February 19, February 20, and February 21, 2014. Citations to "T2" refer to the minutes of the verdict on February 24, 2014. Citations to "S" refer to the sentencing on April 23, 2014.

whether Mr. Villa had been promised anything or had been pressured to waive a jury. W. 3-4.

In open court, Mr. Villa signed a Jury Trial Waiver form. Jury Trial Waiver Form, Jan. 30, 2014; W. 5. After receiving the waiver form, Justice Massaro declared, "[t]he Court executes it and so orders it." W. 5. However, just moments later, Justice Massaro told Mr. Villa that he could reconsider. W. 6. "[S]hould you have any reflections in it and wish to proceed otherwise, you may share that with counsel. So you have a full opportunity to consider this as far as you wish to consider it." W. 6.

The next day, Justice Massaro reminded Mr. Villa that he had given him the opportunity to reconsider his jury waiver decision by allowing him "to reflect overnight." T. 69. Justice Massaro then asked Mr. Villa whether anyone had "twisted [his] arm, put [his] back to the wall" or tried to force or coerce him into having a bench trial rather than a jury trial to which Mr. Villa answered, "No." T. 69.

The judge made a final inquiry, asking, "[a]nd the last thing, giving you that time to reflect, is there anyone you wish further to discuss with, talk to to get advice from before going forward as we've planned to do?" T. 69. At this point, Mr. Villa answered directly, "*Talk*

*to my family.*" T. 69 (emphasis added). Without acknowledging this request, the judge stated, "[e]verything stays in place," and then reiterated that the plan was to go forward with the bench trial "as [Mr. Villa] already wish[ed] to do and informed the Court," to which Mr. Villa answered yes both times. T. 69.

## II.   The *Wade* Hearing

Although the suppression hearing began on January 31, 2014, it was interrupted in the middle of testimony and not completed until February 11, 2014, *after* some trial testimony had been taken.[2] T. 71-72, 144. Put another way, at this bench proceeding, the court took trial testimony before deciding a case-dispositive suppression motion.

During the *Wade* hearing, the prosecution presented testimony from one witness, Detective Sean O'Connell, the lead detective on the case, T. 63, who testified as to his investigation and to the identification procedures employed. Det. O'Connell went to Jacobi Hospital on September 24, 2011 and spoke to friends of Sedrick Sambolah, but did

---

[2]      On February 5, 2014, the prosecutor stated on the record: "We did not finish the hearing, and there has been no decision with defense counsel. We are reserving. We haven't done Sandoval, that has been reserved, so we can expedite and get this witness on the case. So we are actually beginning the trial with this witness, and follow up with defense counsel['s cross examination]." T. 71. The court then took trial testimony from one witness, Detective Anthony Ribustello, an officer from the NYPD Crime Scene Unit.

not receive any information about suspects. T. 16-17. However, around 4:30 p.m., Seyquana Rambert, Mr. Sambolah's girlfriend, was interviewed at the precinct.[3] T. 18. Det. O'Connell testified that Ms. Rambert described the man who shot her boyfriend as a white Hispanic man with a stocky build, braids, and possibly a beard and goatee, around 20-30 years old, about 5'9" tall, and about 200 pounds. T. 19, 67, 128, 134-35. Ms. Rambert stated the perpetrator wore a blue sweatshirt. T. 19-20.

Ms. Rambert gave police a detailed accounting of Mr. Sambolah's "problem" with a neighborhood man in a nightclub that morning and of his warning to her that trouble was still brewing. T. 65-66. According to Det. O'Connell, Ms. Rambert said that Mr. Sambolah came to her early in the morning on September 24th and told her that he had a problem at the club with "O.G.," from the neighborhood, and that he anticipated more trouble because O.G. was hanging around outside. T. 65-66. Ms. Rambert also told police that when she went outside, she saw O.G. walk by Mr. Sambolah getting close enough to him that she thought they

---

[3]    Although Seyquana Rambert was identified as "female witness" during the pre-trial suppression hearing, for the sake of clarity, her name will be used when referring to Det. O'Connell's suppression hearing testimony. *See* T. 4.

might have a "fist fight" and giving him a hard look "like they had a problem," right before she saw a white Hispanic man with braids wearing a blue sweater approach Mr. Sambolah, pull a gun out of his waistband, and shoot Mr. Sambolah several times. T. 66-67, 124.

Later that day—at around 9 p.m.—police from the 49th Precinct arrested a man named Carl, who told police that he heard that a guy named "Pure" shot Mr. Sambolah. T. 132.[4]

On October 3, 2011, sometime after 4 p.m., another detective received an anonymous tip that Pure was known to frequent the area of Grand and Burnside Avenues. T. 22. That evening, Det. O'Connell drove to the area and "spotted the individual" who "fit the description" of "[m]ale Hispanic, braids, heavy – kind of chubby, stocky." T. 23. Det. O'Connell testified that this individual, Guillermo Villa, gave his identification, and Det. O'Connell wrote down Mr. Villa's name, date of birth, and address. T. 23-24. Det. O'Connell testified that he had no notes and no memory of asking Mr. Villa whether his nickname was

---

[4]     Det. O'Connell testified that "more than one witness" said the perpetrator was nicknamed Pure but did not give any further details about who the other witness or witnesses were. T. 21

Pure. T. 137-38. After patting him down to search for a weapon, Det. O'Connell found nothing and let Mr. Villa go. T. 23, 25.

Back at the 49th Precinct, Det. O'Connell created a photo array with a prior arrest photo of Mr. Villa and five other arrestees who he believed looked "similar to the defendant." T. 26-28. On cross examination, Det. O'Connell agreed that Mr. Villa is not white *and also* affirmed that he created the photo array with the information from the witness that the perpetrator was a white Hispanic man. T. 134-35.

On October 4, 2011, at approximately 5 p.m., Ms. Rambert identified Mr. Villa in the photo array as the person who shot Mr. Sambolah. T. 32, 34-35, 37. Det. O'Connell called Ms. Rambert back into the precinct, shortly after he arrested Mr. Villa on October 5, 2011, to view a lineup. T. 39-40. In the lineup, Mr. Villa and four fillers—all seated so that height could not be determined—were given black hats to put on their heads and black plastic sheets to hold under their chins. T. 44-46. Det. O'Connell testified that Ms. Rambert observed the lineup for "[l]ess than five seconds" and identified Mr. Villa as the shooter. T. 55.

The defense argued that the photo array and lineup were suggestive. T. 141-42. Although Ms. Rambert told the detective that the

perpetrator was a 5'9" tall white Hispanic man, all of the men in the photo array were black. T. 141. Defense counsel argued that the photo of Mr. Villa, a brown-skinned Hispanic man, stood out. T. 141; *see also* Pros. Hearing Ex. 1 (Photo Array).[5] Defense counsel also pointed out that his client was placed in the lineup with men of varying ages, heights, and with varying skin tones. T. 141-42.

The prosecution, in turn, argued that the identification procedures were conducted without impermissible suggestiveness and that the witness identified Mr. Villa in the photo array and lineup. T. 142-44.

Immediately after the arguments, Justice Massaro denied the motion to suppress, and failed to put forth on the record any findings of fact, conclusions of law, or reasons for the determination:

|  |  |
|---|---|
| [Court]: | All right. Court will reflect. |
|  | (Pause.) |
| [Court]: | Upon due reflection, having reviewed the Court's trial notes bifurcated as appropriate herein and having considered the testimony and the exhibits, likewise in Evidence, the Court denies, the suppression is |

---

[5]    Pros. Hearing Ex. 1, which depicts (in spot 3) Mr. Villa's skin tone as lighter than that of the other five men in the array, is being provided to the Court for review.

denied. We now move forward in trial posture.

T. 144.

## III. *Sandoval* and the Decision to Testify

On February 11, 2014, in the middle of trial testimony, the court conducted a *Sandoval* hearing. T. 187.[6] After the court first confirmed that defense counsel was ready to proceed, the prosecutor made his *Sandoval* application. T. 187. The prosecutor told Justice Massaro, who was acting not only as arbiter of the law but also as factfinder during this bench trial, about Mr. Villa's alleged prior bad acts, a 1998 arrest, and a subsequent adjudication as a juvenile delinquent for grand larceny in the fourth degree. T. 187. Defense counsel did not object or interrupt the prosecutor during this recitation and announced, only after the prosecution had begun his application, that he had decided to withdraw the *Sandoval* motion. T. 187-89.

---

[6]   Earlier that day, the prosecutor noted for the record that defense counsel had agreed to reserve a *Sandoval* decision "for a time after we present the witness this morning." T. 144. The *Sandoval* hearing actually occurred after opening statements and three trial witnesses, including the trial witness who testified in the middle of the *Wade* hearing, had testified. *See* T. 72-113 (testimony of Det. Ribustello), T. 145-51 (opening statements), T. 151-60 (testimony of Edwin Sambolah), T. 161-86 (testimony of Officer Solomon).

13

Furthermore, defense counsel said that he had come to the decision at that moment that his client would not testify. T. 187-89. The following exchange took place.

| | |
|---|---|
| [Defense Counsel]: | *He's not going [to] testify. I'm not going [to] put him on.* |
| [Court]: | You already made that decision. |
| [Defense Counsel]: | *I made that decision.* |
| [Court]: | Well, this is in the event. |
| [Defense Counsel]: | *I made that decision in [] as much as the trier of the facts, I don't want my well to [be] poisoned. He's not going to testify.* It has no bearing on the case[.] |
| [Court]: | That's your application? |
| [Prosecutor]: | Well – |
| [Court]: | It is subject to renewal. |
| [Prosecutor]: | Okay, Judge, I guess. The Sandoval motion was made by defendant, so in essence he's withdrawing the motion. |
| [Defense Counsel]: | *Judge, at this point[] I made the decision. I am not going to put him on.* If it changes, I will give him ample time. |
| [Court]: | It is [] fine with the court should he wish to change his mind. We can revisit the issue. |

14

| | |
|---|---|
| [Defense Counsel]: | I will request you to ignore everything that was just said. |
| [Court]: | All right. Mr. Rosenfeld. |
| [Prosecutor]: | Your Honor, the Court has to make it's [sic] decision based upon defense counsel. I was just responding. The Court will make a decision. |
| [Court]: | He's now withdrawing, is that correct? |
| [Defense Counsel]: | Yes, your Honor. |
| [Court]: | And subject to renewal. |
| [Defense Counsel]: | Without prejudice. |
| [Court]: | Should Mr. Villa wish to change his mind. Okay. |

T. 187-89 (emphasis added). At no point did the court address Mr. Villa.

## IV.  The Shooting at 1240 Burke Avenue

On September 24, 2011 at about 2:25 p.m., Police Officer Karen Solomon received a radio call of "shots fired" quickly followed by a call of "male shot." T. 165-66. Two minutes later, Officer Solomon and her partner were the first to arrive at 1240 Burke Avenue in the Bronx. T. 165-166, 182, 184.

15

Officer Solomon discovered Sedrick Sambolah face down on the ground in the area near the fence. T. 170. He had been shot several times at close range.[7] T. 392. Mr. Sambolah was wearing a shirt and jeans with one shoe on and one shoe off. T. 173, 176, 183-84. It was a chaotic scene, with about 25 to 30 people, many crying and screaming, around Mr. Sambolah's unresponsive body. T. 167, 172-73.

