*To be argued by*
T. CHARLES WON

---

# New York Supreme Court

## Appellate Division - First Department

———

**THE PEOPLE OF THE STATE OF NEW YORK**,

*Respondent,*
Bronx County Supreme Court
Ind. No: 3376/2011

*-against-*

**GUILLERMO VILLA,**

*Defendant-Appellant.*

---

**RESPONDENT'S BRIEF**

---

**DARCEL D. CLARK**
*District Attorney*
Bronx County
Attorney for Respondent
Bronx, New York 10451
(718) 838-7097
wonc@bronxda.nyc.gov

NANCY D. KILLIAN
T. CHARLES WON
Assistant District Attorneys
*of Counsel*

---

PRINTED ON RECYCLED PAPER

# **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

THE FACTS

    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    The Pre-Trial Hearing

        The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        The Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        The Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    THE TRIAL

        The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
        The Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT

    POINT ONE

        THE COURT BELOW PROPERLY DENIED
        DEFENDANT'S MOTION TO SUPPRESS THE PHOTO
        ARRAY IDENTIFICATION SINCE IT WAS NOT
        UNDULY SUGGESTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    POINT TWO

        DEFENDANT'S GUILT WAS PROVEN BEYOND A
        REASONABLE DOUBT AND THE GUILTY VERDICT
        WAS SUPPORTED BY THE WEIGHT OF THE
        EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

POINT THREE

DEFENDANT'S CHALLENGES TO VARIOUS RULINGS BY THE COURT BELOW ARE ALL MERITLESS AND DEFENSE COUNSEL RENDERED EFFECTIVE REPRESENTATION IN CHOOSING NOT TO MAKE FRUITLESS CHALLENGES AGAINST THE RULINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT FOUR

THE PROSECUTOR'S SUMMATION CONSTITUTED FAIR COMMENT ON THE EVIDENCE AND A FAIR RESPONSE TO THE DEFENSE SUMMATION . . . . . . . . . . . . . 47

POINT FIVE

DEFENDANT'S SENTENCE WAS FAIR AND PROPER. . . . . . . 55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# TABLE OF AUTHORITIES

## CASES

<u>Brown v. Artuz</u>, 124 F.3d 73 (2d Cir 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

<u>Chang v. United States</u>, 250 F.3d 79 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . 44

<u>People v. Ahl</u>, 243 A.D.2d 985 (3d Dept. 1997) . . . . . . . . . . . . . . . . . . . . . . . 35, 36

<u>People v. Bazemore</u>, 147 A.D.3d 698 (1st Dept. 2017),
    <u>lv. denied</u>, 29 N.Y.3d 1076 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>People v. Bleakley</u>, 69 N.Y.2d 490 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

<u>People v. Caban</u>, 5 N.Y.3d 143 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>People v. Caesar</u>, 91 A.D.3d 503 (1st Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>People v. Campos</u>, 93 A.D.3d 581 (1st Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . 32

<u>People v. Casillas</u>, 134 A.D.3d 1394 (4th Dept. 2015) . . . . . . . . . . . . . . . . . . . . . 40

<u>People v. Chambers</u>, 123 A.D.2d 270 (1st Dept. 1986). . . . . . . . . . . . . . . . . . . . . 55

<u>People v. Chipp</u>, 75 N.Y.2d 327 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>People v. Christian</u>, 244 A.D.2d 297 (1st Dept. 1997) . . . . . . . . . . . . . . . . . . . . . 45

<u>People v. Collins</u>, 214 A.D.2d 483 (1st Dept. 1995). . . . . . . . . . . . . . . . . . . . . . . 55

<u>People v. D'Alessandro</u>, 184 A.D.2d 114 (1st Dept. 1992) . . . . . . . . . . . . . . . . . 47

<u>People v. Danielson</u>, 9 N.Y.3d 342 (2007) . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

<u>People v. Delamota</u>, 18 N.Y.3d 107 (2011). . . . . . . . . . . . . . . . . . . . . . . 19, 20, 25

i

People v. Delgado, 80 N.Y.2d 780 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

People v. Farrar, 52 N.Y.2d 302 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

People v. Flowers, 166 A.D.3d 1492 (4th Dept 2018),
　　　lv. denied, 32 N.Y.3d 1125 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

People v. Fratta, 83 N.Y.2d 771 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

People v. Gamble, 135 A.D.3d 1078 (3d Dept. 2016),
　　　lv. denied, 27 N.Y.3d 997 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Hanson, 256 A.D.2d 74 (1st Dept. 1998). . . . . . . . . . . . . . . . . . . . . 38, 40

People v. Haynes, 163 A.D.3d 994 (2d Dept. 2018) . . . . . . . . . . . . . . . . . . . . 43, 45

People v. Hogan, 26 N.Y.3d 779 (2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

People v. Holley, 26 N.Y.3d 514 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

People v. Kin Kan, 78 N.Y.2d 54 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

People v. Lamont, 25 N.Y.3d 315 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

People v. Ledwon, 153 N.Y. 10 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

People v. Love, 57 N.Y.2d 998 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

People v. Marryshow, 162 A.D.3d 1313 (3d Dept. 2018). . . . . . . . . . . . . . . . . . 26

People v. Mateo, 2 N.Y.3d 383, 410 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

People v. Mercado, 147 A.D.3d 613 (1st Dept. 2017). . . . . . . . . . . . . . . . . . . . 41

People v. Morgan, 271 A.D.2d 248 (1st Dept. 2000) . . . . . . . . . . . . . . . . . . . . . 46

People v. Muhammad, 168 A.D.3d 549 (1st Dept. 2019) . . . . . . . . . . . . . . . . . . 16

People v. Orkabi, 160 A.D.2d 644 (1st Dept. 1990). . . . . . . . . . . . . . . . . . . . . . 36

People v. Overlee, 236 A.D.2d 133 (1st Dept. 1997). . . . . . . . . . . . . . . . . . 47, 55

People v. Owens, 151 A.D.3d 520 (1st Dept. 2017),
        lv. denied, 29 N.Y.3d 1131(2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

People v. Rahman, 137 A.D.3d 523 (1st Dept. 2016).. . . . . . . . . . . . . . . . . . . 32

People v. Rivera, 71 N.Y.2d 705 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

People v. Rizk, 146 A.D.3d 523 (1st Dept. 2017),
        lv. denied, 29 N.Y.3d 952 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Rodriguez, 166 A.D.3d 459 (1st Dept. 2018),
        lv. denied, 2019 WL. 1200192 (Ct. App. Feb. 8, 2019) . . . . . . . . . . . . . . 48

People v. Rodriguez, 258 A.D.2d 299 (1st Dept. 1999) . . . . . . . . . . . . . . . . . . 40

People v. Romero, 7 N.Y.3d 633 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

People v. Rumph, 93 A.D.3d 1346 (4th Dept. 2012) . . . . . . . . . . . . . . . . . . . . 24

People v. Samuels, 37 A.D.3d 336 (1st Dept. 2007) . . . . . . . . . . . . . . . . . . . . 35

People v. Sanchez, 95 A.D.3d 241 (1st Dept. 2012),
        aff d, 21 N.Y.3d 216 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

People v. Smith, 6 N.Y.3d 827 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

People v. Smith, 142 A.D.3d 1027 (2d Dept. 2016) . . . . . . . . . . . . . . . . . . . . . 24

People v. Solivan, 157 A.D.3d 554 (1st Dept. 2018),
        lv. denied, 31 N.Y.3d 1087 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Staton, 138 A.D.3d 1149 (2d Dept. 2016),
        affd, 28 N.Y.3d 1160 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

People v. Tones, 148 A.D.3d 490 (1st Dept. 2017),
    lv. denied, 29 N.Y.3d 1087 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

People v. Villanueva, 148 A.D.3d 210 (1st Dept. 2017),
    lv. denied, 29 N.Y.3d 1088 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

People v. Williams, 15 A.D.3d 244 (1st Dept. 2005) . . . . . . . . . . . . . . . . . . . . 17

People v. Williams, 29 N.Y.3d 84 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

People v. Walker, 83 N.Y.2d 455 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Ferrarini, 219 F.3d 145 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . 45

## STATUTES

Criminal Procedure Law § 320.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Criminal Procedure Law § 440.10(3)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Criminal Procedure Law § 470.05(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 43, 48

Criminal Procedure Law § 710.40(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

Criminal Procedure Law § 710.60(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Penal Law § 125.25 (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Penal Law § 265.03(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT
----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

               -against-

GUILLERMO VILLA,

                  Defendant-Appellant.
----------------------------------------------------------------------X

## **RESPONDENT'S BRIEF**

## **STATEMENT**

     Guillermo Villa appeals from a judgment of the Supreme Court, Bronx County (Massaro, J.), rendered April 23, 2014, convicting him, after a bench trial, of Murder in the Second Degree (Penal Law § 125.25[1]), and Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[1]]b]), and sentencing him, as a second felony offender, to an indeterminate term of imprisonment of from twenty-five years to life and a determinate term of fifteen years plus five years of post-release supervision, respectively, to be served concurrently.

     Defendant is currently incarcerated.

## QUESTIONS PRESENTED

1.    Whether the court below properly denied defendant's motion to suppress the photo array identification.

       The court below denied the motion on the implicit basis that the photo array was not unduly suggestive.