Unable to find a pulse, Officer Solomon immediately called for an ambulance, asking the dispatcher to put "a rush on the bus." T. 173. However, it took the ambulance "a little while" to arrive. T. 174. More precisely, on cross examination, Officer Solomon testified that it took "maybe a half hour to 45 minutes, I'm not sure," and then again, "[t]he time we got there until the ambulance came it was about 45 minutes." T. 182-83. When the ambulance did finally arrive, EMS workers placed Mr. Sambolah on a stretcher, tried to revive him, and took him to the hospital. T. 174. Officer Solomon's partner rode in the ambulance while Officer Solomon continued to safeguard evidence at the scene. T. 176.

Officer Solomon testified that she did not recall any eyewitnesses approaching her, during the approximately 45 minutes that she spent

---

[7]    The medical examiner testified that depending on the way Mr. Sambolah's body was positioned during the shooting, he was shot two to four times. T. 392.

on the scene with Mr. Sambolah, to tell her what happened. T. 182. From her recollection, no woman identified herself as Mr. Sambolah's girlfriend or wife. T. 185.

Mr. Sambolah was pronounced dead at 3:03 p.m. T. 376. The medical examiner described the four gunshot wounds suffered by Mr. Sambolah, including a fatal gunshot wound to the right side of the chest, which perforated both lungs, the heart, the stomach, and the spleen, T. 379-80, 382, a gunshot wound to the right arm, T. 382, a gunshot wound near the genitalia that exited through the left thigh, T. 386, and a gunshot wound through the right hand, T. 388. The medical examiner collected one bullet that had been lodged in the left side of Mr. Sambolah's chest. T. 384. The medical examiner also testified that Mr. Sambolah suffered injuries and abrasions to the front of his face that were consistent with falling and striking his face on the sidewalk. T. 380-81.

Police collected physical items of evidence from the crime scene, including Mr. Sambolah's blood-stained sweatshirt, one sneaker, headphones found by a fire hydrant, and three shell casings. T. 80, 89. Per a stipulation entered at trial, an NYPD firearms analyst would

have testified that the three shell casings had been fired from the same firearm and that the deformed bullet found in Mr. Sambolah's body could not be compared to the shell casings. T. 397-98.

## V.   The Fight Seen by Sedrick Sambolah's Mother

Edwin Sambolah, Sedrick Sambolah's father, testified that around 2 p.m. on September 24, 2011, he was on the phone with his wife, Sedrick Sambolah's mother, as she made her way to the bus stop. T. 157. He said his wife told him that "they are fighting"—but could not see how many people were involved. T. 157, 159-60. He said he heard her scream, "[O]h, Sedrick's on the floor." T. 157-58. Edwin Sambolah testified that he did not hear any gunshots through the phone and opined that his son had been shot before she called. T. 160. He said she couldn't see "[Mr. Villa] or anybody else." T. 160.

## VI.   The Single Eyewitness Account of Seyquana Rambert

Seyquana Rambert, Mr. Sambolah's girlfriend and the prosecution's only purported eyewitness, gave inconsistent testimony at trial that often contradicted her prior statements to police and to the grand jury. When confronted with these inconsistencies, Ms. Rambert

quibbled with the accuracy of the prior police reports and grand jury minutes calling them mistaken and wrong. *See, e.g.*, T. 272-74, 369-70.

Ms. Rambert said that her boyfriend Sedrick Sambolah arrived at her house on September 24, 2011 at 4 or 5 a.m. but that she did not speak with him until she woke up around 10 or 11 a.m. T. 197. She said that he stayed in her house and talked to her for about an hour and 30 or 45 minutes—from about 11 a.m.–12:30 p.m. T. 198, 266. He told her that he was involved in a fight with a man around 5 a.m. and that the same man wanted to fight with him again. T. 198, 270, 282. On cross examination, Ms. Rambert agreed that she previously told police that the man involved in the earlier bar fight with Mr. Sambolah was O.G. T. 270. Mr. Sambolah kept getting phone calls to go outside, and when Ms. Rambert asked him to stay in the house, he refused. T. 198, 282.

Ms. Rambert said that after Mr. Sambolah left the house, she called her best friend and told her that she would stop by after she went to the store. T. 198. Ms. Rambert then showered and left the house. T. 199. Ms. Rambert estimated that she was in the house for about an hour and 20 or 30 minutes after Mr. Sambolah left. T. 266. She also guessed that it took her three minutes to get to the store and that she

19

spent five to 10 minutes in the store before walking back toward her building. T. 202.

On her way to the store, Ms. Rambert saw Mr. Sambolah by a fire hydrant and his friends, Clifford, Ron, 50, and Nee-Q nearby. T. 200, 285. She also saw O.G., the man with whom Mr. Sambolah had earlier argued, with the group. T. 270, 285. Ms. Rambert claimed that O.G. walked past Mr. Sambolah and "gave him a look," and then left the area and did not return. T. 228-29. Ms. Rambert exchanged some words and a smile with her boyfriend on her way to the store. T. 200.

On her way back from the store, Ms. Rambert, who could see her boyfriend by the same hydrant and his friends, suddenly noticed a man in a blue shirt walking toward her. T. 206, 228. She testified that she stared at this man, who was a total stranger to her, because "[b]lue is [her] favorite color." T. 206-07, 341. Ms. Rambert explained that, due to her affinity for blue, she stared at the stranger's face as he got closer and noticed that "he had something on his mind." T. 207.

Ms. Rambert passed the man as she approached the entrance of her building and saw him take out a gun. T. 207-08, 309. She picked up her pace and heard a gunshot about seven seconds later. T. 309. At this

point, near the recycling bins by the building, she dropped her grocery bag, crouched down, and put her arms up over her head. T. 241-44. She heard a second shot five to eight seconds after the first. T. 244, 317. And she heard a third shot about three to seven seconds later. T. 244, 318. Although Ms. Rambert purportedly saw the stranger pull out the gun and point it at her boyfriend, she did not see the first or the second shots. T. 318-19. She testified, however, that at the time of the third shot, she was sitting up and she saw the perpetrator stand over Mr. Sambolah and "pop (indicating) him one more time" before the perpetrator turned around and fled. T. 245, 319. Ms. Rambert testified that she heard three shots in total. T. 244.

While still able to see the shooter walking down the block, Ms. Rambert claimed that she ran over to Mr. Sambolah. T. 210, 328-29. In between her own screaming and crying, she called 911 on her cell phone. 210, 245, 249, 328. Ms. Rambert tried to talk to the 911 operator but placed her phone on the ground and continued to scream and attempt to talk to Mr. Sambolah, who was unresponsive, at the same time. T. 211. Although Mr. Sambolah's friends had mostly scattered,

Ms. Rambert said that Ron—crying and yelling—came back over and jumped on top of Mr. Sambolah's body. T. 209, 332.

Ms. Rambert said that after Mr. Sambolah was shot, she hovered over him and saw that his eyes were still open. T. 211. She said she "dropped down in front of him and put both hands on his chest," she grabbed his head—placing her left hand under his head—so that she could whisper in his ear. T. 211, 330.

At trial, the prosecution played a nearly eight minute long 911 recording while Ms. Rambert testified about what was happening on the call. T. 251, 257; Pros. Ex. 21 (911 Call #3744).[8] Ms. Rambert identified her own voice and Ron's voice on the call. T. 252-53. According to Ms. Rambert, at some point in the first two and one-half minutes of the call, she was dragged away from Mr. Sambolah's body by friends when the ambulance pulled up in front of the building. T. 253-54. She then stood

---

[8]    A copy of Pros. Ex. 21 (911 Call #3744), as part of the record before the lower court, is being provided to this Court.

by while EMS responders began "doing their job." T. 254.[9] Ms. Rambert

testified that during this 911 call, she observed an EMS technician

cutting off Mr. Sambolah's shirt, while she yelled for people to get off of

her because she could not see well through the crowd. T. 212, 254; Pros.

Ex. 21 (911 Call #3744) at 2:22–4:02. At the end of the call, Ms.

Rambert is heard saying, "Some guy just walked up to him in a blue

shirt and one of his friends…" and the recording abruptly cut off.[10] Pros.

Ex. 21 at 7:41-7:43. Ms. Rambert recalled that this was her statement

to the police at the crime scene about the identity of the perpetrator. T.

212-13, 257, 352-53; Pros. Ex. 21 at 7:41–7:43.

Although two officers approached Ms. Rambert and asked her

what she saw, Ms. Rambert testified that she did not tell them that she

saw the entire incident, nor did she give a detailed description of the

---

[9]    Notably, Ms. Rambert's 911 call, which is being provided to this Court, does
not indicate that EMS responders or an ambulance arrived during the call.
Although the prosecution argued in summation that the call corroborated Ms.
Rambert's testimony because "you hear the operator say E.M.S. is already there" on
"minute six or seven" of the call, T. 473, the call itself undermined this argument.
The 911 dispatchers can be heard saying, "I hear sirens," and then "I hear somebody
talking to her. I don't know if it's the EMS or [inaudible]," to which a dispatcher
asked, "EMS is there?" and another dispatcher responded, "No because I don't see
[63 (difficult to understand)] here." Pros. Ex. 21 (911 Call #3744) at 6:05-6:30. The
evidence is just as likely that police officers, not EMS responders, were present
during that time.

[10]    On cross examination, Ms. Rambert said that the call ended because "[t]he
phone hung up." T. 352.

23

perpetrator, including his height, his hair, or his race. T. 212-13, 335-37. She could not recall telling police which direction the shooter ran or that he was Hispanic. T. 335-36. She could not recall whether the shooter was wearing anything on his head. T. 336. She said that she "just kept yelling he has on a blue shirt, blue shirt." T. 212. Further, Ms. Rambert testified that she had no memory of seeing a police officer take Mr. Sambolah's vital signs or call for an ambulance and request that the dispatcher "rush the bus." T. 333-34. She similarly could not remember whether the police or the ambulance arrived first. T. 331.

Ms. Rambert, however, gave a detailed description of the shooter at trial and emphasized that she had never seen him before the shooting. T. 213-14, 341-42. She said he was a black Hispanic, possibly Dominican, man with cornrows in his hair, around 5'10"–5'11" tall and 200 pounds, and in his late twenties or early thirties. T. 213-14, 265.

Ms. Rambert also testified about the pre-trial identification procedures. She confirmed that she met with the prosecutor on September 24, October 4, and October 5, 2011, and that she testified in the grand jury on October 6, 2011. T. 257-58, 262. She identified Mr.

24

Villa from some photos on October 4, 2011.[11] T. 350-51. Further, she explained that she had "no doubt at all" when she chose Mr. Villa during the lineup on October 5, 2011, after Det. O'Connell told her to do her best and "pick out the guy that did it." T. 259-60. Ms. Rambert then tried to clarify, stating, "I can't specifically say what he said. This is what I was told." T. 259.