2.    Whether the jury verdict was supported by the weight of the evidence.

3.    Whether the court below properly found that defendant had waived his right to a jury trial.

       The court below did not have a full opportunity to address this claim because defendant failed to raise all of the issues below.

4.    Whether the court below acted properly in holding a combined suppression hearing and non-jury trial.

       The court below did not have a full opportunity to address this claim because defendant failed to raise all of the issues below.

5.    Whether defense counsel had acted properly in advising the court that defendant will not testify at trial.

       The court below did not have a full opportunity to address this claim because defendant failed to raise all of the issues below.

6.    Whether the prosecutor's summation afforded defendant a fair trial.

       The court below did not have a full opportunity to address this claim because defendant failed to raise all of the issues below.

7.    Whether defendant's sentence was fair and proper.

2

# THE FACTS[1]

## The Indictment

Under Indictment Number 282/2012, filed on January 11, 2012, the Bronx County Grand Jury charged defendant with committing the crimes of Murder in the Second Degree, Manslaughter in the First Degree, and Criminal Possession of a Weapon in the Second Degree (2 counts).

## The Pre-Trial Hearing

On January 31, 2014, the Honorable Dominic R. Massaro presided over a Wade/Dunaway hearing, and denied defendant's motion to suppress.  The following relevant facts were elicited:

## The People's Case

On September 24, 2011, Detective Sean O'Connell responded to Jacobi Hospital upon receiving a notification of a male shot in front of 1246 Burke Avenue in the Bronx, on that day at approximately 2:25 p.m.  Upon arriving at the hospital

---

[1]   Numerical references preceded by "W." refer to minutes of January 30, 2014, when defendant executed his written waiver of his right to a jury trial; those preceded by "T." refer to the pre-trial suppression hearing and the trial minutes; and those preceded by "S." refer to the verdict and the sentencing minutes.

3

shortly after 3 p.m., the detective learned that the victim, Sedrick Sambolah, had passed away from multiple gunshot wounds (O'Connell: T. 15-17, 59).

At the hospital, police personnel spoke with several of the victim's friends. None of them had any relevant information for the police (O'Connell: T. 17). Later that day, at approximately 4:30 p.m., Detective O'Connell interviewed a female witness at the precinct (O'Connell: T. 18, 65).

The detective learned that the victim had come to the witness's home in the morning and told her that, the night before, the victim had a dispute at a nightclub with an individual known as O.G. Later that day, when the witness went outside, the witness saw both the victim and O.G. staring at each other. While standing outside, the witness then saw a male white Hispanic with braids, wearing a blue sweater, approximately 20 to 30 years old, five feet nine inches tall, and weighing approximately 200 pounds, approach the victim. The individual pulled out a gun from his waistband and shot the victim several times (O'Connell: T. 19-21, 66-67, 118-124, 126-128, 130, 132, 134)

The police subsequently received information from multiple witnesses that the culprit was an individual known as Pure. On October 3, 2011, during the evening hours, Detectives O'Connell and Chico went to the area of Burnside and Grand Avenues; they had an anonymous tip that the suspect Pure, described as a stocky male

Hispanic with braids, frequented the area (O'Connell: T. 21-23, 132).

At approximately 8:50 p.m., near 2042 Grand Avenue, the detectives spotted an individual -- a male Hispanic, long braids, approximately five feet seven or eight inches tall, stocky build, and between 20 to 30 years old -- who matched the description. Detective O'Connell approached the individual and asked for his identification. Upon receiving it, the detective wrote down the individual's information and let him leave without asking any questions. The identification listed the individual's name as Guillermo Villa, and born on December 2, 1984, and his home address as 35 E. 106th Street (O'Connell: T. 23-25, 136-137)

Back at the precinct, Detective O'Connell input the suspect's name and date of birth into the photo manager system which contains the photographs of all past defendants who had been arrested and photographed by the police, and obtained defendant's photograph. Detective O'Connell then had the system automatically provide photographs of other individuals with appearances similar to defendant. The detective created a photo array with six different individual photographs, including defendant's photograph (O'Connell: T. 26-28, 31; People's Exhibit 1 [previously provided to this Court by appellant]).

On October 4, 2011, at approximately 5 p.m., Detectives O'Connell and Chico met with the female witness to have her view the photo array. Detective O'Connell

read to the witness the pre-printed instruction form on viewing a photo array.  The instructions basically stated that the witness would be shown photographs of six individuals and should indicate if she recognized any of the individuals.  The detective did not tell the witness who would be in the photographs (O'Connell: T. 32-34).

The witness looked at the photo array and identified number 3 -- defendant's photograph -- as the individual who had shot the victim.  On October 5th, after defendant was arrested, the same female witness viewed a lineup, consisting of five individuals, and identified defendant, in seat number four, as the shooter.  Defendant himself had chosen seat number 4.  Defendant and the four fillers all wore black hats, and a wall in front blocked the witness's view of the bodies of the lineup participants (O'Connell: T. 39-41, 43-45).

**The Defense**

The defense presented no evidence.

**The Court's Decision**

The court below decided that, "[u]pon due reflection, having reviewed the Court's trial notes bifurcated as appropriate herein and having considered the

testimony and the exhibits, likewise in Evidence, the Court denies, the suppression is denied" (T. 144).

## THE TRIAL

### The People's Case

On September 24, 2011, in the early morning hours, the victim, Cedric Sambolah, came to the home of <u>Seyquana Rambert</u>, his then girlfriend.  Once Ms. Rambert woke up, the victim came into her room, at around 10 or 11 a.m., and they talked for approximately an hour and a half to an hour and forty-five minutes.  Ms. Lambert learned that, the night before, the victim had an incident with an individual who kept calling the victim to have another fight.  Ms. Lambert asked him to stay, but the victim insisted he had to go and left the apartment (Rambert: T. 195-198, 265-266, 282, 346).

Later on, Ms. Lambert left her apartment to go to a nearby store.  Outside, she saw the victim and individuals known to her as OG, Ron, 50, Nee-Q, and Cliff all nearby.  As Ms. Rambert returned home from the store, she saw defendant -- a black Hispanic,[2] with braids, in his 20s to 30s, around 200 to 210 pounds, and "wasn't that

---

[2] On cross-examination, Ms. Lambert denied having told Detective O'Connell that the shooter was white Hispanic (Lambert: T. 265, 268).

tall, but he was a good, around 5-10 inches" tall, and wearing a blue shirt -- walk towards the victim. Ms. Rambert stared at defendant as they walked towards each other because his shirt was blue, her favorite color (Rambert: T. 200-204, 206, 213-215, 235-237, 239, 265, 284-285, 290, 293).

As he neared the victim, defendant reached into his pocket and pulled out a gun. Upon hearing a gunshot -- Ms. Rambert did not see the gunshot -- she turned and ran. She then heard two additional gunshots -- a total of three gunshots. Ms. Rambert then ran back towards the victim and saw defendant walking away from the victim (Rambert: T. 208-209, 242-246, 248, 301, 305, 314-315, 329-330).

Ms. Rambert called 911,[3] and placed her phone on the ground as she held the victim's body. She stayed by the victim until the EMT technicians arrived. When police officers approached her, she yelled that the shooter had a blue shirt and that he had gone down the block (Rambert: T. 210-212, 242-249, 257).

Later that day, Ms. Rambert went to the 48th Precinct where detectives interviewed her. On October 4th, she identified defendant from a photo array. The following day, she viewed a lineup and identified the individual in seat number four as the shooter. Prior to viewing the lineup, the detective read instructions from a

---

[3] A recording of the 911 call was played in court (T. 252-255, 257).

sheet of paper (Rambert: T. 216-217, 257-261, 340-341, 344, 345).[4]

On September 24, 2011, at approximately 2:25 to 2:30 p.m., Police Officer Karen Solomon responded to the area of 1240 Burke Avenue, upon receiving notification of a male shot in the area (165-166, 181a). Officer Solomon approached an open area where a group of individuals had gathered. The officer saw a male black laying face down on the ground (169-170, 172). As she approached the victim, she spotted two shell casings on the sidewalk (Solomon: T. 16, 170-171, 183).[5] The ambulance came approximately 30-45 minutes after the officer arrived on the scene (Solomon: T. 173-174, 183).[6]

The victim suffered multiple gunshot wounds. The cause of death was a wound to the chest that had perforated the lungs, the heart, the spleen, and the

---

[4] Although she did not remember the exact words spoken by the detective, Ms. Rambert, in her own words, recalled him saying, "[T]here's going to be some people. They can't see you. You can only see them. Take your time and pick out the guy that did it" (Rambert: T. 259, 340-341).

[5] On September 24, 2011, at approximately 5:40 p.m., Detective Anthony Ribustello, with NYPD crime scene unit, recovered three shell casings, a sweat shirt, a sneaker, and head phones from the vicinity of 1240 Burke Avenue in the Bronx (Ribustello: T. 76-78, 80, 100). The parties stipulated that had Detective Geoffrey Bahm, an expert in the filed of firearms identification and comparisons testified, his testimony would be that the three recovered shell casings were all fired from the same firearm (T. 397-398).

[6] Ms. Rambert did not testify as to when the ambulance arrived at the scene. Instead, during the playing of the recording of her 911 call, Ms. Rambert pointed out the part when the ambulance arrived and she was taken away from the victim's body to allow the EMTs to work on the victim (T. 253-254).

stomach (Dr. <u>Carolyn Kappen</u>, medical examiner: T. 378).