1. Ms. Rambert Provides Testimony Inconsistent with Her Prior Accounts, and Contradictory to Other Evidence.

Ms. Rambert testified that her grand jury testimony, on October 6, 2011, was not as "fresh" as her trial testimony, on February 18 and 19, 2014—nearly 2 1/2 years later—because of her emotions, "the confusion and everything else" at the time of the incident. T. 272. She testified that her memory had improved over time. T. 280-81. When questioned about the statements in Det. O'Connell's police report that contradicted her trial testimony, Ms. Rambert claimed that her words were reported

---

[11]   Ms. Rambert's testimony about looking at photos of suspects was confusing and inconsistent. On cross examination, she first testified that she only looked at photos on a computer with Det. O'Connell and did not look at photos in any books or on paper. T. 340. However, shortly thereafter and still on cross examination, Ms. Rambert testified that she possibly looked at "three or four, five pages" of about six people per page. T. 344. She then identified Mr. Villa as the perpetrator and explained that "[f]rom the pages I seen him on I only seen him on that *paper*." T. 344 (emphasis added). On redirect examination, she seemingly confirmed that she identified Mr. Villa from a paper photo array by identifying Pros. Ex. 41 (Photo Array) as "[o]ne of the *papers* with the people on them." T. 350. (emphasis added).

in the wrong order in the report and there were parts of the report that were entirely incorrect. T. 368-71. She agreed, however, that when she was asked at the time of the report "if this is what [she] said, [she] said yes." T. 370. Ms. Rambert's contradictions, of both her prior testimony, and the other trial evidence, ran the gamut between the most minor details to the most important issues in the case.

### a. Description of the Perpetrator

Ms. Rambert denied that she told Det. O'Connell that the shooter was a white Hispanic man. T. 264-65. Ms. Rambert described the perpetrator at trial as a black, possibly Dominican, Hispanic man. T. 213-14. When confronted with the disparity, Ms. Rambert called the details in the report "incorrect information." T. 268.

In addition, when pressed for a more detailed description of the perpetrator's blue shirt, Ms. Rambert said that she did not know whether it was button down, long-sleeved, or short-sleeved, or even whether it was a shirt, a sweater, or a jacket. T. 294, 360-61. She also could not describe the shade of blue or whether it was light or dark. T. 300-01. She affirmed on cross examination that any information in the police report that she said the shooter was wearing a jacket was wrong.

T. 294-95, 360-61. In attempting to explain her inconsistent testimony, Ms. Rambert said that when she testified in the grand jury and at trial, she "decided to say a shirt for him to be a human" even though she was not sure that the garment was a shirt. T. 372-73.

### b. *Timing of the Ambulance*

Ms. Rambert testified that the ambulance arrived just minutes after she placed a call to 911—shortly after watching the shooter walk away and then running over to Mr. Sambolah's body. T. 210-11, 253-54. In complete contrast, Officer Solomon testified that the ambulance arrived 30 to 45 minutes after she and her partner arrived at the scene. T. 182-83.

### c. *Position of Mr. Sambolah's Body*

Ms. Rambert testifed that she rushed over to Mr. Sambolah immediately after he had been shot and dropped down in front of him— staring into his still open eyes and placing her hands on his chest. T. 211, 330. Ms. Rambert's testimony about the way Mr. Sambolah fell directly contradicts all of the other trial evidence on this point. Officer Solomon testified that she found Mr. Sambolah face down on the ground. T. 170. The medical examiner confirmed this when she testified

27

that Mr. Sambolah had suffered multiple abrasions on his face consistent with falling directly onto it. T. 380-81.

### d. O.G.'s Involvement

At trial, Ms. Rambert testified that O.G. left the area where Mr. Sambolah and his friends were standing before the shooter arrived. T. 315. After attempting to refresh her recollection with Det. O'Connell's police report, Ms. Rambert testified that the account in the report was a mistake. T. 316.

| [Defense Counsel]: | Did you tell the detective that just before you heard the shots, O.G. was on the phone and walked right pass [sic] your boyfriend and give him a [] nasty look? |
|---|---|
| [Rambert]: | Are you sure about that? |
| [Defense Counsel]: | Let me give you this and see if it refreshes your recollection. |
| [Rambert]: | I read it. |
| [Defense Counsel]: | Does it refresh your recollection? |
| [Rambert]: | No. |
| [Defense Counsel]: | So, that is a mistake again? |
| [Rambert]: | Yes, it is. |

***

28

| [Defense Counsel]: | You told him O.G. was there when the shots rang[] out. |
|---|---|
| [Rambert]: | You asked me if I told [O]fficer O'Connell a story, yes. That's the story on the paper that he wrote. That is a summary of what I told him. There are bits and pieces as a paragraph, that's not what I told him. |

T. 316-17.

### e. Number of Shots Fired

On October 6, 2011, less than two weeks after the shooting, Ms. Rambert testified to the grand jury that she had heard four gunshots. T. 323. At trial, Ms. Rambert testified in detail about the three shots that were fired. T. 244; *see supra*. When pressed on which version was the truth, Ms. Rambert said, "The three shots are correct. The four shots are wrong, yes. The four shots are wrong. The three are correct." T. 323.

### f. Other Details

Ms. Rambert also contradicted herself on even the smallest details when confronted with prior statements. For example:

- She claimed the police report was incorrect where it stated that she told Det. O'Connell that Mr. Sambolah arrived at her house at 11 a.m. (not 4 or 5 a.m., as she testified at trial) on September 24, 2011. T. 269-70.

- On cross examination, Ms. Rambert denied knowing what time Mr. Sambolah arrived "because [she] was [a]sleep" but reiterated that she saw him at 10 or 11 a.m. T. 265.

- She claimed the police report was incorrect where it stated that Mr. Sambolah called her from outside the apartment approximately 10 minutes before he was shot. T. 270.

- She asserted that the Grand Jury minutes were "worded wrong" where they stated that Ms. Rambert invited her best friend over to her house rather than inviting herself over to her best friend's house. T. 273, 275. "[T]hat was a mistake on that paper." T. 273.

- Although Ms. Rambert testified on direct that she spent about five to 10 minutes in the store, on cross examination, when asked the same question, she answered, "[h]onestly I couldn't tell you." T. 202, 293.

- Prior to Ms. Rambert's testimony, the prosecutor stated for the record that Ms. Rambert indicated that the word "fight" on one page in the grand jury testimony was incorrect. T. 191-92.

- Ms. Rambert was inconsistent in her accounts of who was at the scene. Despite initially testifying that Nee-Q was *not* with Mr. Sambolah when she returned from the store, T. 204, Ms. Rambert then said that as she was walking back and saw the shooter approach, she passed "Ron, 50, Nee-Q and [Mr. Sambolah]." T. 207; *see also* T. 209, 228, 229-30, 246 (indicating Nee-Q was still at the scene when Ms. Rambert was walking back from the store).

- After using Det. O'Connell's police report to refresh her recollection at trial, Ms. Rambert said she did not remember telling police that the shooter used a semi-automatic .40 caliber handgun. T. 301-02.

30

VII.   <u>The Defense's Arguments on Legal Insufficiency and Summation</u>

At the conclusion of the prosecution's case, defense counsel moved for a directed verdict on the ground that Ms. Rambert's testimony was incredible as a matter of law. T. 399, 408. Defense counsel argued that Ms. Rambert's testimony did not make sense in light of Officer Solomon's account and that only one version could be true. T. 399-400. He recounted that Officer Solomon had found Mr. Sambolah face down, took his pulse and tried to revive him. T. 399-400. Whereas, Ms. Rambert indicated that she found her boyfriend face up. T. 404. The officer testified that she "put a rush on the bus," the ambulance, because it had not come yet and ultimately took between 30 to 45 minutes to arrive. T. 400. Whereas, Ms. Rambert testifed that the ambulance arrived shortly after the incident, and she did not know whether the police or the ambulance arrived first. T. 400. Defense counsel also emphasized that Ms. Rambert's description of the perpetrator changed drastically between her statement to police and her testimony at trial. T. 405. He pointed out other inconsistencies between Ms. Rambert's trial testimony and her earlier statements and grand jury testimony. T. 401-03. He reminded the court that Ms.

31

Rambert blamed the inconsistencies on the accuracy of the reporter. T. 403. He pointed out the implausible idea that Ms. Rambert and the police officer could have been at the scene together for 45 minutes waiting for an ambulance without Ms. Rambert approaching the police to tell them what she saw. T. 404. The court denied defense counsel's motion. T. 408-09.

After the defense rested, having presented no evidence, defense counsel again requested a directed verdict of acquittal stating that the prosecution failed to prove all of the elements of the crime. T. 416. Although the court allowed defense counsel to incorporate Mr. Villa's height—defense counsel asked Mr. Villa to stand to show the court that he was about 5'5.5" tall[12]—the court still denied the motion stating that factual questions would be determined by the factfinder. T. 415, 417.

On summation, defense counsel argued that in this single eyewitness case, Ms. Rambert's inconsistent testimony that directly contradicted Officer Solomon's testimony was not proof beyond a reasonable doubt. T. 430-31, 452-53. Defense counsel theorized that the contradictory testimony at the crime scene could be explained in a

---

[12]    Ms. Rambert testified that the shooter was around 5'10" tall. T. 213.

scenario where Ms. Rambert did not actually witness the shooting but arrived after Mr. Sambolah had been shot. T. 429, 438-39.

Defense counsel again compared the ambulance-timing testimony of Officer Solomon, a disinterested, reliable witness, with the testimony of Ms. Rambert, who, he argued, wanted to be "the hero." T. 428, 430-31, 450. He asserted that Ms. Rambert changed her story several times, did not identify herself as an eyewitness at the crime scene, gave an ill-fitting description of the perpetrator to law enforcement, and was unable to provide any details on the blue top that the perpetrator wore. T. 430-35.

Defense counsel pointed out that there was no other evidence tying Mr. Villa to the scene—no DNA, no fingerprints, and no video. T. 429.

Defense counsel also addressed the prosecution's lack of motive evidence. Although Ms. Rambert testified about O.G.'s earlier fight with Mr. Sambolah and O.G's presence at the scene, there was no evidence of why Mr. Villa would have been involved in the shooting. T. 436-37, 450-51.

VIII.    <u>The Prosecutor's Misstatement of Key Evidence in Summation</u>

During summation, the prosecutor misstated key evidence relating to when the ambulance arrived at the scene and asserted that motive had been proven where the prosecution presented no evidence on motive that was at all connected to Mr. Villa.

The prosecutor insisted that Officer Solomon testified that the ambulance arrived in four to five minutes. T. 473, 475. In fact, Officer Solomon testified that it took "maybe a half hour to 45 minutes, I'm not sure," and then again, "[t]he time we got there until the ambulance came it was about 45 minutes." T. 182-83.

The prosecutor, incredibly, contended that there was a mistake in the minutes:

> [Prosecutor]:    And it says in the testimony, in the transcript, I don't know it took about forty-five minutes to get there. I think it was a mistake. I didn't catch it, but when you say 45 and say four or five minutes – I agree every time it says 45 minutes. I submit your Honor that is a mistake. It's four to five minutes. I will tell you why, on that tape as we are listening, you hear the operator say E.M.S. is already there. I think it was on minute six or seven.
>
> . . .

34

| [Prosecutor]: | It makes no sense for 45 minutes to have passed for an ambulance to arrive. |
|---|---|
| | . . . |
| [Prosecutor]: | And the tape starts with the first call, and people get there. So we are not talking a while. Mr. Aranda and I agree it says 45 on Officer Solomon's testimony. Common sense says we picked it up, but it should have been four to five minutes. That is simply a mistake. . . |

T. 473-75. Defense counsel objected to this misstatement and tried to correct the record stating, "Judge, I am sorry. This is not the time. She has said clearly 30 minutes to 45. She says a half-hour." T. 473, 475. Rather than ruling on defense counsel's objection, the court told him that he already "had [his] opportunity." T. 475.