On September 25, 2011, Officer Solomon went to the medical examiner's office where she identified Sedrick Sambolah's body as the individual she had seen in front of 1240 Burke Avenue (179).  The same day, <u>Edwin Sambolah</u> identified his son Sedrick Sambolah at the medical examiner's office (Sambolah: T. 153, 159).

**<u>The Defense</u>**

The defense presented no evidence.

**ARGUMENT**

**POINT ONE**

**THE COURT BELOW PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS THE PHOTO ARRAY IDENTIFICATION SINCE IT WAS NOT UNDULY SUGGESTIVE** (responding to defendant's brief, Point III[A]).

The court below, upon having examined the photo array, denied defendant's motion to suppress. Yet, arguing that all the fillers in the photo array appeared to male blacks, even though the detective testified that the eyewitness had described the culprit as a white male Hispanic, defendant claims that the photo array was unduly suggestive. Defendant further asserts that the subsequent lineup and trial identifications of him by the eyewitness were all tainted, and thus, should be all suppressed. The claim is meritless.

In reviewing the propriety of a pre-trial identification procedure, the People have the initial "burden of producing evidence in support of the fairness of the identification procedure." People v. Holley, 26 N.Y.3d 514, 521 (2015). Once the People have satisfied their burden of going forward, "the burden shifts to the defendant to persuade the hearing court that the procedure was improper." Id. Put differently, "[w]hile the People have the initial burden of going forward to establish

11

. . . the lack of any undue suggestiveness in a pretrial identification procedure, it is the defendant who bears the ultimate burden of proving that the procedure was unduly suggestive." Id. (internal quotation marks and citations omitted).

"There is no requirement that the photograph of a defendant shown as part of a photo array be surrounded by photographs of individuals nearly identical in appearance." People v. Staton, 138 A.D.3d 1149, 1149-1150 (2d Dept. 2016) (citations omitted), affd, 28 N.Y.3d 1160 (2017); People v. Chipp, 75 N.Y.2d 327, 336 (1990). Participants need only be reasonably similar in appearance to the defendant so there is no "substantial likelihood that the defendant would be singled out for identification." Chipp, 75 N.Y.2d at 336; People v. Solivan, 157 A.D.3d 554, 555 (1st Dept. 2018), lv. denied, 31 N.Y.3d 1087 (2018).

Detective O'Connell explained at the pre-trial hearing that he utilized the photo manager system, which contains photographs of all past defendants who have been arrested and photographed by the New York City Police Department. Upon locating defendant's photograph in the system, Detective O'Connell had commanded the system to create a photo array. Upon command to create a lineup with similar images, the photo manager system automatically selected photographs of individuals of similar appearance to defendant. Out of the thousands of photographs selected by the system, five were selected and placed in the photo array, along with defendant's

photograph (T. 26-28; People's Exhibit 1).

Detective O'Connell then met with the witness to have her view the photo array.  After reading the pre-printed instructions on how to view the photo array, the detective showed it to the witness.  The witness identified photograph number 3 -- defendant -- as the shooter  (T. 31-37).

Ignoring the detective's testimony that he had the photo manager system select fillers whose appearances were similar to that of defendant's photograph in the system, defendant implicitly accuses Detective O'Connell of having created an unduly suggestive photo array.  Without any basis on the record, defendant contends that the "fillers in the photo array appeared to be African-American" even though the detective allegedly "testified that he created the photo array with the information from Ms. Rambert that the perpetrator was a white Hispanic man" (defendant's brief, p. 73, citing T. 134-135).

In the cited pages of the transcript, during cross-examination, the following colloquy took place:

> Q:    And at the time you were working on composing the photo array, you had the following information, male Hispanic, correct?
>
> A.    Following information as far as what?
>
> Q.    As far as you been told by the witness, you were looking

for a male Hispanic?

A.    Correct.  Yes.

Q.    White male Hispanic?

A.    Yes.

\*      \*      \*

Q.    Would it be fair to say that all of the individuals on the photo array that you composed are male blacks?

[The prosecutor]:   Objection.  The photo speaks for itself?

The Court:   Speaks for itself.

Q.    [Defendant] is not white, correct?

[The prosecutor]:   Objection.

The Court:   You may answer.

A.    No.

Q.    He's not white?

A.    No.

(T. 134-135).

Detective O'Connell merely testified that the eyewitness had described the culprit as a white male Hispanic.  The record contains no indication that the detective intentionally selected fillers with darker skin to highlight defendant.  As noted, the

14

detective testified that he had the system select fillers who appeared similar to defendant's photograph.  Indeed, the photo array contains photographs of six individuals of varying skin complexion with similar hair styles and facial hair.  The detective never testified that he used the witness's alleged description of defendant being a white male Hispanic in creating the photo array.

Here, "[t]he court properly denied defendant's motion to suppress [the photo array] identification.  The [photo array] reveals that the participants were all reasonably similar in appearance, so that there was no substantial likelihood that defendant would be singled out."  People v. Bazemore, 147 A.D.3d 698, 698 (1st Dept. 2017), lv. denied, 29 N.Y.3d 1076 (2017).  Even if "defendant was the only person in the [photo array] not of [African-American] origin, this difference is not reflected in the actual appearances of the participants as shown by the photo, which establishes that defendant and the fillers were sufficiently similar in skin tone and other features."  Id.

Nevertheless, "[t]he hearing record and . . . examination of a copy of a photo array support the [lower] court's finding that the array was not unduly suggestive.  The alleged discrepancies in skin tone . . . between defendant and the fillers were not noticeable."  People v. Owens, 151 A.D.3d 520 (1st Dept. 2017), lv. denied, 29 N.Y.3d 1131 (2017) (citations omitted).  "Discrepancies regarding skin tone . . . were

15

not so pronounced as to create a 'substantial likelihood that the defendant would be singled out for identification.'" <u>People v. Muhammad</u>, 168 A.D.3d 549, 549 (1st Dept. 2019) (citations omitted). "[T]he variations in skin tone . . . among defendant and the fillers in the [photo array] were minor." <u>People v. Sanchez</u>, 95 A.D.3d 241, 250 (1st Dept. 2012), <u>aff'd</u>, 21 N.Y.3d 216 (2013). Since the photo array itself shows that it was not unduly suggestive, defendant's claim must be rejected.

In a related claim, defendant argues that the witness's trial testimony provided additional fodder for a finding of suggestiveness and that counsel was ineffective for not moving to reopen the suppression hearing at that point (see defendant's brief, p. 74, n. 18). At trial, upon being asked if the detective had said anything to her before she viewed the lineup, Ms. Rambert replied "I remember he asked me, I remember him telling me do your best. You are going -- there's going to be some people. They can't see you. You can only see them. Take your time and pick out the guy that did it, in my words. Those are my words" (T. 259). She further iterated that she could not specifically repeat what the detective had said, but that he read from a sheet of paper (T. 259).

In his testimony,[7] Detective O'Connell stated that he read the instructions to

---

[7] During trial, the prosecutor stated, "Your Honor, for the record the People have the lineup that was testified to by the detective. Since we are incorporating testimony into the trial, I ask what was exhibit three, the lineup photograph be deemed and marked into evidence at trial as People's

Ms. Rambert from a pre-printed lineup viewing instruction sheet: "That I was going to lift the blinds, she was going to look, there would be some individuals in front of her, look to see if she recognized anybody. If she did, indicate which number and where she recognized him from" (T. 53).

Yet, ignoring the detective's preceding testimony and focusing only upon the initial part of Ms. Rambert's testimony, defendant now claims that the lineup itself might have been unduly suggestive and that trial counsel was ineffective for not having sought to re-open the <u>Wade</u> hearing (defendant's brief, p. 74, n. 18). As noted, the record makes it evident that Ms. Rambert merely paraphrased what the detective had read to her from the lineup instruction sheet.

Nevertheless, even if such remark indicated that the police had a suspect in custody (which they did not, even as testified to by Ms. Rambert), such remarks would not render the procedure unduly suggestive "because they merely conveyed what a witness of ordinary intelligence would have expected under the circumstances." <u>People v. Williams</u>, 15 A.D.3d 244, 246 (1st Dept. 2005). Indeed, "[i]nherent in any [identification procedure] is the likelihood that an identifying witness will realize that the police are displaying a person they suspect of committing

---

Exhibit 18 on consent" (T. 186). The court responded, "Yes, so done there being no objection" (T. 187). The above colloquy demonstrates that Detective O'Connell's hearing testimony was adopted for trial purposes.

the crime, rather than a person selected at random." <u>People v. Caesar</u>, 91 A.D.3d 503, 503 (1st Dept. 2012) (internal quotation marks and citations omitted).  Consequently, under all the circumstances, trial counsel wisely chose not to seek to re-open the <u>Wade</u> hearing based upon such a flimsy argument.  <u>See</u> <u>People v. Caban</u>, 5 N.Y.3d 143, 152 (2005) ("There can be no denial of effective assistance of trial counsel arising from counsel's failure to make a motion or argument that has little or no chance of success) (internal quotation marks and citation omitted).

In sum, the court below properly denied defendant's suppression motion.[8]

---

[8] Defendant's claim that the court below failed to adhere to proper procedures by allowing trial testimony to be offered before the pre-trial suppression hearing was concluded will be addressed in Point Three, <u>infra</u>.