In an attempt to respond to the defense attorney's argument on summation that evidence of motive had not been presented, the prosecutor stated simply, "The People have proved motive in this case. And it's clear from this incident that the defendant, as he drew the weapon clearly wanted to shoot and kill Sedrick Sambolah and that was his intent." T. 479. Indeed, no evidence of motive relating to Mr. Villa

35

had been presented at trial. The prosecution arguably presented motive testimony as to O.G., a neighborhood man who had gotten into an early morning fight with Mr. Sambolah at a nightclub. T. 198, 270-71, 282. In stark contrast, the prosecution theorized that Mr. Villa was a complete stranger—wearing a blue shirt—who inexplicably shot Mr. Sambolah at point blank range in public in the middle of the afternoon. *See* T. 206-07, 341-42.

IX.    The Verdict and Sentence

On February 24, 2014, the court found Mr. Villa guilty of murder in the second degree and criminal possession of a weapon in the second degree. T2. 2. The court also adjudicated Mr. Villa a second violent felony offender.[13] T2. 3-4.

On April 23, 2014, prior to sentencing, Mr. Sambolah's brother and father made statements. S. 11-13. The prosecution requested that the court sentence Mr. Villa to the maximum on both convictions. S. 14-15, 19.

---

[13]    Mr. Villa was convicted of assault in the second degree in Bronx County on February 24, 2005 and was sentenced to three years of incarceration and three years of post-release supervision on March 14, 2005. T2. 3.

Defense counsel expressed his own concerns over whether the right person was convicted for this crime.[14] S. 16. He emphasized that Mr. Villa "vehemently denie[d] being involved in this homicide in any way" and that he had asserted his innocence from day one and would not consider accepting any potential plea offers. S. 17. In addition, defense counsel said that Mr. Villa and his family felt great sympathy for the Sambolah family for their loss. S. 16. Defense counsel explained that Mr. Villa had a young daughter, who he wanted to help raise, and he requested that the court sentence Mr. Villa to the minimum. S. 18.

In a statement to the court, Mr. Villa unequivocally declared his innocence. S. 18. In addition to stating, "I'm innocent," he said, "This is not me. I know I might fit the description or whatever, but this is not

---

[14]   At the sentencing proceeding on April 23, 2014, defense counsel requested an adjournment to investigate and file a N.Y. C.P.L. § 330.30 motion requesting to set aside the verdict. S. 2, 5. The prosecution opposed the adjournment, and the court denied the request, suggesting that Mr. Villa bring a post-conviction motion. S. 5, 9-10.

Defense counsel explained that he had located a witness, Raheim Wright, who had given him an affidavit stating that he witnessed the shooting, observed that the shooter was a black man wearing a black hoodie, and that the shooter was not Mr. Villa. S. 2-3. Defense counsel asked for more time to look for two other witnesses at the scene. S. 3. Defense counsel again argued that, where Ms. Rambert's testimony contradicted Officer Solomon's testimony regarding when the ambulance arrived—opening up the possibility that Ms. Rambert did not actually witness the shooting itself—the court should adjourn for sentencing to allow defense more time to investigate the new information and to file a motion. S. 3-5.

me. I did not commit this crime, and I ask for you to declare a righteous sentence. That's all." S. 18-19. Mr. Villa conveyed his "deepest condolences" to the Sambolah family. S. 18.

The court sentenced Mr. Villa to an indeterminate term of 25 years to life for the count of murder in the second degree and a determinate term of 15 years of incarceration and five years of post-release supervision for the count of criminal possession of a weapon in the second degree, sentences to run concurrently. S. 20.

## ARGUMENT

### POINT I

**THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT MURDER IN THE SECOND DEGREE AND CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE BECAUSE THE SOLE EYEWITNESS WAS INCREDIBLE AS A MATTER OF LAW; ADDITIONALLY, THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

Guillermo Villa's convictions for murder in the second degree and criminal possession of a weapon in the second degree are both legally insufficient and against the weight of the evidence where the only evidence offered to prove the identity of the perpetrator was the testimony of one alleged eyewitness whose testimony about what happened before and during the crime was filled with "hopeless contradictions." *See People v. Foster*, 64 N.Y.2d 1144, 1147-48 (1985). Significantly, Seyquana Rambert's testimony cannot be reconciled with police officer testimony about what happened at the crime scene, nor testimony from the medical examiner. In addition, Ms. Rambert's repeated blaming of the police and court reporters for inconsistencies in her accounts rendered her testimony incredible as a matter of law. Ms. Rambert offered only fractured and inconsistent stories from the most

39

important details of the case, including a description of the shooter, to less significant details about circumstances leading up to the crime.

Without further evidence of the identity of the perpetrator, the incredible testimony provided by Ms. Rambert was legally insufficient. This issue was preserved by defense counsel, who moved—after the prosecution rested and again at the end of the case—for a directed verdict on the precise ground that Ms. Rambert's testimony was incredible as a matter of law. T. 399-408; 416-17.

A.   <u>The Sole Eyewitness Testimony Was Incredible as a Matter of Law, and Therefore, the Prosecution Did Not Prove That Mr. Villa Was the Shooter Beyond a Reasonable Doubt.</u>

The prosecution did not put forth sufficient evidence that Mr. Villa was the person who shot and killed Mr. Sambolah in the middle of the day on September 24, 2011. To prove murder in the second degree and criminal possession of a weapon in the second degree, the prosecution must prove the identity of the perpetrator. *See* Penal Law §§ 125.25(1), 265.03(1). The standard review for legal sufficiency of the evidence is the same under the laws and Constitution of New York and under the Fourteenth Amendment to the United States Constitution, that is, whether, when "viewed in the light most favorable to the People," the

40

evidence "could lead a rational trier of fact to find the elements of the crime to have been proven beyond a reasonable doubt." *People v. Wong*, 81 N.Y.2d 600, 608 (1993) (citations omitted); *accord, e.g., Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Forte*, 223 A.D.2d 358, 360 (1st Dep't 1996); *see also* U.S. Const. amend. XIV; N.Y. Const. art. I, § 6.

In New York, it has long been held that a defendant's guilt cannot be established by a single eyewitness's testimony mired in "hopeless contradictions." *People v. Ledwon*, 153 N.Y. 10, 22-23 (1897); *People v. Reed*, 40 N.Y.2d 204, 208, 210 (1976); *Foster*, 64 N.Y.2d at 1147-48; *People v. Calabria*, 3 N.Y.3d 80, 82 (2004); *see also People v. Stewart*, 40 N.Y.2d 692, 699 (1976); *People v. Logue*, 35 N.Y.2d 658, 658 (1974). Where the prosecution must establish the defendant's guilt beyond a reasonable doubt, "a mere *scintilla* or even *some proof* is not sufficient to warrant the submission of the case to the jury." *Ledwon*, 153 N.Y. at 18; *Reed*, 40 N.Y.2d at 208.

In *Foster*, the Court of Appeals found that the only witness who identified the defendant as a perpetrator of a stabbing offered testimony that was "involved in 'hopeless contradictions'" concerning timing, crime location, and what the eyewitness did during and after the incident, and

specifically, concerning the details surrounding the actual stabbing of the victim. 64 N.Y.2d at 1146-48 (dismissing the indictment against defendant Reed where his guilt could not be established beyond a reasonable doubt by a witness, who was "either from moral or mental defects, irresponsible").

> 1.  Seyquana Rambert's testimony was inconsistent, contradictory, and unbelievable.

Similarly, here, Seyquana Rambert's testimony was irreconcilable with Officer Solomon's account and incredible as a matter of law. Ms. Rambert testified that she found Mr. Sambolah's body face up, T. 211, 330; whereas, Officer Solomon testified that Mr. Sambolah's body was face down. T. 170. Further, the medical examiner testified that Mr. Sambolah sustained injuries to his face consistent with falling and striking his face on the sidewalk. T. 380-81.

In addition, Officer Solomon, the first responding officer, testified that it took between 30 to 45 minutes for an ambulance to arrive. T. 182-83. Ms. Rambert, in contrast, testified that the ambulance arrived just minutes into her call with 911, claiming that she made this call after running to her boyfriend while she could "still see the shooter walking [] down the block." T. 210-11; *see* Pros. Ex. 21 (911 Call #3744).

Furthermore, Ms. Rambert's testimony was riddled with "hopeless contradictions" surrounding the identity of the perpetrator. The stark inconsistency of her statements prior to trial and during trial rendered her testimony incredible. For example, Ms. Rambert claimed to be able to identify the shooter. Yet, while at the crime scene, other than shouting that the shooter was wearing a "blue shirt," Ms. Rambert gave no other identifying information to police nor did she tell police that she witnessed the shooting. T. 212-13, 335-36. At trial, Ms. Rambert described the perpetrator as a black, possibly Dominican, Hispanic man. T. 213. She disputed that she ever told Det. O'Connell that the shooter was a white Hispanic man and argued that he had made multiple errors in writing down her account in his report. T. 264-65, 268; *see also* T. 269-70, 294-95, 301-02, 316-17. In addition, Ms. Rambert testified that the shooter was 5'10-11" tall, T. 213, 265, even though Mr. Villa stood several inches shorter than that. T. 415.

Similarly, Ms. Rambert's testimony, if anything, implicated someone else—O.G.—in the shooting. The prosecution proffered no link between Mr. Villa, who Ms. Rambert did not know, and O.G., a person known to the eyewitness and her boyfriend. Ms. Rambert testified at

trial that earlier that same day another man, who she told police was O.G., had gotten into a fight with her boyfriend, wanted to continue that fight, and walked by her boyfriend giving him "a look" before she walked to the store. T. 198, 228-29, 270. She then testified that on her way back from the store, she saw a strange man in a blue shirt, who walked up to Mr. Sambolah and executed him—shooting him three times—before walking away in the direction from which he came. T. 206-10.

> 2. The prosecution falsely claimed to have proven Mr. Villa's motive for the shooting to bolster this single eyewitness identification case.

In a case where the prosecution is relying on the testimony of a single stranger eyewitness identification, the prosecution may not bolster that identification by falsely claiming to have proven motive. *See* U.S. Const. amends. V, XIV; N.Y. Const. art. I § 6; *People v. Calabria*, 94 N.Y.2d 519, 522-23 (2000); *People v. Ashwal*, 39 N.Y.2d 105, 109-10 (1976). At summation, the prosecutor stated: "The People have proved motive in this case. And it's clear from this incident that the defendant, as he drew the weapon clearly wanted to shoot and kill Sedrick Sambolah and that was his intent." T. 479. By claiming that motive had

44

been proven, the prosecutor attempted to imply a motive and connection where there was none between Mr. Villa and the early morning nightclub fight that Mr. Sambolah described. *See* T. 479.