18

## POINT TWO

**DEFENDANT'S GUILT WAS PROVEN BEYOND A REASONABLE DOUBT AND THE GUILTY VERDICT WAS SUPPORTED BY THE WEIGHT OF THE EVIDENCE** (responding to defendant's brief, Point I)

Incorrectly characterizing minor discrepancies between the testimonies of the eyewitness and police witnesses as establishing the eyewitness testimony to be incredible as a matter of law, defendant claims that his guilt was not proven beyond a reasonable doubt, and that the verdict was also against the weight of the evidence. The claim is meritless.

The evidence at trial is legally sufficient if a rational trier of fact, in viewing the evidence in a light most favorable to the prosecution, drawing "all reasonable evidentiary inferences" for the People, could have found the essential elements of the crime beyond a reasonable doubt. People v. Lamont, 25 N.Y.3d 315, 318 (2015) (internal quotation marks and citation omitted); People v. Delamota, 18 N.Y.3d 107, 113 (2011) (citations omitted); People v. Danielson, 9 N.Y.3d 342, 349 (2007). So long as there exists "any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury," that conclusion, embodied in the verdict, should be upheld. People v. Bleakley, 69 N.Y.2d 490, 495

19

(1987).

In determining whether the verdict is against the weight of the evidence, this Court must first ascertain whether "based on all the credible evidence a different finding would not have been unreasonable." People v. Romero, 7 N.Y.3d 633, 643 (2006) (citing People v. Bleakley, 69 N.Y.2d 490, 495 [1987]); see People v. Delamota, 18 N.Y.3d at 116-117 (discussing the standard for weight of the evidence review). If a different finding would not have been unreasonable, then this Court must, "like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." Romero, 7 N.Y.3d at 643 (internal quotation marks and citations omitted); see also People v. Danielson, 9 N.Y.3d at 349 (the Court must consider the elements of the crime as charged to the jurors in making that determination).

This Court must "affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the [fact finder] in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt." Delamota, 18 N.Y.3d at 116-117. Only if it appears that the trier of fact "failed to give the evidence the weight it should be accorded," should the verdict be set aside. People v. Mateo, 2

N.Y.3d 383, 410 (2004) (internal quotation marks and citations omitted).  Although

essentially serving as a thirteenth juror (Danielson, 9 N.Y.3d at 348), this Court must

give "great deference" to the fact finder's verdict and credibility determinations

because "the memory, motive, mental capacity, accuracy of observation and

statement, truthfulness and other tests of the reliability of witnesses can be passed

upon with greater safety by those who see and hear than by those who simply read the

printed narrative." Romero, 7 N.Y.3d at 645 (internal quotation marks and citation

omitted).

Here, the trial court, sitting as the trier of fact, correctly found that the People

had established all the elements of Murder in the Second Degree, and its verdict was

not against the weight of the evidence.

Seyquana Rambert, the sole eyewitness, consistently identified defendant as the

individual who shot and killed the victim, her then boyfriend.  As Ms. Rambert

walked towards the victim, defendant, who approached the victim from the opposite

end of the street, drew her attention because he wore a blue top -- Ms. Rambert's

favorite color.  Ms. Rambert saw defendant walk up to the victim and raise his right

hand, while holding a handgun.  Although she turned away, she heard multiple

gunshots.  Ms. Rambert then saw the victim lying on the ground and bleeding, as

defendant went back in the direction he came.

Ms. Rambert subsequently identified defendant from both a photo array and lineup, and at trial as the individual who had shot and killed the victim.  No testimony was offered at trial that contradicted Ms. Rambert's testimony that she witnessed the shooting.  Ms. Rambert's identification of defendant as the shooter established his guilt of second-degree murder beyond a reasonable doubt.

Arguing that, "[i]n New York, it has long been held that a defendant's guilt cannot be established by a single eyewitness testimony mired in 'hopeless contradictions, '" defendant contends that Ms. Rambert's testimony was incredible as a matter of law, and thus, failed to establish his guilt beyond a reasonable doubt (defendant's brief, p. 41, citing inter alia, People v. Ledwon, 153 N.Y. 10 [1897]).  Defendant's contention, however, is not that Ms. Rambert's testimony was inherently contradictory because it supported both defendant's guilt and innocence.  Instead, defendant argues that Ms. Rambert's testimony was contradicted by other witnesses, none of whom had witnessed the actual shooting.

Defendant points out that Ms. Rambert's testimony differed with Officer Solomon's testimony regarding whether the victim's body lay face up or face down after he was shot, even though the two individuals arrived at the side of the victim's body at different times (see defendant's brief, p. 42).  Regardless of how the victim lay, it does not refute Ms. Rambert's testimony that she saw  defendant shoot the

22

victim, as a matter of law.

Defendant further argues that whereas Ms. Rambert remembered that the ambulance arrived within minutes of the shooting, Officer Solomon testified that it took thirty to forty-five minutes for it to arrive (see defendant's brief, p. 42).  Of course, any inaccuracy on this detail by Ms. Rambert would be easily understood as a result of the traumatic event she had witnessed.  And, again, the arrival time of the ambulance does not refute Ms. Rambert's insistence that she saw defendant shoot and kill defendant.

Defendant faults Ms. Rambert, who remained in shock for some time after having witnessed her boyfriend shot and killed in front of her, for not having immediately told the police officers on scene that she had witnessed the shooting (defendant's brief, p. 43).  Ms. Rambert , however, told the police later that day that she had witnessed the shooting; she did not come forward as a witness months later.  Moreover, her testimony should not be deemed incredible because she could only tell the police that defendant wore a blue shirt.  Even though Ms. Rambert had ample time to see defendant's face and to remember it before the shooting, she could not have known that she should also memorialize every piece of clothing defendant wore.  She had focused on the blue shirt because it was favorite color.

While Detective  O'Connell had written in his memo book that Ms. Rambert

23

described defendant as being white, she denied it.  She was adamant that she said

defendant was black Hispanic, possibly Dominican.  Regardless, as noted, Ms.

Rambert consistently identified defendant as the shooter.  Even assuming, arguendo,

that Ms. Rambert had told the detective on the night of the shooting, while still in

shock, that defendant was white, Mr. Rambert consistently identified defendant as the

shooter.  The discrepancy in defendant's skin tone between the detective's notes and

Ms. Rambert's trial testimony does not render her identification of defendant

incredible.  See People v. Smith, 142 A.D.3d 1027, 1028 (2d Dept. 2016) ("The minor

discrepancies between the description of the defendant given at trial by the People's

main witnesses and the descriptions given to police in affidavits after the shooting

and before the grand jury did not render their testimony incredible") (citations

omitted).  "Although there were discrepancies between [Ms. Rambert's] description

of the perpetrator to the police and the physical appearance of defendant, [Ms.

Rambert's] identification of defendant was not incredible and unbelievable, that is,

impossible of belief because it [was] manifestly untrue, physically impossible,

contrary to experience, or self-contradictory."  People v. Rumph, 93 A.D.3d 1346,

1347 (4th Dept. 2012) (internal quotation marks and citations omitted).

    As all inferences are to be drawn in the People's favor, any conflicts between

the witnesses's testimonies should be resolved as establishing defendant's guilt

24

beyond a reasonable doubt.   Moreover, in <u>Delamota</u>, 18 N.Y.3d at 114, the Court of Appeals refuted defendant's contention by explaining that explained that "<u>Ledwon</u> applies [only] in rare cases where the charged crime is established by only one witness who provides inherently contradictory testimony at trial" that demonstrates both guilt and innocence.  As noted, Ms. Rambert did not offer any testimony that would support defendant's innocence -- a contention that defendant notably does not make on appeal.

The Court further stated that "<u>Ledwon</u> does not apply when a conflict arises from the testimony of more than one witness. When this occurs, it is the [trier of fact] that must weigh the evidence and determine who to believe because the discrepancy simply creates a credibility question for the [trier of fact] ... to be determined by them in the context of the entire body of evidence before them." <u>Delamota</u>, 18 N.Y.3d at 115 (internal quotation marks and citations omitted).

Defendant's argument essentially is that Ms. Rambert was not a credible witness.   Recognizing the difficulty of challenging the trial court's credibility determination, defendant  attempts to portray Ms. Rambert's testimony as being incredible as a matter of law.  "[G]iven the failure of defendant to present any compelling evidence . . .  to render [that testimony] unworthy of belief or establish a basis upon which to disturb the [trier of fact's] resolution of these credibility

issues," it was not incredible as a matter of law.  People v. Gamble, 135 A.D.3d 1078, 1079-1080 (3d Dept. 2016) (internal quotation marks and citations omitted), lv. denied, 27 N.Y.3d 997 (2016).

"To the extent that questions may be raised concerning the reliability of the trial witnesses and the credibility of their testimony, great deference must be accorded to the [trier of fact's] findings because the [trier of fact] had an opportunity to view the witnesses, hear the testimony and observe demeanor."  People v. Rizk, 146 A.D.3d 523, 523 (1st Dept. 2017), lv. denied, 29 N.Y.3d 952 (2017); see People v. Villanueva, 148 A.D.3d 210, 214 (1st Dept. 2017) (same), lv. denied, 29 N.Y.3d 1088 (2017).  "[A]ny inconsistencies and gaps in the testimony posed credibility issues for the [trier of fact], which it ultimately resolved in favor of the People."  People v. Marryshow, 162 A.D.3d 1313, 1317 (3d Dept. 2018).  Here, upon having heard all the testimony, including the discrepancies brought out by defense counsel on cross-examination, and having observed the witnesses during their testimony, the court below, as the trier of fact, credited Ms. Rambert's testimony and found defendant guilty of second-degree murder.