The prosecution presented evidence that Mr. Sambolah and another man had gotten into a fight at a club earlier that morning and that this man wanted to fight with Mr. Sambolah again. T. 198. On cross examination, Ms. Rambert testified that she had reported to police that Mr. Sambolah said O.G. was the man involved in this earlier fight. T. 270-71. The prosecution also presented evidence that Mr. Sambolah's mother witnessed an afternoon fight among an unknown number of people immediately before she saw Mr. Sambolah on the ground. T. 157, 159-60. However, the prosecution provided no evidence linking Mr. Villa to either fight—the early morning nightclub fight or the afternoon street brawl. Instead, the prosecution presented evidence that another man wanted to harm Mr. Sambolah.

Here, the prosecution presented evidence of a motive for a man who was not on trial, no evidence of a motive for Mr. Villa, and no evidence connecting the two. If O.G. had been the shooter, the prosecution would have had evidence of motive, which would have been

45

relative to intent. But that was not this trial. Where there was no evidence that O.G. and Mr. Villa even knew each other, the prosecutor's attempted sleight of hand—imputing O.G.'s motive onto Mr. Villa—was not only prejudicial but did nothing to cure the legal insufficiency of the evidence.

> 3. The prosecution argued against the credibility of a police officer, relying on a fact not in evidence, to bolster this single eyewitness identification case.

In *Reed*, 40 N.Y.2d at 206-08, the Court of Appeals held that where the credibility of the witness was questioned by the prosecution itself, and no other evidence tended to tie the defendant to the crime, the prosecution did not prove guilt beyond a reasonable doubt.[15] Here, Officer Solomon's testimony directly contradicted Ms. Rambert's. In a clear concession of this, the prosecutor here attempted to argue that the very clear timing testimony given by Officer Solomon could not have been correct. *See* 182-83 (Officer Solomon testifying that she waited "maybe a *half hour* to 45 minutes, I'm not sure," … "[t]he time we got there until the ambulance came it was about 45 minutes.") (emphasis

---

[15]    In *Reed*, the only testimony connecting the defendant with a shooting in a bar was provided by "the barmaid on duty," and that testimony both implicated and exculpated the defendant in that it provided a defense of justification. 40 N.Y.2d at 206-07.

added). During his summation, the prosecutor insisted that Officer

Solomon testified that the ambulance arrived in four to five minutes, T.

473, 475, implying either that the court reporter made a mistake in

transcribing the minutes or that Officer Solomon's testimony was not

credible.

> [Prosecutor]:
>
> It makes no sense for 45 minutes to have passed for an ambulance to arrive.
>
> . . .
>
> And the tape starts with the first call, and people get there. So we are not talking a while. Mr. Aranda and I agree it says 45 on Officer Solomon's testimony. Common sense says we picked it up, but it should have been four to five minutes. That is simply a mistake in either –

T. 473, 475. There was nothing in Officer Solomon's testimony that

rendered it unbelievable. In an attempt to save the single eyewitness's

testimony filled with "hopeless contradictions," the prosecutor instead

relied on a fact not only not in evidence, but directly contradictory to

what was actually said, against the credibility of the testimony of the first responding officer.[16]

### 4. The single eyewitness identification of Mr. Villa was patently unreliable.

In *People v. Boone*, the Court of Appeals recently highlighted the "prevalence of eyewitness misidentifications in wrongful convictions and the danger they pose to the truth-seeking function and integrity of our justice system," especially in cases with a single eyewitness. 2017 N.Y. LEXIS 3722, *1, *4-5 (2017) (holding that the defendant is entitled to a charge on cross-racial identification where identification is at issue and where the defendant and the witness appear to be of different races). The Court of Appeals underscored the vast array of studies, psychological research, and DNA-based exonerations that indicate that "[m]istaken eyewitness identifications are the single greatest cause of wrongful convictions in this country, responsible for more wrongful convictions than all other causes combined." *Id.* at *4-5 (citations and quotations omitted).

The single, stranger eyewitness identification in this case is cause for concern. Individuals, such as Ms. Rambert, who have recently

---

[16]    It should be noted that the prosecutor did not seek to recall either the court reporter or Officer Solomon.

experienced highly stressful situations are particularly susceptible to misinformation and will frequently incorporate false or misleading post-event information given to them as part of their "memory" of what occurred. C.A. Morgan III, et al., *Misinformation Can Influence Memory for Recently Experienced, Highly Stressful Events*, 36 Int'l J. L. & Psychiatry 11 (2013) (studying 861 active-duty military personnel who had just undergone the intense stress of "survival school"). Indeed, "human memory for realistic, recently experienced stressful events is subject to substantial error. In addition . . . memories for stressful events are also highly vulnerable to modification by misinformation." *Id.* at 16. Researchers found that "approximately 50% of participants, when given a target-absent eyewitness array and asked to identify their interrogator, gave false positive identifications." *Id.* It is not surprising that Ms. Rambert, who initially identified Mr. Villa in a suggestive photo array identified him again *the very next day* in a lineup where she was told to "pick out the guy that did it." T. 258-60, 350-51. Assuming for the sake of argument that Ms. Rambert did witness the shooting of her boyfriend, she experienced an incredibly stressful and traumatic

incident, and thus, was "highly vulnerable to modification by misinformation." Morgan III, *supra* at 16.

This case can be distinguished from *Calabria*, 3 N.Y.3d at 82-83, where the Court of Appeals held that the evidence was sufficient as a matter of law where the single eyewitness, who viewed the defendant very briefly on two occasions, never wavered in her identification testimony and testified *without contradiction* and where the defendant made an inculpatory statement.  Here, although Ms. Rambert identified Mr. Villa in a photo array, in a lineup on the following day, and in court, her testimony was not consistent with her prior statements on major and minor issues. Furthermore, her trial testimony contradicted police testimony and tended to show that Ms. Rambert was not at the scene of the crime when the shooting occurred. The prosecution offered no other evidence connecting Mr. Villa to the crime.

 "A defendant's guilt cannot be established beyond a reasonable doubt by the testimony of a witness, who is, evidently, either from moral or mental defects, irresponsible." *Foster*, 64 N.Y.2d at 1147-48 (citations omitted). Here, where the single eyewitness' testimony was riddled with inconsistencies and contradictions with her prior accounts,

and the other evidence in the case, and where her explanation for these discrepancies relied on unbelievable claims that her grand jury testimony days after the crime was not as "fresh" as her trial testimony nearly 2 1/2 years later and that she had been repeatedly quoted inaccurately in her prior statements, her testimony was unreliable and incredible as a matter of law. The prosecution did not prove that Mr. Villa was the shooter beyond a reasonable doubt, and this Court should reverse Mr. Villa's convictions as legally insufficient and dismiss the indictment.

> B.   Even If This Court Finds That the Evidence Was Legally Sufficient to Support the Conviction, the Verdict Was Against the Weight of the Evidence Where the Sole Eyewitness's Testimony Completely Contradicted the Testimony of Law Enforcement at the Scene of the Crime.

Even if this Court finds that the evidence was legally sufficient to support the convictions, as the Court of Appeals has noted, "[t]here is nothing the least bit novel about Appellate Division weight of the evidence reversals." *People v. Cahill*, 2 N.Y.3d 14, 59 (2003). Indeed, the Appellate Division's weight of the evidence examination is an "important judicial bulwark against an improper criminal conviction." *People v. Delamota*, 18 N.Y.3d 107, 116 (2011). In reviewing a weight of

the evidence claim, this Court in effect becomes a second factfinder and must independently review the record. *Id.* at 116-17. First, the Court must determine whether a different finding would not have been unreasonable based on "all the credible evidence." *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987). Where, as here, a different finding would have been reasonable, this Court must then "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *Id.* (citations omitted). If the fact finder did not properly weigh the evidence, this Court may set aside the verdict. *Id.*; *see also* N.Y. C.P.L. § 470.15(5).

Here, as discussed in detail *supra*, the court overlooked serious credibility issues and irreconcilable contradictions in the single eyewitness's testimony and did not properly consider that Officer Solomon's testimony, if true, rendered Ms. Rambert's testimony incredible. The incongruous testimony evokes at least a reasonable doubt that Mr. Villa was the shooter.

In addition to Ms. Rambert's conflicting testimony on major aspects of the case—the description of the perpetrator, the way Mr. Sambolah's body was found at the crime scene, and the amount of time

52

it took for the ambulance to arrive—even the smallest details of the case caught Ms. Rambert off guard when confronted with her prior statements. *See* T. 269-70, 273, 275.

Where testimonies are inconsistent, a court may find the ensuing conviction to be against the weight of the evidence. *See, e.g., People v. McMitchell*, 110 A.D.3d 923, 926 (2d Dep't 2013) (reversing where prosecution witnesses' testimony was contradictory and inconsistent); *People v. Zephyrin*, 52 A.D.3d 543, 544 (2d Dep't 2008) (reversing conviction where complainant's testimony differed from her earlier statement and was incredible). While minor inconsistencies in testimonies may not render a verdict against the weight of the evidence, *see People v. Gilliam*, 36 A.D.3d 1151, 1152-53 (3d Dep't 2007), the testimonies in this case differed materially on critical aspects of the incident.

Where, as here, the only alleged eyewitness presented by the prosecution was fraught with credibility issues, this Court should reverse Mr. Villa's convictions as against the weight of the evidence and dismiss the indictment.

## POINT II

GUILLERMO VILLA DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS RIGHT TO A JURY TRIAL OR HIS RIGHT TO TESTIFY, AND DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO PROTECT HIS CLIENT'S RIGHTS.

Guillermo Villa did not knowingly, intelligently, and voluntarily waive his right to a jury or his right to testify. In both instances, the court should have inquired further when it became clear that these fundamental rights were being waived without Mr. Villa's clear understanding. First, after the court initially allocuted Mr. Villa on his right to a jury trial, the court then promised Mr. Villa a chance to reflect overnight and reconsider. W. 5-6. Yet, the next day, when Mr. Villa asked to speak to his family to discuss the issue further, the court simply ignored the request, stating that everything would remain the same. T. 69. Second, after defense counsel blatantly and repeatedly stated for the record that *he* was making the decision for his client that his client would not testify, the court failed to ask Mr. Villa if he was waiving these rights knowingly and voluntarily. T. 187-89.[17] Because

---

[17] Where defense counsel's decision came in the middle of a *Sandoval* hearing, it was clear that Mr. Villa could not have conferred with counsel about waiving this right that is both personal and fundamental.

Mr. Villa did not, under both the United States and New York Constitutions, knowingly, intelligently, and voluntarily waive his fundamental rights to a jury trial and to testify at trial, his conviction must be reversed.

A. <u>Where Mr. Villa's Request to Speak With His Family for Advice on Waiving a Jury Trial Was Not Honored, the Court Abused Its Discretion by Failing to Follow Through on the Inquiry to Ensure that the Waiver Was Knowing, Intelligent, and Voluntary</u>.

Although Mr. Villa signed a jury trial waiver form the day before trial began, Justice Massaro, who had not asked Mr. Villa any questions about whether the decision was voluntary at that time, gave him time to "reflect overnight." W. 6; T. 69. The next day, accordingly, when the court, implicatively acknowledging that Mr. Villa's decision was not considered final, asked Mr. Villa if he would like to speak with anyone for advice on this issue, Mr. Villa answered unequivocally that he wanted to speak with his family. T. 69. Rather than honor that request and allow Mr. Villa to reconsider his decision—as the court explicitly promised the day before—Justice Massaro simply ignored Mr. Villa's response and affirmed that he would move forward with the bench trial. W. 6; T. 69. Where the record demonstrates that Mr. Villa did not

knowingly, intelligently, and voluntarily waive his right to a jury trial, his conviction must be reversed.