Finally, in a futile attempt to complicate the issue, defendant complains, without any basis on the record, that the prosecution "proffered no link between [defendant], who Ms. Rambert did not know, and O.G., a person known to the

eyewitness and her boyfriend" (defendant's brief, p. 44). The prosecution never theorized that O.G. was involved in the shooting or had conspired with defendant to commit the murder. The victim had told Ms. Rambert that he had fought with O.G. the night before and that O.G. waited outside Ms. Rambert's building to fight, once again, with the victim. When Ms. Rambert saw the victim and O.G. later in front of her building, they were not engaged in any dispute nor was O.G. present when Ms. Rambert saw defendant shoot the victim. The testimony regarding the victim's fight with O.G. was offered merely to complete the narrative on why the victim had left Ms. Rambert's home that morning and was outside on the street. The prosecution never asserted any link between O.G. and the shooting.[9]

In sum, defendant's guilt was proven beyond a reasonable doubt and the guilty verdict was supported by the weight of the evidence.

---

[9] Defendant claims that the prosecutor improperly claimed to have proven defendant's motive for the shooting to bolster Ms. Rambert's single witness identification of defendant (see defendant's brief, pp. 44-45). The argument, which stems from the prosecutor's summation remarks, will be addressed in Point Four of the respondent's brief, infra.

27

## **POINT THREE**

**DEFENDANT'S CHALLENGES TO VARIOUS RULINGS BY THE COURT BELOW ARE ALL MERITLESS AND DEFENSE COUNSEL RENDERED EFFECTIVE REPRESENTATION IN CHOOSING NOT TO MAKE FRUITLESS CHALLENGES AGAINST THE RULINGS** (responding to defendant's brief, Points II and III[B]).

Prior to the commencement of trial proceedings, defendant voluntarily, knowingly and intelligently waived his right to a jury trial by executing a written waiver before the court. Defendant discussed the waiver with his attorney before signing the form. Yet, defendant claims, for the first time on appeal, that the waiver was invalid. In a related argument, defendant argues that the court below erroneously held a combined suppression hearing and trial, and heard trial testimony before rendering a decision upon defendant's application to suppress evidence. Defendant further contends that the court below erred by not having questioned him on whether he had agreed with counsel to forfeit his right to testify at trial. The claims are partially unpreserved for appellate review, as a matter of law, and entirely meritless.

A.    Waiver of Right to a Jury Trial & Combined Hearing and Trial

Before starting the pre-trial hearings, the court below confirmed with defense counsel and defendant both that he desired to proceed with a bench trial. Afterwards,

28

the court below explained to defendant the rights he would be forfeiting by choosing to forego a jury trial, and instead, to have a bench trial:

> The Court:
>
> First of all, you'll get a fair trial, no question about that.  However, you should be aware that there will be no opportunity since you are waiving it, for you to participate in the picking of a jury that will sit in judgment over you.
>
> No opportunity for your counsel to argue to twelve people.  All you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted.  Going before the bench those odds shrink a little bit.  Now you're only one on one as opposed to one to twelve.
>
> Do you feel enough confidence in your case, have you discussed it enough with the people you think you should discuss it with and [sic] your attorney before coming to this decision?  Do you feel strong enough to go forward before the bench?
>
> The defendant:
>
> Yes
>
> The Court:
>
> All right.  I will ask you to review a waiver . . . and if you find it in order, you may execute it and we will proceed accordingly.  But here again I want to emphasize the right to go to trial by jury.  You have the right to pick people that you will actually help to pick and choose, and you have the right for

> the representation of counsel to treat [sic] with all court-related matters, but now you're placed solely in the hands of the Court.  Do you understand that again?

The defendant:   Yes.

The Court:   I emphasize that to you.

> Okay.  Look at this paper, review it with your counsel and see whether or not you find it in order.

(W. 3-4).  The court further sought confirmation from counsel that defendant knew the sentence exposure -- a maximum of 25 years to life and a minimum of 15 years to life -- for a murder conviction (W. 5).

Afterwards, defendant reviewed the written waiver of jury trial form with his attorney.  Upon deciding that the waiver was executed properly, the court accepted it (W. 5).  The court went further to state to defendant, "I'll reserve for you, Mr. Defendant . . . that should you have any reflections [sic] in it and wish to proceed otherwise, you may share that with counsel.  So you may have a full opportunity to consider this as far as you wish to consider it" (W. 6).

The following day, after the pre-trial suppression hearing had started, the court engaged in following colloquy with defendant:

The Court          . . . I suggested to you, [defendant], that I would allow you to reflect overnight, what I

30

|                   |                                                                                                                                                                                 |
|-------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                   | want to ascertain, yesterday when we alloccuted you, you were not under any drugs or medication or under anything along that line, alcohol, anything at all is that correct.     |
| The defendant:    | That's correct.                                                                                                                                                                 |
| The Court:        | And has anyone in any way, and I include everyone, in any way twisted your arm, put your back to the wall in any way, tried to force you or coerce you into going forwards as a bench rather than a jury trial?? |
| The defendant:    | No.                                                                                                                                                                             |
| The Court:        | And the last thing, giving you that time to reflect, is there anyone you wish further to discuss with, talk to get advice from before going forward as we've planned to do?     |
| The defendant:    | Talk to my family.                                                                                                                                                             |
| The Court:        | Everything stays in place.                                                                                                                                                     |
| The defendant:    | Yes.                                                                                                                                                                           |
| The Court:        | And again, you are going forward with the bench trial as you, you already wish to do and informed the Court, correct.                                                          |
| The defendant:    | Yes.                                                                                                                                                                           |

(T. 69).

Despite having executed a written waiver of right to a jury trial, after having

the court explain the rights he was forfeiting and having consulted with his attorney,

31

defendant now claims that the waiver is invalid, and that it was not done voluntarily, knowingly, and intelligently.  Defendant points out that, the day after signing the written waiver, when the court asked if he wished to consult with anyone before proceeding, he had stated that he wished to speak with his family.  According to defendant, this was an indication that he was not prepared to waive his right to a jury trial (see defendant's brief, pp. 55-56).

Defendant, however, raised no objection that the court below had not responded to his request to speak with his family.  Instead, when the court inquired if defendant was willing to proceed with a bench trial, as he previously had stated, defendant replied "Yes" (T. 69).  Consequently, "[d]efendant's challenge to the validity of his waiver of the right to a jury trial, made in writing in open court in accordance with law, is unpreserved." People v. Rahman, 137 A.D.3d 523, 525 (1st Dept. 2016); see CPL § 470.05(2); People v. Campos, 93 A.D.3d 581, 582-583 (1st Dept. 2012).  Nevertheless, the claim is meritless.

"Article I, § 2 of the New York Constitution guarantees a criminal defendant the right to a trial by jury. This fundamental right has been properly interpreted as guaranteeing the right to trial by jury as it had existed at common law. . . [The Court of Appeals] has thus long recognized that under our State Constitution a person accused of a crime is entitled to determination by a jury of 12." People v. Page, 88

N.Y.2d 1, 5 (1996). Pursuant to CPL § 320.10, a defendant "may at any time before trial waive a jury trial and consent to a trial without a jury" provided the waiver is "in writing and . . . signed by the defendant in person in open court in the presence of the court, and with the approval of the court." The statute requires the court "approve the execution and submission of such waiver unless it determines that it is tendered as a stratagem to procure an otherwise impermissible procedural advantage or that the defendant is not fully aware of the consequences of the choice he is making."

Here, as evidenced by the record, defendant signed the written waiver in open court upon being advised of the differences between a jury and a non-jury trial and having consulted with his attorney. Contrary to defendant's assertions, the court below did not make "only a minimal inquiry into [defendant's] understanding of the consequences of his waiver of his right to a jury trial" (see defendant's brief, pp. 57-58). The court below stated that, by waiving his right to a jury trial, defendant and his attorney would not have the opportunity to select twelve jurors who would all have to be convinced of his guilt beyond a reasonable doubt. The court explained, "All you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted" (W. 3-4). The court further informed defendant that, "Going before the bench those odds shrink a little bit. Now you're only one on one as

33

opposed to one to twelve" (W. 4).  The court explained the key difference between a jury and a non-jury trial and emphasized that defendant should review the written waiver form with his attorney (W. 4-5).  As noted, upon reviewing the waiver with his attorney, defendant signed it (W. 5).

Puzzlingly, defendant contends that, the following day after having given defendant additional time to weigh his decision, "rather than inquiring as to whether the decision was truly voluntary . . . the court asked [defendant] whether anyone had 'twisted [his] arm, put [his] back to the wall' or tried to force or coerce him into having a bench trial" (defendant's brief, p. 58, quoting T. 69).  Asking defendant if anyone had "tried to force you or coerce you into going forwards as a bench rather than a jury trial" (T. 69), is the equivalent of inquiring if the waiver was voluntarily made.  The court also inquired if, during the waiver allocution the day before, defendant was "under any drugs or medication or under anything along that line, alcohol, anything at all" (T. 69).  The court received assurances from defendant, on the record with his attorney present, that the allocution and the waiver were both voluntarily, knowingly, and intelligently made.  The court's questioning may have been non-typical, but "no particular catechism is required to establish the validity of a jury trial waiver."  People v. Smith, 6 N.Y.3d 827, 828 (2006) ("The inquiry here, though minimal, was sufficient to establish that defendant understood the

34

ramifications of such waiver").