A waiver of the right to a trial by jury can only be accepted by the court if it is knowing, intelligent, and voluntary. *People v. Smith*, 6 N.Y.3d 827, 828 (2006).   In fact, this right is so fundamental that criminal defendants were not originally allowed to waive it. *People ex rel. Rohrlich v. Follette*, 20 N.Y.2d 297, 300 (1967). Of course, now, a defendant's right to waive a trial by jury is recognized as both a statutory and a constitutional right. *People v. Davis*, 49 N.Y.2d 114, 119 (1979) ("It can no longer be disputed that defendant had a constitutional right to waive trial by jury . . ."); *People v. Saunders*, 19 A.D.3d 744, 744 (3d Dep't 2005) ("Defendants have a statutory right to waive trial by jury . . ."). *See also* N.Y. const. art I § 2; N.Y. C.P.L. § 320.10. In recognition of the importance of the waiver, the prosecution bears the burden of proving that the defendant has waived his right to a jury trial. *See People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977).

To determine whether Mr. Villa's waiver of his right to a jury trial was knowing, intelligent, and voluntary, this Court must scrutinize the circumstances surrounding the waiver, including the length and

56

thoroughness of the court's inquiry into Mr. Villa's understanding of the right he was waiving. *People v. McQueen*, 52 N.Y.2d 1025, 1025 (1981); *People v. Anderson*, 216 A.D.2d 257, 258 (1st Dep't 1995). In enacting the amendment to the New York Constitution that permitted a waiver of jury trial, the legislature sought to ensure that a defendant fully understood what he was doing when waiving a jury trial and required that the court participate in the process. *People v. Page*, 88 N.Y.2d 1, 6 (1996). The court is tasked with ensuring that the defendant is fully aware of his right to a jury trial and the consequences of waiving that fundamental right. *People v. Ahl*, 243 A.D.2d 985, 986 (3d Dep't 1997); C.P.L. § 320.10 (2) (the court must approve a signed jury trial waiver unless it determines "that the defendant is not fully aware of the consequence of the choice he is making"). Mr. Villa's waiver cannot withstand such scrutiny.

Justice Massaro made only a minimal inquiry into Mr. Villa's understanding of the consequences of his waiver of his right to a jury trial. Specifically, on the first day, Justice Massaro asked Mr. Villa whether he understood that he was giving up a jury of 12 people and whether he had discussed the decision with counsel. W. 3-4.

Significantly, *after* Mr. Villa signed the jury trial waiver form in open court, Justice Massaro explicitly promised him that he could still change his mind and make a decision to "proceed otherwise." W. 6. The very next day, Justice Massaro reminded Mr. Villa that he still had time to reflect before making a final decision. T. 69. However, rather than inquiring as to whether the decision was truly voluntary and Mr. Villa was freely choosing to waive his right to a jury, the court asked Mr. Villa whether anyone had "twisted [his] arm, put [his] back to the wall" or tried to force or coerce him into having a bench trial. T. 69. Finally, the court asked Mr. Villa whether he wished to seek advice from anyone before going forward as planned. T. 69. Mr. Villa replied that he wanted to speak to his family. T. 69. Although there is "no requirement of a uniform mandatory catechism," *People v. Watson*, 162 A.D.2d 360, 361 (1st Dep't 1990), here, the court opened the door and should have inquired further, *see Ahl*, 243 A.D.2d at 986. Instead, Justice Massaro ignored Mr. Villa's reasonable request and declared, "[e]verything stays in place," to which Mr. Villa replied, "[y]es." T. 69. Without a break in the proceedings, the court proclaimed that the plan

was to go forward with the bench trial, and Mr. Villa again replied, "[y]es." T. 69.

Once Mr. Villa—at the court's entreaty—communicated his doubt, the court should have inquired further. *See Page*, 88 N.Y.2d at 6; *Ahl*, 243 A.D.2d at 986. In *Ahl*, the Third Department found that Mr. Ahl's waiver was knowing, intelligent, and voluntary where the court allowed Mr. Ahl to speak with his attorney *and his daughter* to discuss his decision. 243 A.D.2d at 986. In addition, there was no indication in the record that Mr. Ahl ever questioned the waiver or tried to withdraw it. *Id.* Here, in complete contrast, not only did the court deny Mr. Villa the opportunity to speak with his family, an express wish, but the court also ignored Mr. Villa's articulated uncertainty. T. 69.

B.  Where Defense Counsel, During a Mid-Trial *Sandoval* Hearing, Improperly and Unilaterally Waived Mr. Villa's Right to Testify, Without Advising Mr. Villa That it Was Mr. Villa's Personal Right and Decision, the Court Abused Its Discretion by Failing to Inquire to Determine Whether the Waiver Was Knowing, Intelligent, and Voluntary.

During the *Sandoval* hearing, Mr. Villa's defense counsel repeatedly stated on the record that *he* had decided that Mr. Villa would not testify. T. 187-88. Where the record demonstrates that defense counsel stated indisputably that he—not Mr. Villa—made the

decision that Mr. Villa would not testify, there was no valid waiver of Mr. Villa's waiver of his right to testify in his own defense, and his conviction must be reversed.

A defendant has a fundamental constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987); U.S. Const. amends. V, VI, XIV; N.Y. Const. art. I, § 6; N.Y. C.P.L. § 60.15; *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997); *People v. Rosen*, 81 N.Y.2d 237, 244 (1993); *People v. Mason*, 263 A.D.2d 73, 76-77 (1st Dep't 2000); *People v. Mercado*, 147 A.D.3d 613, 615 (1st Dep't 2017). This Court has defined this right as "personal," explaining that it "can be waived only by the defendant, not counsel alone." *Mercado*, 147 A.D.3d at 615. In *Mason*, this Court also concluded that the trial court erred where it held that defense counsel could trump the client's right to testify in "a very delicate situation." 263 A.D.2d at 75, 77.

As with other fundamental rights, a waiver of the right to testify can only be made knowingly, voluntarily, and intelligently. *See, e.g., United States v. Ferrarini*, 219 F.3d 145, 151-52 (2d Cir. 2000) (where a defendant's right to testify is even more fundamental than the right to self-representation, "it is *incumbent upon trial courts* to prevent an

involuntary waiver of the right") (emphasis added)). Although the trial courts are not under a general obligation to inform defendants of their right to testify, courts must sometimes take affirmative steps to ensure that this important right is not unknowingly waived. *Id.*

Here, the court failed to take any affirmative steps to ensure that Mr. Villa had not been divested of his right to testify by a unilateral decision by his trial attorney. Defense counsel was so blatant in his insistence that the right to testify was *his* decision to make for his client that he stated it repeatedly on the record. T. 187-88. Defense counsel's first statement that "[h]e's not going [to] testify. I'm not going [to] put him on," prompted the court to respond by asking if he had already made that decision to which defense counsel replied, "*I made that decision.*" T. 187-88 (emphasis added). Defense counsel then repeated, "*I made that decision* in [] as much as the trier of the facts, I don't want my well to [be] poisoned. He's not going to testify." T. 188 (emphasis added). Finally, in response to the prosecutor's remark that defense counsel appeared to be withdrawing the *Sandoval* motion, defense counsel responded, "Judge, at this point[] *I made the decision.* I am not going to put him on. If it changes, I will give him ample time." T. 188

61

(emphasis added). The court, rather than inquire of Mr. Villa to ensure that he even knew that he had the right to testify, much less that he was knowingly waiving the right, accepted defense counsel's decision. T. 188. The court went on to address defense counsel—not Mr. Villa—directly: "It is [] fine with the court should he wish to change his mind. We can revisit the issue." T. 188.

Furthermore, where defense counsel waived Mr. Villa's right to testify right in the middle of the *Sandoval* hearing, defense counsel could not have discussed it with Mr. Villa before withdrawing the *Sandoval* motion and putting it on the record that Mr. Villa would not testify. Clearly, the prospect of Mr. Villa testifying was a possibility at the start of the *Sandoval* hearing (otherwise, there was no reason to have the hearing); thus, the only conclusion to be made is that counsel unilaterally made the decision.

In *Mason*, this Court found that the court's error in allowing counsel to waive her client's right to testify was not harmless where the error was "clearly of a constitutional nature and in order for such error to be deemed harmless, there must be no reasonable possibility that the error might have contributed to defendant's conviction and it must be

found harmless beyond a reasonable doubt." 263 A.D.2d at 77. Here, where the only evidence pointing to Mr. Villa was a single eyewitness whose testimony not only contradicted itself on the decisive issue—the identity of the perpetrator—but also simply could not have been true in light of law enforcement testimony, there is, at the very least, a reasonable possibility that the error contributed to Mr. Villa's conviction. Mr. Villa's testimony would have included a denial that he committed the crime, an opportunity he did not have until sentencing when he stated, "I'm innocent." S. 18.

Where the record makes clear that Mr. Villa's defense counsel usurped his fundamental right to testify and that defense counsel could not have thoroughly discussed this right with him, the court was obligated to conduct an inquiry of Mr. Villa to ensure that the waiver was knowing, intelligent, and voluntary. *See Ferrarini*, 219 F.3d at 151-52. Moreover, a defendant need not object at trial to preserve the claim that the waiver of the right to testify was not knowing, intelligent, and voluntary. *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001). Because Mr. Villa did not, under both the United States and New York

Constitutions, knowingly, intelligently, and voluntarily waive his fundamental right to testify at trial, his conviction must be reversed.

C.  <u>Mr. Villa's Right to the Effective Assistance of Counsel Was Violated by Defense Counsel's Failure to Object and Insist on a Further Inquiry into the Jury Trial Waiver, and by His Usurpation of His Client's Personal and Fundamental Decision to Testify</u>.

Guillermo Villa's attorney was egregiously ineffective where he failed to protect his client from unknowingly, unintelligently, and involuntarily waiving two fundamental rights—the right to testify and the right to a trial by jury. *See* Const. amends. VI, XIV; N.Y. Const. art. I § 6. Under both the federal and state standards, Mr. Villa did not receive effective assistance from his attorney. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Benevento*, 91 N.Y.2d 708, 713 (1998).

The record on appeal amply demonstrates defense counsel's unreasonable mistakes. *See, e.g., People v. Brown*, 45 N.Y.2d 852, 853 (1978).

1.    Defense counsel failed to object and request that the court honor Mr. Villa's request to speak to his family and to further inquire as to whether Mr. Villa was knowingly, intelligently, and voluntarily waiving his right to a jury trial.

A waiver of jury trial must be knowing, intelligent, and voluntary. *Smith*, 6 N.Y.3d at 828. Although generally, once a defendant has signed a written form in open court waiving his right to a jury trial, the court need not continue to inquire, *see McQueen*, 52 N.Y.2d at 1025-26, this case presents special circumstances where the court explicitly told Mr. Villa that he could have more time to reflect on the decision. *See* W. 6; T. 69. Furthermore, when the court revisited the issue as promised, Mr. Villa expressed his desire to discuss the issue with his family. T. 69. The court, inexplicably, ignored Mr. Villa's wish, declared that "[e]verything stays in place," and simply moved forward with the bench trial. T. 69.