The record is lacking on why the court did not respond, at least on the record, to defendant presumably wanting to speak with his family.  Perhaps it was because the court understood defendant to have said that he had "talked" to his family, rather than having had uttered the non-responsive command "talk to my family."  In any event, when the court then immediately asked defendant "you are going forward with the bench trial as you, you already wish to do and informed the Court, correct," defendant gave an affirmative response.  He did not seek to withdraw his waiver nor insist on speaking to his family (T. 69).  "The totality of the circumstances demonstrates that defendant made a valid waiver of his right to a jury trial. Defendant, who had discussed the waiver with counsel and was familiar with criminal proceedings, stated unequivocally -- as did his attorney -- that he wanted a nonjury trial, and the record [is] sufficient to establish that defendant understood the ramifications of such waiver."  People v. Samuels, 37 A.D.3d 336, 336 (1st Dept. 2007) (internal quotation marks omitted).

Defendant's reliance upon People v. Ahl, 243 A.D.2d 985 (3d Dept. 1997), is misplaced (see defendant's brief, p. 59).  In Ahl, the Third Department simply upheld the waiver of a jury trial where the "defendant indicated under oath that he was aware of his right to a jury trial and the consequences of his waiver of such right; that his

decision was totally voluntary; that he had discussed his decision with his attorney and with his daughter; that he was conscious of what he was doing; and that he had not had anything to eat or drink nor taken any medication or any other substance which would affect his ability to think." Id. at 986.  Furthermore, a "written waiver was thereafter executed by defendant in open court and accepted by the court." Id. The court did not emphasize that the defendant had spoken with his daughter in finding the waiver valid.  It was merely one of the factors cited by the court.

In sum, the court below properly accepted defendant's waiver of his right to a jury trial.

In a related argument, defendant contends that the court below "erred by allowing trial testimony to be presented *before* making a decision on the suppression motion and by failing to put forth on the record any findings of fact, conclusion of law, or reasons for its determination in denying the suppression motion" (defendant's brief, p. 74) (emphasis in original) (citations omitted).  The claims are meritless.

"[T]he requirement that suppression motions be determined before trial (CPL § 710.40[3]) is not inviolate, and the record herein [implies] that defense counsel consented" to the procedures taken in this case.  People v. Orkabi, 160 A.D.2d 644, 645 (1st Dept. 1990).  While in the midst of the suppression hearing, the court took a break to hear trial testimony from a police witness.  The colloquy that took place

prior to the testimony strongly indicates that it was previously agreed upon by all

parties:

> [The Prosecutor]: For the record I want to indicate that the People have premarked People's Exhibit 1 through 17, and including 17A, B, C and D. These exhibits have been shown to defense counsel and with his consent they have all been marked in.

> [Defense counsel]: That's correct, for the purposes at the hearing.

> The Court: For all purposes if that becomes necessary.

> [The Prosecutor]: This is -- actually we are starting trial. And I understand that we are reserving opening statements --

> The Court: We shall.

> [The Prosecutor]: -- for trial. We did not finish the hearing, and there has been no decision with defense counsel. We are reserving. We haven't done Sandoval, that has been reserved, so we can expedite and get this witness on the case. So we are actually beginning the trial with this witness, and follow up with defense counsel.

> The Court: And we adopt so much as need should we go forward. Bring in the witness.

(T. 71). Subsequently, during the hearing testimony of Detective O'Connell, the

following took place:

37

| | |
|---|---|
| [The Prosecutor]: | Again I object to these questions are way outside the scope of the hearing. |
| The Court: | I know, but we will do a bifurcated case, as we need for the purpose of the trial as well. |
| [The Prosecutor]: | This is -- I understand, but [defense counsel] is asking questions about what [Ms. Rambert] said. The witness hasn't testified. And what they may or may not have said as possibly impeaching? I don't understand the purpose of asking these questions at this point? |
| The Court: | All right. I will allow them so far. The Court will bifurcate as it needs. |

(T. 125).

In both instances, defense counsel raised no objection that the court was not adhering to CPL § 710.40(3), nor expressed any surprise. Defense counsel also did not protest that Detective O'Connell did not re-appear as a trial witness; the detective's testimony was adopted for trial purposes according to unobjected to representation by the prosecutor (T. 186). Based upon the circumstances, it appears that "[w]ith defendant's consent, the court properly conducted a combined suppression hearing and nonjury trial." People v. Hanson, 256 A.D.2d 74, 74-75 (1st Dept. 1998).

Defendant further complains that the court's decision denying his suppression

motion failed to set forth the court's factual findings and conclusions of law (see defendant's brief, pp. 74-75).

At the conclusion of the hearing and respective arguments by both counsel, the court remarked, "Upon due reflection, having reviewed the Court's trial notes bifurcated as appropriate herein and having considered the testimony and the exhibits, likewise in evidence, the court denies, the suppression is denied" (T. 144).

Under the circumstances, the court's decision denying the suppression motion should not be set aside "merely because the court did not provide a detailed recitation of its underlying reasoning ..., particularly where, as here, the basis of the court's decision may be inferred from the parties' arguments." People v. Flowers, 166 A.D.3d 1492, 1494 (4th Dept 2018) (citations omitted), lv. denied, 32 N.Y.3d 1125 (2018); People v. Walker, 83 N.Y.2d 455, 459 (1994) ("an exercise of a trial court's Sandoval discretion should not be disturbed merely because the court did not provide a detailed recitation of its underlying reasoning, particularly where, as here, the basis of the court's decision may be inferred from the parties' arguments").

"Counsel's consent to the procedure employed by the court did not deprive [defendant] of effective assistance of counsel. On the existing record, which defendant has not sought to expand by means of a CPL 440 motion in order to explore counsel's strategy," this Court should decide that "counsel pursued a strategy

that was reasonable under the circumstances.."[10]  <u>Hanson</u>, 256 A.D.2d at 74-75.

Regardless, should this Court decide that the court below failed to adhere to CPL §

710.60(3), it still should not be "fatal . . . where, as here, there has been a full and fair

hearing.  In such instances, this [C]ourt may make its own findings of fact and

conclusions of law."  <u>People v. Casillas</u>, 134 A.D.3d 1394, 1394-1395 (4th Dept.

2015); <u>People v. Rodriguez</u>, 258 A.D.2d 299, 299 (1st Dept. 1999) ("Although the

hearing court failed to make findings of fact and conclusions of law, this Court has

an adequate record on which to make its own findings").  For the reasons set forth in

Point One, <u>infra</u>, and upon review the photo array, this Court should find that the

photo array was not unduly suggestive.

## B.   <u>Waiver of Right to Testify at Trial</u>

Defendant claims that both his trial counsel and the court failed to uphold his

fundamental right to decide whether to testify on his own behalf at trial.  The claim

is partially unpreserved and entirely meritless.

"It is well established that a defendant, having accepted the assistance of

counsel, retains authority . . . over certain fundamental decisions regarding the case,"

---

[10] To the extent that any of defendant's claim that counsel rendered ineffective assistance is based upon matters that are <u>dehors</u> the record, they are unreviewable on direct appeal.  <u>See</u> <u>People v. Rivera</u>, 71 N.Y.2d 705, 709 (1988); <u>People v. Love</u>, 57 N.Y.2d 998 (1982).

such as, "whether to testify in his or her own behalf." People v. Hogan, 26 N.Y.3d 779, 786 (2016) (citations omitted). "The decision to testify in one's behalf is personal and can be waived only by the defendant, not counsel alone." People v. Mercado, 147 A.D.3d 613, 615 (1st Dept. 2017) (same). It is not required, however, that defendant personally state on the record that he is voluntarily, knowingly and intelligently waiving his right to testify in his defense. See People v. Fratta, 83 N.Y.2d 771, 772 (1994) ("Moreover, we cannot agree that defendant was deprived of his constitutional right to testify on his own behalf because he personally did not waive that right on the record").

Following a witness testimony and the prosecutor placing certain unrelated evidentiary and discovery matters onto the record, the court below started the Sandoval hearing with all parties, including defendant, present:

<blockquote>

The Court: So noted. Lets do the Sandoval[.] Mr. [Defense counsel], are you ready. Mr. [Prosecutor], you may proceed.

[The Prosecutor]: As to the Sandoval hearing, should the defendant take the witness stand. The People would request to be allowed to question the defendant regarding his two prior arrests, please. As well as his gang affiliation with the Bloods and his alias or nickname of Pure as to the first item.

The defendant was arrested on July 30, 1998

</blockquote>

41

and in the 17th Precinct in Manhattan.  And, he pled guilty .  He was adjudicated a juvenile defendant on October 10, 2000 are [sic] for a grand larceny in the fourth degree section 152 subdivision five, a class E felony.  I understand that the defendant was adjudicated a juvenile delinquent, however that should not protect him from the People being allowed to question regarding the underlying facts of that incident.   One moment.

[Defense counsel]:          [Defendant's] not going to testify.  I'm not going to put him on.

The Court:          You already made that decision.

[Defense counsel]:          I made that decision.

The Court:          Well, this is in the event.

[Defense counsel]:          I made that decision in much as much as the trier of the facts, I don't want my well to [sic] poisoned.  It has no bearing . . . on the case?