Defense counsel, as Mr. Villa's zealous advocate, should have objected to protect his client's fundamental right and requested that the court follow through on its promise. Because defense counsel failed to fulfill his role in the adversarial context of a criminal trial, which is to represent the interests and rights of his client with zeal and ardor, Mr.

Villa did not receive meaningful representation under both state and federal standards. *See* Const. amends. VI, XIV; N.Y. Const. art. I § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

> 2. Defense counsel improperly and unilaterally waived Mr. Villa's right to testify, without advising Mr. Villa that it was his personal right and ultimately his decision, rather than a strategic choice for defense counsel to make.

As discussed in detail *supra*, the fundamental constitutional right to testify in one's own defense is a "personal" right that "can be waived only by the defendant, not counsel alone." *Rock*, 483 U.S. at 49-53 (1987); *Mercado*, 147 A.D.3d at 615; U.S. Const. amends. V, VI, XIV; N.Y. Const. art. I, § 6. This Court held in *Mason* that defense counsel may not usurp the client's right to testify even in "a very delicate situation." 263 A.D.2d at 75, 77. The Second Circuit has also defined this right as "personal," concluding that "the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel." *Brown*, 124 F.3d at 77-79. In addition to apprising a defendant of the right to testify, defense counsel must ensure that the defendant knows that "ultimately it [is] his choice to make, not that of his attorney." *Campos v. United States*, 930 F.

66

Supp. 787, 793 (E.D.N.Y. 1996). "[T]his burden is a component of the effective assistance of counsel." *Brown*, 124 F.3d at 79.

This Court follows the rule set forth in *Brown* that defense counsel holds primary responsibility for apprising a defendant of his right to testify and all of the associated ramifications. *See, e.g., People v. Bussey*, 276 A.D.2d 331, 331 (1st Dep't 2000) (noting that "[c]ounsel properly discharged her responsibility to advise defendant relative to his right to testify"); *People v. Perry*, 266 A.D.2d 151, 152 (1st Dep't 1999) (same).

This Court has found ineffectiveness where an attorney mistakenly believed that the right to testify was a strategic decision reserved for counsel, and not a fundamental decision reserved for the defendant. *Mason*, 263 A.D.2d at 78-79. In *Mason*, the court acquiesced in defense counsel's mistaken interpretation of the law that it was counsel's prerogative to determine whether her client should testify under delicate circumstances. *Id.* at 75-76. And although the defendant ultimately testified, he did so under extremely prejudicial conditions. *Id.* at 76-77. In reversing the conviction, this Court acknowledged that the right to testify was a "fundamental decision[]" reserved for the

defendant and not his attorney. *Id.* at 76. By making this decision for her client, counsel rendered constitutionally ineffective representation. *Id.* at 78-79.

The record in this case reveals that defense counsel unilaterally decided to keep Mr. Villa off the witness stand. Defense counsel was deliberate in his decision-making process. To start, he personally made the decision that Mr. Villa would not testify in the middle of the *Sandoval* hearing. *See* T. 187-89. Defense counsel, therefore, could not have discussed this decision with Mr. Villa at any time before he withdrew the *Sandoval* motion. *See id.* The very purpose of a *Sandoval* hearing is to give the defendant "definitive advance knowledge of the scope of cross-examination as to prior conduct to which he will be subjected [so that he] can decide whether to take the witness stand." *People v. Sandoval*, 34 N.Y.2d 371, 375 (1974). Where defense counsel withdrew the motion while simultaneously insisting that Mr. Villa would not testify, counsel effectively took this decision away from Mr. Villa by denying him the "advance knowledge" of the full scope of what could be used against him on cross-examination and by failing to

explain to Mr. Villa that the right to testify was personal and ultimately Mr. Villa's decision to make.

In addition, the record is clear that defense counsel, not Mr. Villa, made the decision that Mr. Villa would not testify. Defense counsel stated unambiguously three separate times, "I made [the] decision." T. 188. Defense counsel also stated clearly that the decision he had made was to not allow his client to testify. Defense counsel said, "He's not going [to] testify. I'm not going [to] put him on." T. 187. And then again, "I am not going to put him on." T. 188. Defense counsel followed that by stating that "[i]f it changes, I will give him ample time," again showing that defense counsel was under the mistaken impression that the choice was his—not his client's—to make. T. 188.

Counsel's clear statements that he decided that Mr. Villa would not testify provide compelling record evidence that Mr. Villa was deprived of his fundamental constitutional right to testify. Both federal and state law required counsel to engage in at least a minimal discussion with Mr. Villa about the nature of his right to testify in his own defense. *See Brown*, 124 F.3d at 77-78; *Perry*, 266 A.D.2d at 152. By improperly appropriating this decision to himself, defense counsel

violated his client's constitutional rights. This is exactly the error that led this Court to reverse the conviction in *Mason*. 263 A.D.2d at 78-79.

Had Mr. Villa testified professing his innocence and explaining that he did not participate in this crime, as he was only allowed to do at sentencing, the outcome of the case might well have been different, especially where the only evidence tying Mr. Villa to the crime was the hopelessly contradictory testimony of Ms. Rambert. Counsel did not properly apprise Mr. Villa either of his right to testify or of the fact that it was his choice to make. This grave error denied Mr. Villa the effective assistance of counsel. *See* Const. amends. VI, XIV; N.Y. Const. art. I § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

POINT III

SEYQUANA RAMBERT'S PHOTO ARRAY, LINEUP, AND IN-COURT IDENTIFICATIONS OF MR. VILLA SHOULD HAVE BEEN SUPPRESSED WHERE THE PHOTO ARRAY WAS UNDULY SUGGESTIVE; ADDITIONALLY, THE COURT ERRED FOR FAILING TO FOLLOW THE PROPER STATUTORY PROCEDURES, AND DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

The court erred when it declined to suppress Ms. Rambert's identifications of Mr. Villa from the photo array, the lineup, and in court given that Mr. Villa's skin tone in his photo was by far the lightest skin tone in all of the photos, the other men in the photo array appeared to be African-American, and Ms. Rambert initially identified the perpetrator as a white Hispanic man. Where the photo array was unduly suggestive, the lineup, which was conducted the very next day, and the in-court identification should be suppressed because they were tainted by the initial photo array.

In addition, the court erred in allowing trial testimony to be presented before making a decision on a case-dispositive pre-trial suppression motion and in not putting forth on the record any findings of fact or conclusions of law to support its refusal to suppress the identifications. N.Y. C.P.L. §§ 710.40(3) and 710.60(6). Under the

71

totality of these circumstances, the photo array in which Ms. Rambert identified Mr. Villa was unduly suggestive, and thus, the photo array, lineup, and the resulting in-court identification of Mr. Villa should have been suppressed. *See* U.S. Const. amend. XIV; N.Y. Const. art. I, § 6.

A.  <u>Ms. Rambert's Pre-Trial and In-Court Identifications of Mr. Villa Should Have Been Suppressed Where She Initially Described the Shooter As White, and Mr. Villa's Photo Depicted His Skin Tone as Much Lighter Than the Skin Tones of the Other Men</u>.

At Mr. Villa's *Wade* hearing, the prosecution failed to meet its burden to adduce evidence that the photo array and lineup were not unduly suggestive. "It is firmly established in our jurisprudence that unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of an accused." *People v. Chipp*, 75 N.Y.2d 327, 335 (1990); *see also United States v. Wade*, 388 U.S. 218, 242 (1967). The fundamental principle is that the suspect should not be singled out so as to suggest that he is the culprit. *See United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996). Undue suggestiveness is determined by considering the totality of the circumstances surrounding the pre-trial identification procedures. *People v. Gonzalez*, 173 A.D.2d 48, 56 (1st Dep't 1991).

Furthermore, an identification procedure is unduly suggestive especially where a characteristic that was highlighted by the eyewitness, such as skin color, is found to be different between the defendant and the fillers. *Id.; see also People v. Carroll*, 303 A.D.2d 200, 201 (1st Dep't 2003) (Where the complainant never mentioned anything about skin tone to police, defendant was not entitled to suppression based on his skin tone being darker than the fillers' skin tones.).

Here, where Ms. Rambert described the perpetrator to Detective O'Connell as a white Hispanic man, T. 67, 134, the photo array singled out Mr. Villa because his skin tone in his photo appeared to be the lightest out of all of the photos. *See* Pros. Hearing Ex. 1 (Photo Array); T. 141. In fact, Det. O'Connell, who concurred on cross examination that Mr. Villa is not white, testified that he created the photo array with the information from Ms. Rambert that the perpetrator was a white Hispanic man. T. 134-35. Furthermore, the fillers in the photo array appeared to be African-American. Pros. Hearing Ex. 1; T. 141.

It follows that Ms. Rambert's identification of Mr. Villa in a lineup the very next day was irreparably tainted by the initial, presumptively

suggestive photo viewing and therefore should have been suppressed.[18]

*See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Dunaway v. New York*, 442 U.S. 200, 217-18 (1979). The prosecution did not establish attenuation from the initial photo array because Ms. Rambert had viewed the suggestive photo only the evening before. T. 37-40.

B.   <u>The Court Erred and Defense Counsel Was Ineffective for Allowing Trial Testimony to Be Presented Before the Court Made a Decision on a Case-Dispositive Motion in Which the Court Failed to Put Forth on the Record Its Findings and Conclusions</u>.

Adding to the general confusion, the court erred by allowing trial testimony to be presented *before* making a decision on the suppression motion and by failing to put forth on the record any findings of fact, conclusions of law, or reasons for its determination in denying the suppression motion. C.P.L. §§ 710.40(3) and 710.60(6); *People v. Jackson*, 221 A.D.2d 964, 965 (4th Dep't 1995) (holding that the court's

---

[18]   Ms. Rambert testified at trial that Det. O'Connell told her to "pick out the guy that did it" before she viewed the lineup. T. 259-60. Defense counsel was ineffective for failing to move to reopen the suppression hearing where Ms. Rambert's testimony indicated that the lineup itself may have been unduly suggestive under the totality of the circumstances. *People v. Gonzalez*, 173 A.D.2d 48, 55-56 (1st Dep't 1991); *see also* Const. amends. VI, XIV; N.Y. Const. art. I § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713. On this evidence, defense counsel should have argued that the prosecution did not establish attenuation from the initial photo array, which was unduly suggestive. Mr. Villa's right to the effective assistance of counsel was violated by the cumulative effect of his attorney's numerous prejudicial errors, including his failure to object here.

failure to determine the suppression motion prior to commencing the trial was error, although it was harmless where the evidence of guilt was overwhelming and the defendant consented to the divergence from the statute).

Here, the evidence was not overwhelming. The prosecution presented the eyewitness testimony of a lone witness, who did not know Mr. Villa, and whose testimony was irreconcilable with police testimony and incredible as a matter of law. *See Jackson*, 221 A.D.2d at 965. Furthermore, defense counsel was ineffective for failing to object to the presentation of trial testimony before a decision was rendered on a case-dispositive motion. Once again, defense counsel failed to fulfill his role in the adversarial context, and Mr. Villa did not receive meaningful representation under both state and federal standards. *See* Const. amends. VI, XIV; N.Y. Const. art. I § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713. Thus, these errors require reversal.