The Court:          That's your application?

* * *

[Defense counsel]:          Judge,  at  this  point  I  made the decision.  I am not going to put him on.   If it changes, I will give him ample time.

The Court:          It is fine with the court should he wish to change his mind.  We can revisit the issue.

42

| [Defense counsel]: | I will request to ignore everything that was just said. |
|---|---|

> \*     \*     \*

| The Court: | He's now withdrawing, is that correct? |
|---|---|
| [Defense counsel]: | Yes, your Honor. |
| The Court: | And subject to renewal. |
| [Defense counsel]: | Without prejudice. |

(T. 187-189).

Claiming that counsel had unilaterally decided that defendant would not testify at trial, defendant argues that the court below failed to uphold his right to testify by not having inquired into whether defendant agreed with counsel's declaration. Defendant, however, raised no protest to the court that he desired to testify, but that counsel would not permit it. Defendant remained silent throughout the entire colloquy. He expressed no shock or surprise. Thus, the claim is unpreserved for appellate review, as a matter of law. See CPL § 470.05(2); People v. Haynes, 163 A.D.3d 994, 995 (2d Dept. 2018) ("The defendant's contention that the court should have inquired whether his failure to testify was intelligent and voluntary is unpreserved for appellate review").[11] Nevertheless, the claim is meritless.

---

[11] Citing to a federal case, defendant claims that "a defendant need not object at trial to preserve the claim that the waiver of the right to testify was not knowing, intelligent, and voluntary"

43

The sole basis for defendant's claim is that counsel had stated on the record that "I made the decision."  Pointing out that counsel had requested a <u>Sandoval</u> hearing, defendant contends that counsel must have initially decided that defendant would testify.  Defendant further contends that counsel did not have an opportunity to discuss with him the change in trial tactic -- that defendant would not testify -- because it was made in the middle of the <u>Sandoval</u> hearing.

Counsel's declaration, however, was made upon the prosecutor listing the prior convictions and additional bad acts that the prosecution would seek to question if defendant testified at trial.  From the record, it cannot be ascertained whether defendant and counsel had discussed, prior to the <u>Sandoval</u> hearing, that defendant would not testify if certain prior convictions were raised by the prosecution.  While the prosecutor was talking, counsel and defendant plausibly could have confirmed their prior decision that, under the circumstances, defendant would no longer testify.  Counsel's rationale was that he did not want the court, as the trier of fact, to hear of defendant's prior convictions, even in the role as the judge presiding over the hearing.

Notably, during his opening statement, which took place prior to the <u>Sandoval</u>

---

(defendant's brief, p. 63) (citing <u>Chang v. United States</u>, 250 F.3d 79, 84 [2d Cir. 2001]).  While bound by the United States Supreme Court's interpretations of federal statutes and the federal Constitution, a lower federal court's interpretation of a constitutional question may serve as useful and persuasive authority, but it is not binding on this Court.  <u>See</u> <u>People v. Kin Kan</u>, 78 N.Y.2d 54, 59-60 (1991).

44

hearing, counsel never argued that defendant would be testifying. A reasonable inference can be drawn that counsel and defendant had already agreed, prior to opening statements, that defendant possibly would not testify at trial, and thus, counsel had not made such an assertion during his opening.

Here, "[n]othing in the record casts doubt on the voluntariness of defendant's waiver of the right to testify and there was no reason for the court, sua sponte, to make a personal inquiry of defendant on this matter." People v. Christian, 244 A.D.2d 297, 297 (1st Dept. 1997) (citations omitted). "A trial court does not have a general obligation to sua sponte ascertain if the defendant's [decision not to] testify was a voluntary and intelligent waiver of his right." Haynes, 163 A.D.3d at 995.[12]

Defendant further claims that his counsel was ineffective for having waived his

---

[12] Citing to the federal case, United States v. Ferrarini, 219 F.3d 145 (2d Cir. 2000), defendant argues that "the court was obligated to conduct an inquiry of [defendant] to ensure that the waiver was knowing, intelligent, and voluntary" (defendant's brief, p. 63). While the federal case does not control how the state trial court should have acted (see Kin Kan, 78 N.Y.2d at 59-60), defendant's reliance is misplaced. In Ferrarini, the Second Circuit merely held that, in "ruling on a motion to sever or to adjourn a trial on medical grounds . . . in cases in which a trial court has sufficient cause to question a defendant's physical capacity to take the stand or when the defendant has specifically raised the issue of capacity to testify, the district court, in order to insulate this fundamental constitutional right [to testify at trial] from an involuntary waiver, must determine whether the defendant is in fact physically able to testify." Id. at 151-152. The decision that a court must conduct an inquiry was limited to specified circumstances. Indeed, in emphasizing the limitations, the Court cited to its own decision in Brown v. Artuz, 124 F.3d 73, 79 (2d Cir 1997), wherein the Court held that it "agree[s] with those courts that place no general obligation on the trial court to inform a defendant of the right to testify and ascertain whether the defendant wishes to waive that right . . . .the judge need not intervene when counsel announces that the defendant rests and the defendant has not testified."

right to testify without having consulted him.  Normally, "[d]efendant's claim that he

was denied effective assistance of counsel is procedurally defective and not

reviewable on direct appeal since it is based, in significant part, on allegations of fact

<u>dehors</u> the record. . . .The proper vehicle by which to make such factual claims is a

motion pursuant to CPL 440.10."  <u>People v. Morgan</u>, 271 A.D.2d 248, 248-249 (1st

Dept. 2000).  Here, defendant had ample opportunity to place facts on the record that

would have allowed review of the claim on direct appeal.  As noted, defendant could

have objected and informed the court that he had not agreed to waive his right to

testify.  Additionally, counsel stated that he did not want defendant to testify because

counsel did not want the court, as the trier of fact, to hear of defendant's prior bad

acts and be influenced by them.  At the end, counsel requested that the court ignore

everything it had heard during the hearing.  Consequently, had defendant raised this

claim in a CPL § 440.10 motion, the People's response would have been that the

claim should be denied pursuant to CPL § 440.10(3)(a).  The claim, therefore, can be

reviewed and denied on the instant direct appeal.

In contending that counsel's alleged actions prejudiced him, defendant asserts

that his "testimony would have included a denial that he committed the crime, an

opportunity he did not have until sentencing when he stated, 'I'm innocent'"

(defendant's brief, p. 63, quoting S. 18).  Defendant's assertion of innocence is self-

evident in his decision to proceed to trial.  As defendant had no duty to present a defense, it is hard to fathom how defendant not having made a simple declaration that he is innocent from the witness stand affected the court's verdict.  The court below would not have held it against defendant that he did not testify.

In sum, defendant was not deprived of his right to testify at trial.

## POINT FOUR

**THE PROSECUTOR'S SUMMATION CONSTITUTED FAIR COMMENT ON THE EVIDENCE AND A FAIR RESPONSE TO THE DEFENSE SUMMATION** (responding to defendant's brief, Point IV).

Defendant claims that the prosecutor's summation deprived him of his right to a fair trial.  The claim is partially unpreserved and wholly meritless.

A prosecutor has a wide latitude in commenting upon the evidence and may fairly respond to the arguments raised in counsel's summation while staying "within the four corners of the evidence." People v. Williams, 29 N.Y.3d 84, 88 (2017); People v. Overlee, 236 A.D.2d 133, 136 (1st Dept. 1997). It must be determined whether, in light of the entire record, defendant was deprived of a fair trial.  See People v. D'Alessandro, 184 A.D.2d 114, 119 (1st Dept. 1992).  Viewed in this

context, the challenged comments do not warrant a new trial.

Defendant did not object at trial to any of the prosecutor's summation remarks challenged on direct appeal on the same grounds. Consequently, the claim is unpreserved for appellate review, as a matter of law. See CPL § 470.05(2); People v. Rodriguez, 166 A.D.3d 459, 461 (1st Dept. 2018) ("Defendant's general objections . . . failed to preserve his challenges to the People's summation"), lv. denied, 2019 WL 1200192 (Ct. App. Feb. 8, 2019).

In support of the defense argument that Ms. Rambert was not a credible witness and that she had not witnessed the shooting and, instead, had arrived at the scene after the shooting, counsel had argued,

> . . . The officer said, she was with the victim. She took his pulse. She tried to find out what was going on with him. She was rushing the bus, and 45 minutes later the ambulance arrived. Now I will stop her testimony for one second.
>
> What do we hear from our witness. We heard that the ambulance arrived in two minutes. Right there a reliable witness is contradicting her, because two minutes and 45 minutes is a big difference. If she said it arrived in two minutes, and she said it arrived in two [sic] minutes. Between two minutes and 45, this is such a vast difference. You can't rely on her.

(T. 431). Counsel emphasized the differing testimonies between Ms. Rambert and Officer Solomon regarding when the ambulance had arrived at the scene.

In response, the prosecutor made the following arguments during his

summation:

> And this goes to no [sic] another point [defense counsel] made P.O. Solomon, she arrived at the scene and there were a lot of people around. And it says in the testimony, in the transcript, I don't know it took about forty-five minutes to get there. I think it was a mistake. I didn't catch it, but when you say 45 and say four to five minutes -- I agree every time it says 45 minutes. I submit your Honor that is a mistake. It's four to five minutes. I will tell you why, on that tape as we are listening, you hear the operator say E.M.S. is already there. I think it was on minute six or seven.