If this Court determines that a defendant was afforded a "full and fair hearing," then this Court may substitute its own findings of fact and conclusions of law for that of the hearing court. *People v. Denti*, 44 A.D.2d 44, 47 (1st Dep't 1974); *People v. Golliver*, 132 A.D.2d 618, 618

(2nd Dep't 1987). Accordingly, this Court should, based on the record below, find that Ms. Rambert's photo array and lineup identifications of Mr. Villa, as well as her in-court identification, were the product of an unduly suggestive procedure, and should have been suppressed.

<u>POINT IV</u>

MR. VILLA WAS DEPRIVED OF HIS RIGHT TO A FAIR
TRIAL DUE TO THE PROSECUTION'S IMPROPER
SUMMATION, INCLUDING A MISSTATEMENT OF KEY
EVIDENCE AND A FALSE ASSERTION THAT MOTIVE
HAD BEEN PROVEN.

A conviction must be reversed where, as here, a prosecutor
misrepresented the evidence in summation. Perhaps in an effort to
compensate for the inaccuracy of its only eyewitness's testimony, the
prosecution read back key testimony from its own police witness at trial
insisting that it was somehow mistaken. It further misled the factfinder
by stating without a basis in evidence that motive had been proven. The
prosecution's misleading and improper summation comments deprived
Mr. Villa of his right to a fair trial under the due process clauses of both
the federal and state constitutions. *See* U.S. Const. amends. V, XIV;
N.Y. Const. art. I § 6; *Calabria*, 94 N.Y.2d at 522-23 (2000); *Ashwal*, 39
N.Y.2d at 109-10 (1976).

Improper summation comments have been roundly condemned by
New York courts, and attorneys have been cautioned to stay within "the
four corners of the evidence." *Ashwal*, 39 N.Y.2d at 109 (citations
omitted). While attorneys are certainly given some latitude in arguing

on summation, they are prohibited from misleading the factfinder about the evidence and engaging in unsupported speculation. *Id.* Here, the prosecutor departed from the four corners of the evidence and attempted to rewrite the transcript before the verdict was handed down.

A. <u>The Prosecution Misstated Officer Solomon's Testimony Regarding the Amount of Time It Took for the Ambulance to Arrive</u>.

In an effort to rectify its only eyewitness's testimony that the ambulance arrived almost immediately after the shooting, the prosecution resorted to arguing that the minutes of the trial transcript contained an error. The prosecutor argued that where the prosecution's witness Officer Solomon stated that it took the ambulance 45 minutes to arrive, it should have been four to five minutes. T. 473. "I think it was a mistake. I didn't catch it, but when you say 45 and say four or five minutes – I agree every time it says 45 minutes. I submit your Honor that is a mistake. It's four to five minutes." *Id.* Although defense counsel specifically objected to the mischaracterization, T. 475, and attempted to clarify the record stating that Officer Solomon testified at one point that it was a half-hour to 45 minutes, T. 473, 475, proving that the witness could not have said four to five minutes, the prosecutor continued to argue that the evidence showed otherwise. T. 473-76.

78

In a last ditch effort to match up the credible and unbiased testimony of the first responding officer with the hopelessly contradictory testimony of the eyewitness, the prosecutor speculated, "It makes no sense for 45 minutes to have passed for an ambulance to arrive," where Ms. Rambert testified that the ambulance arrived while she was still on the 911 call. T. 473-74. Notably, the prosecutor argued that Ms. Rambert's 911 call corroborated her testimony claiming that "the operator say[s] E.M.S. is already there . . . on minute six or seven." T. 473. In actuality, however, the dispatchers on the call can be heard discussing that EMS responders did not appear to be there yet. Pros. Ex. 21 (911 Call #3744) at 6:05-6:30.[19] The prosecutor continued, stating, "Mr. Aranda and I agree it says 45 on Officer Solomon's testimony. Common sense says we picked it up, but it should have been four to five minutes. That is simply a mistake…" T. 475.

In speculating without any basis in the record, the prosecutor "call[ed] upon the [factfinder] to draw conclusions which are not fairly inferable from the evidence." *Ashwal*, 39 N.Y.2d at 109. This kind of

---

[19]   The 911 dispatchers can be heard saying, "I hear sirens," and then "I hear somebody talking to her. I don't know if it's the EMS or [inaudible]," to which a dispatcher asked, "EMS is there?" and another dispatcher responded, "No because I don't see [63 (difficult to understand)] here." Pros. Ex. 21 (911 Call #3744) at 6:05-6:30.

baseless suggestion deprives the defendant of a fair trial. *See People v. Hemmingway*, 240 A.D.2d 328, 328 (1st Dep't 1997) (reversing conviction due to improper prosecutorial summation because, *inter alia*, "the prosecutor improperly made reference to the bags of clothing defendant had been carrying when arrested, suggesting, without basis, that the clothing had been stolen.").

B.   The Prosecution Misled the Factfinder Stating Motive Had Been Proven Without a Basis in the Evidence.

As discussed *supra*,[20] the prosecution misled the factfinder stating motive had been proven where the prosecution had actually presented evidence of a motive for O.G., a man who was not on trial, no evidence of a motive for Mr. Villa, and no evidence connecting Mr. Villa to O.G. T. 198, 270, 282. In an attempt to rebut the defense argument on summation that there was no evidence that Mr. Villa had a motive to commit this crime, the prosecution not only responded, without explanation, that motive had been proven, but also conflated motive with intent, an element of the crime. T. 479.

---

[20] *See* Argument, Point I (A) (2).

> The People have proved motive in this case. And it's clear from this incident that the defendant, as he drew the weapon clearly wanted to shoot and kill Sedrick Sambolah and that was his intent.

T. 479.

It is well-established that "the District Attorney may not refer to matters not in evidence or call upon the [factfinder] to draw conclusions which are not fairly inferable from the evidence." *Ashwal*, 39 N.Y.2d at 109-10 (citations omitted). Here, where the prosecution arguably presented motive testimony as to O.G., a neighborhood man who had gotten into an early morning fight with Mr. Sambolah at a nightclub, T. 198, 270, 282, the prosecution, in contrast, presented evidence that Mr. Villa was a complete stranger—wearing a blue shirt—who inexplicably shot Mr. Sambolah at point blank range in public in the middle of the afternoon. *See* T. 206-07, 341-42.

The prosecution's improper arguments in summation "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

81

<u>POINT V</u>

MR. VILLA'S SENTENCE IS EXCESSIVE.

Guillermo Villa is a 33 year old man with a young daughter, who he hopes to support and help raise. S. 18. At the time of this crime, Mr. Villa was well on his way to building a law-abiding productive life, working, and starting a family. S. 18.[21]

Mr. Villa has steadfastly maintained his innocence and, in a statement to the court, expressed his deepest sympathy to the Sambolah family for their loss. S. 18. He said, "This is not me. I know I might fit the description or whatever, but this is not me. I did not commit this crime, and I ask for you to declare a righteous sentence. That's all." S. 19. Mr. Villa's defense attorney, too, expressed his concern that the court had convicted an innocent man, emphasizing that Mr. Villa had "vehemently denie[d] being involved in this homicide in any way" and had asserted his innocence and refused to consider any potential plea offers. S. 17. Just prior to sentencing, defense counsel beseeched the court for more time to investigate other eyewitnesses at

---

[21]   Although this is not Mr. Villa's first felony conviction, his prior felony conviction of assault in the second degree occurred many years earlier in 2005. T2. 3; S. 14.

the scene of the crime after a man approached him and stated that he saw the shooter, who was wearing a black hoodie (not a blue shirt), and who was not Mr. Villa. S. 2-3.

This Court has "broad plenary power to modify a sentence that is unduly harsh or excessive under the circumstances, in the interest of justice, even though the sentence falls within the permissible statutory range. This sentence review power may be exercised, if the interest of justice warrants, without deference to the sentencing court." *People v. Delgado*, 80 N.Y.2d 780, 783 (1992) (citations omitted); *accord, e.g., People v. Walsh*, 101 A.D.3d 614, 614 (1st Dep't 2012); *People v. Rosenthal*, 305 A.D.2d 327, 329 (1st Dep't 2003).

If this Court does not reverse the conviction, given the highly contradictory evidence in this case and Mr. Villa's consistent claims of innocence, the minimum sentence of 15 years to life is sufficient. *See People v. Medina*, 67 A.D.3d 548, 550 (1st Dep't 2009) (reducing sentence for first-degree robbery conviction after trial from ten to eight years in the interest of justice), *rev'd on other grounds*, 18 N.Y.3d 98 (2011); *People v. Notey*, 72 A.D.2d 279, 282-83 (2d Dep't 1980) ("[A] minimum amount of confinement should be imposed 'consistent with

the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant.'" (citation omitted)). The minimum sentence available in this case already takes into account the seriousness of the crime for which Mr. Villa was convicted and his prior felony conviction. Should this Court not reverse the convictions and dismiss the indictment, Mr. Villa asks this Court to exercise its discretion in the interest of justice to reduce his sentence to fifteen years to life.

## CONCLUSION

For the reasons stated above, this Court should reverse Mr. Villa's conviction and dismiss the indictment. In the alternative, this Court should reduce Mr. Villa's sentence in the interest of justice.

Dated:      New York, New York
            March 15, 2018

                                    Respectfully submitted,
                                    Christina Swarns, Esq.
                                    Attorney for Defendant-Appellant

                                    Anastasia Heeger, Esq.
                                    Supervising Attorney

                        by:     _____
                                    Mandy E. Jaramillo, Esq.
                                    mjaramillo@appellatedefender.org
                                    Senior Staff Attorney

                                    Office of the Appellate Defender
                                    11 Park Place, Suite 1601
                                    New York, New York 10007
                                    212.402.4100
                                    mjaramillo@appellatedefender.org

# ADDENDA

Supreme Court of the State of New York
Appellate Division: First Department

---

The People of the State of New York,

                              Respondent,

              — against —                    Ind. No. 3376-11

Guillermo Villa,

                    Defendant-Appellant.

---

## Statement Pursuant to Rule 5531

1. The indictment number in the court below was 3376-2011.

2. The full names of the original parties were "The People of the State of New York" against "Guillermo Villa."

3. This action was commenced in Supreme Court, Bronx County.

4. This action was commenced by the filing of an indictment.

5. This is an appeal from a judgment of conviction rendered on April 23, 2014, by Supreme Court, Bronx County. Guillermo Villa was convicted after trial of one count of murder in the second degree, N.Y. Penal Law § 125.25(1), and one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03(1)(b). Guillermo Villa received a term of imprisonment of twenty-five years to life. Justice Dominic R. Massaro presided over the pretrial suppression hearing, trial, and sentencing. Timely notice of appeal was filed. No stay of execution has been sought. Guillermo Villa is currently serving his sentence in the custody of the Department of Corrections and Community Supervision.

6. Guillermo Villa has been granted leave to appeal as a poor person on the original record and typewritten briefs.

Supreme Court of the State of New York
Appellate Division: First Department

The People of the State of New York,

Respondent,

— against —

Ind. No. 3376-11

Guillermo Villa,

Defendant-Appellant.

## Printing Specification Statement

1. The following statement is made in accordance with First Department Rule 600.10.

2. Guillermo Villa's brief was prepared with Microsoft Word 2010 with Century Schoolbook typeface 14 point in the body and 12 point in the footnotes.

3. The text of the brief has a word count of 17,465, as calculated by the processing system and is 85 pages.