[Defense counsel]:    Judge, I am sorry. This is not the time. She has said clearly 30 minutes to 45. She says a half-hour.

The Court: The Court will reflect what is correct in the transcript and make [its] determination considering all the facts.

[Defense counsel]:    I apologize.

[The Prosecutor]: That's what I want you to do. Please consider all the factors. It makes no sense for 45 minutes to have for an ambulance to have arrive. We hear the screaming. She indicates at one point, I am trying to get the page, I think it's 212 line 13:

> Answer:    I stayed with him as long as they would let me, next to his body. But when it was time for E.M.S. to do what they had to do, I stood back.

> Question:    What did you see E.M.T. or E.M.S. technicians do?

> Answer:    Pulling his body closer to the gate and cutting off his shirt.

Page 253 while the tape was being played, line 18:

    Answer:    I have -- was still in front of his building.  Now I'm being dragged away.

    Question:    Sorry.

    Answer:    Now I am being dragged away by friends, family and people standing there.

    Question:    What was happing around [the victim].

    Answer:    At that point in time the ambulance had pulled up in front of the building.

Going onto the next page,

    The Court:  Ms. Rambert at 2/22 there is screaming and crying in the background, whose voice is this?

    Answer:    Mine.

Was her answer to the court's question.

    Question: (The People on direct.)  Where were you at that moment.

    Answer:    I was standing by one of the yellow poles while people were crowding in front of me, and the ambulance was doing their job.

    Question:    Is that your voice in the background still crying and screaming?

    Answer:    Yes it is.

50

Question:    What was happening?

Answer:    At that point they were cutting off his shirt, and I was just saying I want to see?

Question:    Did you said [sic] something abut getting --

Answer:    I asked them to please get off me because everyone was crowding me, and I couldn't see over the people while the ambulance was doing what they were supposed to do.

That is the tape.  And the tape starts with the first call, and people get there.  So we are not talking for a while.  [Defense counsel] and I agree it says 45 on Officer Solomon's testimony. Common sense says we picked it up, but it should have been four to five minutes.  That is simply a mistake in either --

[Defense counsel]:        I object, because on page 182 she used the words half an hour to 45 minutes.

The Court:   [Defense counsel], you had your opportunity.

(T. 473-475).

Defendant claims that the prosecutor "speculat[ed] without any basis in the record," that the minutes contained an error regarding Officer Solomon's testimony regarding how long it took for the ambulance to arrive (see defendant's brief, p. 79). As evident in the prosecutor's summation remarks above, however, the argument was based upon the recording of the 911 call.  The prosecutor, in good faith, relied upon the recording to argue that the ambulance arrived within a short time of the shooting,

51

as Ms. Rambert had testified, and thus, the minutes must be mistaken regarding Officer Solomon's testimony.   The prosecutor's argument is based upon his interpretation of the evidence presented at trial; it is not based upon conjecture as defendant alleges on appeal.  "The remarks were fair responses to defense counsel's summation arguments and were based on reasonable inferences drawn from the evidence, and there was nothing so egregious as to warrant a new trial."  People v. Torres, 148 A.D.3d 490, 491 (1st Dept. 2017), lv. denied, 29 N.Y.3d 1087 (2017). Also, the trial court's remarks show that the court was going to consider the arguments fairly.

Defendant next claims that the prosecutor made false and improper remarks that the evidence presented established motive for defendant's actions.

During his summation, defense counsel had argued:

> What I am proposing to your Honor is that there is no motive here Judge.  There is no motive.  A person who doesn't know another person doesn't just kill them for no reason at all, none whatsover.

> And if anybody had a reason to kill this individual, it would have been OG and he didn't do it.  There is no evidence that he did, and no evidence that he participated in it.

(T. 451-452).

In concluding his summation, the prosecutors responded,

52

There is no basis in evidence for anything [defense counsel] proposed, and should not have any consideration for the facts of this trial and hopefully will not influence your evaluation of this case. He talked about motive. The People have proved motive in this case. And it's clear from this incident that the defendant, as he drew the weapon clearly wanted to shoot and kill Sedrick Sambolah and that was his intent.

Your Honor, it's the People's submission that all the above facts support the case against the defendant and prove his guilt beyond a reasonable doubt based on the evidence. I ask your Honor to convict [defendant] of murder in the second degree. Thank you.

(T. 479).

Without any basis in the record, defendant claims that the prosecutor's above remarks improperly imputed the motive of an individual identified as O.G. at trial, who had an argument with the victim at a club the night before, onto defendant (see defendant's brief, pp. 45-46, 80-81). The prosecutor made no mention throughout the entire summation of O.G. nor the alleged fight O.G. had with the victim(T. 453-480). Indeed, defendant does not point to any excerpt of the prosecutor's summation where O.G. was mentioned. The fight was discussed only during Ms. Rambert's trial testimony. During summation, the prosecutor made no connection between the victim's fight with O.G. and defendant shooting the victim. It is simply a baseless connection defendant futilely attempts to establish to impugn the prosecutor's

53

summation.

The prosecutor simply remarked that the evidence proved defendant's motive in response to counsel's assertions that the prosecution had failed to establish motive for defendant's actions.  As noted, defense counsel did not object, and thus, the prosecutor was never tasked with explaining his remark.  The prosecutor simply may have sought to argue, in an inartful manner, that defendant's motive and intent were the same here -- that defendant was motivated by his intent or desire to kill the victim -- the prosecutor simply may have used the terms 'motive and 'intent' interchangeably.

Additionally, in challenging the legal sufficiency of the evidence on the instant appeal, defendant claims that the prosecutor made improper arguments about motive for the shooting to buttress Ms. Rambert's identification testimony (see defendant's brief, pp. 44-45).  The prosecutor, however, never argued that Ms. Rambert must have correctly identified defendant as the shooter since he had a motive for the shooting. As noted, the prosecutor's remarks should be viewed more as arguing that the evidence satisfied the elements of second-degree murder, including the intent to kill. Ultimately, the court sat as the trier of fact, here, and it would not have been confused or misled by the prosecutor's remarks.

Moreover, the lack of objection by defense counsel is a strong indication that

counsel did not believe the remark to be prejudicial.  See Overlee, 236 A.D.2d at 142 ("defendant's failure to object to any of the questions is perhaps the best indication of the absence of any real prejudice"); People v. Collins, 214 A.D.2d 483, 484 (1st Dept. 1995) ("counsel's very lack of objection [to the prosecutor's summation] suggests the lack of prejudice arising therefrom").

In sum, the prosecutor's summation afforded defendant a fair trial.

## POINT FIVE

### DEFENDANT'S SENTENCE WAS FAIR AND PROPER (responding to defendant's brief, Point V).

Defendant contends that his sentence, as a second violent felony offender, of concurrent maximum terms of imprisonment of from 25 years to life, and fifteen years plus five years of post-release supervision was excessive.  The claim is meritless.

While intermediate appellate courts have broad powers to modify a sentence that is unduly harsh or severe (People v. Delgado, 80 N.Y.2d 780, 783 [1992]), this Court has done so only in exceptional circumstances.  See, e.g., People v. Chambers, 123 A.D.2d 270 (1st Dept. 1986).  This case does not present an atypical situation warranting reduction.

In explaining its decision to impose the maximum term of imprisonment, the

court stated,

> This was a horrendous crime, Mr. Villa, an execution.
> You took away the life of this gentleman, Mr. Villa, and in,
> doing so, you cut short everything this man was, everything this
> man hoped to be, everything this man's family wanted for him.
> Such callous concern deserves a proportionate sentence so that
> not only yourself, but the community, is aware that we cannot
> tolerate this kind of execution in the street.

(S. 19-20).

Defendant provides no reason for a sentence reduction other than a general claim that a minimum sentence would be sufficient punishment. Defendant does also point out that, at sentencing, rial counsel stated he had found a witness who claimed that a different individual had committed the murder. The court below heard all the arguments and the evidence as both the trier of fact and the sentencing judge and found defendant guilty and deserving of the maximum sentence.

Previously, on February 24, 2005, defendant had pled guilty to Assault in the Second Degree and received a sentence of three years of imprisonment plus three years of post-release supervision (S. 3). On September 24, 2011, when the crime took place, defendant (date of birth: December 2. 1985) was only twenty-six years old. Yet, he already had committed two violent felonies, including murder. His prior conviction and imprisonment for felony assault did not deter him from executing the victim. Consequently, as the court below aptly noted, defendant was deserving of the

maximum concurrent sentences imposed.

In sum, considering "the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction," People v. Farrar, 52 N.Y.2d 302, 305 (1981), there is no basis upon which to reduce defendant's sentence.

## CONCLUSION

## THE JUDGMENT APPEALED FROM SHOULD BE AFFIRMED IN ALL RESPECTS.

Respectfully submitted,

DARCEL D. CLARK
District Attorney
Bronx County
Attorney for Respondent

By: _____

T. Charles Won
Assistant District Attorney
Of Counsel

NANCY D. KILLIAN
T. CHARLES WON
Assistant District Attorneys
*of Counsel*

MARCH 2019

58

## <u>PRINTING SPECIFICATIONS STATEMENT</u>

1.     This brief was prepared using Corel WordPerfect X8 word-processing program.

2.     This brief contains 12, 397 words, as measured by the Corel WordPerfect X8 word-processing program.

3.     This brief is typeset in 14-point Times New Roman font.