Supreme Court of the State of New York
Bronx County

| | |
|---|---|
| The People of the State of New York,<br><br>— against —<br><br>Guillermo Villa,<br>Defendant. | Ind. No. 3376-2011<br><br>Notice of Motion to Vacate the Judgment of Conviction |

PLEASE TAKE NOTICE that upon the attached affirmation of Mandy E. Jaramillo, Esq., and its attached exhibits, and the accompanying Memorandum of Law, the undersigned will move this Court, on April 12, 2021, or as soon thereafter as counsel may be heard, for an order pursuant to N.Y. C.P.L. § 440.10(1)(h):

(1) Vacating the judgment of conviction in this case on the grounds that it was obtained in violation of Guillermo Villa's rights, under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, § 6 of the New York Constitution, to the effective assistance of counsel;

(2) Granting, if necessary, a hearing to develop any unresolved factual disputes pertaining to this motion pursuant to N.Y. C.P.L. § 440.30(5); and

(3) Granting any other relief that the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that pursuant to N.Y. Civil Practice Law & Rules § 2214(b), answering papers, if any, shall be served at least seven days before the return date.

Dated:     February 10, 2021
           New York, New York

Respectfully submitted,

CAPRICE R. JENERSON, ESQ.
Attorney for Guillermo Villa

ANASTASIA HEEGER, ESQ.
Supervising Attorney


*Mandy E. Jaramillo*

By:   MANDY E. JARAMILLO, Esq.
Senior Staff Attorney

OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, New York 10007
(212) 402-4100
mjaramillo@oadnyc.org


To:   CLERK, CRIMINAL TERM
Supreme Court, Bronx County

T. CHARLES WON, ESQ.
Assistant District Attorney, Bronx County

HON. DARCEL D. CLARK, ESQ.
District Attorney, Bronx County

Supreme Court of the State of New York
Bronx County

| | |
|---|---|
| The People of the State of New York,<br><br>     — against —<br><br>Guillermo Villa,<br>Defendant. | Ind. No. 3376-2011<br><br>Affirmation in Support of<br>Motion to Vacate the<br>Judgment of Conviction |

Mandy E. Jaramillo, an attorney duly admitted to practice in the State of New York, affirms under penalty of perjury that:

1.  I am a Senior Staff Attorney at the Office of the Appellate Defender (OAD), which the Appellate Division, First Department has assigned to represent Guillermo Villa in the above-captioned case. *See* Ex. 1 (Order of Assignment), at A. 1.[1]

2.  On April 23, 2014, Mr. Villa was convicted, after a bench trial, of one count of murder in the second degree, N.Y. Penal Law § 125.25(1), and one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03(1)(b). Mr. Villa was sentenced as a second violent felony offender to an indeterminate term of 25 years to life for the count of murder in the second degree and a determinate term of 15 years' incarceration and five years of post-release

---

[1]  The appendix is separately bound and attached to this motion. The first volume of the appendix, which contains the exhibits to the motion, will be cited as "Ex. __, at A. __". The second volume of the appendix, which contains the transcripts of the hearings, trial, and sentencing proceedings, will be cited as "T. __" for the hearings and trial pages, "T2. __" for the verdict proceeding on February 24, 2014, and "S. __" for the sentencing proceeding on April 23, 2014.

1

supervision for the count of criminal possession of a weapon in the second degree. *See* Ex. 2 (Sentence and Commitment Order), at A. 2. Mr. Villa remains incarcerated pursuant to this judgment.

3.      I make this affirmation in support of Mr. Villa's motion to vacate the judgment of conviction on the ground that he was denied his right to the effective assistance of counsel where defense counsel: (1) failed to consult with an eyewitness identification expert or present at trial expert testimony on factors that can adversely affect the reliability of eyewitness identifications in this cross-racial identification case where the sole eyewitness contradicted police trial testimony and her prior description of the shooter; (2) failed to intervene or object where Mr. Villa stated clearly that he wanted to speak with his family before deciding whether to waive his fundamental right to a jury in a murder case; (3) failed to properly counsel Mr. Villa on the trial rights that he would be waiving in choosing to have a bench trial; and (4) improperly consented to allowing in trial testimony before the suppression hearing had concluded. *See Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Baldi,* 54 N.Y.2d 137 (1981); *see also People v. Benevento*, 91 N.Y.2d 708 (1998); N.Y. C.P.L. § 440.10(1)(h).

4.      The following exhibits are being filed with this Affirmation:

- Exhibit 1 is a copy of the Order of Assignment;

- Exhibit 2 is a copy of the Sentence and Commitment Order;

- Exhibit 3 is a copy of an affidavit by eyewitness identification expert Dr. Brian L. Cutler;

2

- Exhibit 4 is a copy of the NYPD mugshot pedigree of Mr. Villa;

- Exhibit 5 is a copy of DOCCS' inmate information form;

- Exhibit 6 is a copy of an affidavit by Mr. Villa;

- Exhibit 7 is a transcript of proceedings on January 30, 2014;

- Exhibit 8 is a copy of the affirmation of defense counsel Andres Aranda;

- Exhibit 9 is a copy of Indictment No. 3376-2011;

- Exhibit 10 is a copy of the felony complaint;

- Exhibit 11 is a copy of the grand jury minutes of Det. O'Connell;

- Exhibit 12 is a copy of the Jury Trial Waiver Form;

- Exhibit 13 is a copy of the photo array;

- Exhibit 14 is a copy of the lineup photo;

- Exhibit 15 is a copy of the grand jury minutes of Ms. Rambert;

- Exhibit 16 is a copy of the 911 Call #3744;

- Exhibit 17 is a copy of the predicate felony information statement;

- Exhibit 18 is a copy of the rap sheet of Mr. Villa;

- Exhibit 19 is a copy of the *curriculum vita* of Dr. Cutler;

- Exhibit 20 is a copy of Mr. Aranda's Attorney Detail Report on NYS Unified Court System's website;

- Exhibit 21 is a copy of the photos of Sedrick Sambolah's sweatshirt found at the crime scene and entered into evidence as trial exhibits 12, 15, and 16; and

- Transcripts of the proceedings.

5.    All statements of fact in this affirmation are made upon information and belief, based on a review of the record on appeal; documents received from Mr.

3

Villa and his family; communications with Mr. Villa's trial counsel Andres Aranda; communications with Dr. Brian L. Cutler, Professor of Social Science and Humanities at University of Ontario Institute of Technology; and communications with Mr. Villa.

6.     Mr. Villa reserves the right to supplement this motion upon the discovery of additional evidence that supports his legal claims.

## **INTRODUCTION**

7.     Mr. Villa's conviction rests on the testimony of a single stranger eyewitness, who made a cross-racial identification of him as the perpetrator. Nothing else tied Mr. Villa to the September 24, 2011 shooting of Sedrick Sambolah. There were no other witnesses. There was no forensic evidence. There was no evidence of motive. Seyquana Rambert, Mr. Sambolah's girlfriend, was the prosecution's star witness, but her testimony made little sense, contradicted her prior statements to police, and was completely incompatible with police officer testimony.

8.     In a case such as this—with sparse evidence and a single eyewitness, who was under an incredible amount of stress during the shooting and whose initial identification was a poor match for Mr. Villa—defense counsel's failures to consult with and present testimony from an eyewitness identification expert, to protect his client's fundamental right to a jury of his peers, and to help ensure that his client received a fair process were egregious and left Mr. Villa without effective or meaningful representation. Notably, Mr. Villa's trial attorney, Andres Aranda, has

4

an extensive disciplinary history in the First Department and the Second Circuit. Mr. Aranda's license was suspended both before and after his representation of Mr. Villa. He remains suspended to this day.

9.      As described in an affidavit by eyewitness identification expert Dr. Brian L. Cutler, in a case like this one, where the single eyewitness, who made a cross-race identification, had limited exposure time to view and encode the shooter's facial and physical characteristics,[2] experienced high stress further impairing her ability to encode information, and was focused on the shooter's gun, the eyewitness's identification was certainly affected by factors that increased the risk of mistaken eyewitness identification. *See* Ex. 3 (Eyewitness ID Expert Dr. Cutler Affidavit), at A. 5-7. These factors should have been presented as part of Mr. Villa's defense. Dr. Cutler emphasizes that "information from an eyewitness identification expert on the factors that affect the risk of mistaken eyewitness identification in a particular case can assist juries and other factfinders in evaluating eyewitness identifications in the cases before them, for many of the factors [involved in mistaken identifications] defy common sense." *Id.* at A. 5.

10.     Significantly, Ms. Rambert, the sole eyewitness in this case, changed her description of the shooter from a white Hispanic man, a description she gave to police just hours after the incident, to a Black, possibly Dominican, Hispanic

---

[2]      This is particularly problematic here where the eyewitness and the shooter were both moving quickly and the eyewitness initially saw the shooter at an extended distance of 30 feet. *See* T. 237-40.

man[3]—a description more befitting of Mr. Villa[4]—at trial nearly two and one-half years later. Furthermore, Ms. Rambert's description of the assailant changed *after* picking Mr. Villa out of a potentially suggestive photo array a full ten days after the shooting,[5] and then, *again*, when she selected him out of a lineup the following day, immediately after the detective told her to "pick out the guy that did it."[6]

11.     In his report, Dr. Cutler explains that "memories are not held static but rather are subject to erosion due to the passage of time" and that they "may be updated by information we have since learned or inferred," where eyewitnesses "often fill gaps in [their] memories with information that makes sense or that [they]

---

[3]     *See* T. 19, 67, 128, 134-35 (Det. Sean O'Connell testifying during the suppression hearing that, on the day of the shooting, Ms. Rambert described the shooter as a 5'9" tall white Hispanic man); T. 213-14, 265 (Ms. Rambert testifying during trial that the shooter was a 5'10"-5'11" tall Black Hispanic, possibly Dominican, man).

[4]     *See* Ex. 4 (Mugshot Pedigree of Mr. Villa), at A. 19 (showing that Mr. Villa is a 5'6" tall Black Hispanic man); Ex. 5 (Inmate Information Form for Mr. Villa, DIN 14-A-1998), at A. 20.

[5]     *See* T. 32, 34-35, 37 (the lead detective testifying at the suppression hearing that (1) he created a photo array that included Mr. Villa after a man who had just been arrested told the detective that he "heard" that "Pure" was the shooter and after finding Mr. Villa in an area where, according to an anonymous tipster, "Pure" frequented, and (2) Ms. Rambert picked Mr. Villa out of the photo array on October 4, 2011 as the person who shot Mr. Sambolah); T. 340, 344, 350 (Ms. Rambert testifying at trial that she picked Mr. Villa out of the photo array). It should be noted that one of the prosecution's trial exhibits, attached to this motion as Ex. 4 (Mugshot Pedigree Form), notes that Mr. Villa's alias is "Pure." However, this form was printed on November 10, 2011, and it is likely that police entered this information at the time of Mr. Villa's arrest in this case. No other evidence was offered at trial tending to connect the nickname "Pure" to Mr. Villa.

[6]     *See* T. 259-60 (Ms. Rambert testifying that prior to the lineup, the detective told her to "pick out the guy that did it").

learned from other sources." Ex. 3 (Dr. Cutler Affidavit), at A. 4.[7] As such, Ms. Rambert's subsequent identification of Mr. Villa at trial was unreliable.

12.     Defense counsel's failure to consult with an eyewitness identification expert or to present such testimony to the factfinder to explain the many factors present here that may well have affected the accuracy of Ms. Rambert's identifications denied Mr. Villa his right to the effective assistance of counsel.

13.     In addition, defense counsel failed to provide meaningful or effective representation where he did not protect Mr. Villa's fundamental right to a jury trial. In his affidavit, Mr. Villa states that defense counsel did not explain to him the full import of choosing a bench trial and waiving his right to a jury trial—what it meant to give up his right to have a jury of twelve people determine his verdict—nor did defense counsel explain any other rights Mr. Villa would be giving up in order to have a bench trial. Ex. 6 (Affidavit of Guillermo Villa), at A. 22-23. Furthermore, defense counsel failed to intervene when Mr. Villa expressed second thoughts about waiving a jury trial and tried to avail himself of the Court's offer to speak to his family. *Id.* at A. 23-24; *see also* Ex. 7 (Minutes of January 30, 2014), at A. 30 (the Court allowing Mr. Villa to reconsider his waiver of a jury trial overnight); T. 69 (Mr. Villa requesting to speak to his family).

_____

[7]     Incredibly, Ms. Rambert claimed at trial that her memory had improved significantly over the two and one-half years from the day of the crime to the time of trial. *See* T. 280-81.

14.     While defense counsel asserts that he does not recall explaining the pros and cons of a bench trial versus a jury trial with Mr. Villa, he clearly remembers telling Mr. Villa about obtaining an acquittal for another client in a bench trial in front of the same judge, who counsel described as "fair." *See* Ex. 8 (Affirmation of Andres Aranda), at A. 33. Defense counsel's specific recollection that he had recently obtained an acquittal in a bench trial in the same courtroom in a case involving domestic violence (and not involving a misidentification defense) and that he discussed this prior bench trial with Mr. Villa, along with counsel's lack of any memory as to what he actually discussed with Mr. Villa about the differences between a bench trial and a jury trial does not provide a reasonable or strategic explanation for counsel's failure to properly advise Mr. Villa about the extraordinary and unusual decision to forego a jury in a murder trial. It was defense counsel's duty to ensure that Mr. Villa understood that by having a bench trial, he would be waiving a twelve-person jury of his peers, and to ensure that Mr. Villa understood the consequences of such a waiver. *See* Ex. 6 (Affidavit of Mr. Villa), at A. 22-23. To the extent there is any dispute as to whether counsel had a strategy, and fully explained this to Mr. Villa, defense counsel's recollections should be explored, under oath, at a hearing.

15.     Moreover, regardless of whether or not defense counsel won a prior bench trial before this particular judge does not excuse his failure to protect Mr. Villa's right to a jury trial when Mr. Villa expressly asked to talk to his family about this extremely consequential decision. *See* Ex. 8, at A. 33 (Mr. Aranda stating that

8

he cannot recall why he failed to object when Mr. Villa stated that he wanted to talk

to his family about his decision to have a bench trial).

16.     Where counsel's errors and oversights were egregious, Mr. Villa was

denied the effective and meaningful assistance of counsel.[8]

## FACTUAL AND PROCEDURAL BACKGROUND

17.     Guillermo Villa was charged, under indictment 3376-2011, of murder

in the second degree, manslaughter in the first degree, and criminal possession of a

weapon in the second degree. *See* Ex. 9 (Ind. No. 3376-2011), at A. 34-36. The

charges arose out of the mid-day September 24, 2011 fatal shooting of Sedrick

Sambolah in a chaotic scene in front of a Bronx apartment complex. *See* Ex. 10

(Felony Complaint), at A. 37.

18.     Mr. Villa was arrested on October 5, 2011 at about 7:15 p.m. *See* Ex.

11 (Grand Jury Testimony of Det. Sean O'Connell), at A. 38-39, after he had been

placed into a lineup and identified as the shooter by Ms. Rambert, Mr. Sambolah's

girlfriend. *See* T. 55. A felony complaint was drafted and executed on October 6,

2011. *See* Ex. 10, at A. 37.

19.     On January 30, 2014, the Court inquired as to whether Mr. Villa

wanted to waive his right to a jury trial and proceed with a bench trial. *See* Ex. 7

─────────────────────

[8]     Defense counsel also failed to object to and, in fact, consented to allowing trial
testimony in before the case-dispositive suppression hearing had concluded. Defense
counsel stated in his affirmation that he cannot recall why he consented except that he
believes "that it had to do with the unavailability of a witness." Ex. 8 (Aranda Affirmation),
at A. 33.

(Minutes of Jan. 30, 2014), at A. 27-30. On January 31, 2014, this same inquiry continued, and soon thereafter, pre-trial hearings and a bench trial began. *See* T. 69-70.

20.     On February 24, 2014, Mr. Villa was convicted of murder in the second degree and criminal possession of a weapon in the second degree. On April 23, 2014, Mr. Villa, who claimed that he is innocent during the sentencing proceeding, was sentenced to an aggregate term of 25 years to life in prison. *See* S. 18-19.

A. Pre-Trial Proceedings

    a. Jury Trial Waiver Allocution

21.     On January 30, 2014, Justice Dominic Massaro questioned Guillermo Villa after a bench conference with counsel, as to whether Mr. Villa wanted to waive a jury trial. Ex. 7, at A. 27-30. Mr. Villa answered affirmatively, and the Court cautioned him that waiving a jury would "shrink" his odds "a little bit" stating that "[n]ow you're only one on one as opposed to one to twelve." *Id.* at A. 28. The Court inquired as to whether Mr. Villa understood that he would be giving up his right to pick a jury and to argue to a jury, and as to whether he felt "enough confidence" in his case and had discussed it with people close to him and with his attorney. *Id.* at A. 27-28. The Court did not ask any questions about whether Mr. Villa had been promised anything or had been pressured to waive a jury. *See id.* at A. 27-30.

22.     Mr. Villa signed a Jury Trial Waiver form. *See* Ex. 12 (Jury Trial Waiver Form, Jan. 30, 2014), at A. 42; *see also* Ex. 7, at A. 29. After receiving the

waiver form, the Court declared, "[t]he Court executes it and so orders it." Ex. 7, at A. 29. However, just moments later, the judge told Mr. Villa that he could reconsider. *Id.* at A. 30. "[S]hould you have any reflections in it and wish to proceed otherwise, you may share that with counsel. So you have a full opportunity to consider this as far as you wish to consider it." *Id.*

23.    The next day, the judge reminded Mr. Villa that he had given him the opportunity to reconsider his jury waiver decision by allowing him "to reflect overnight." T. 69. The judge then asked Mr. Villa whether anyone had "twisted [his] arm, put [his] back to the wall" or tried to force or coerce him into having a bench trial rather than a jury trial to which Mr. Villa answered, "No." *Id.*

24.    The judge made a final inquiry, asking "[a]nd the last thing, giving you that time to reflect, is there anyone you wish further to discuss with, talk to to get advice from before going forward as we've planned to do?" *Id.* At this point, Mr. Villa answered directly, "Talk to my family." *Id.* Without acknowledging this request, the judge stated, "[e]verything stays in place," and then reiterated that the plan was to go forward with the bench trial "as [Mr. Villa] already wish[ed] to do and informed the Court," to which Mr. Villa answered yes both times. *Id.* Defense counsel said nothing during this exchange.

b.    The *Wade* Hearing

25.    Although the suppression hearing began on January 31, 2014, it was interrupted in the middle of testimony and not completed until February 11, 2014,

*after* some trial testimony had been taken.[9] T. 71-72, 144. Put another way, at this bench proceeding, the Court took trial testimony and viewed trial exhibits, including photos of Mr. Sambolah's bloodied yellow sweatshirt at the crime scene, before deciding a case-dispositive suppression motion.[10]

26.     During the *Wade* hearing, the prosecution presented testimony from one witness, Detective Sean O'Connell, the lead detective on the case, T. 63, who testified as to his investigation and to the identification procedures employed. Det. O'Connell went to Jacobi Hospital on September 24, 2011 and spoke to friends of Mr. Sambolah, but did not receive any information about suspects. T. 16-17. However, around 4:30 p.m., Ms. Rambert, Mr. Sambolah's girlfriend, was interviewed at the precinct. T. 18. Det. O'Connell testified that Ms. Rambert described the man who shot her boyfriend as a white Hispanic man with a stocky build, braids, and possibly a beard and goatee, around 20-30 years old, about 5'9" tall, and about 200 pounds. T. 19, 67, 128, 134-35. Ms. Rambert stated the perpetrator wore a blue sweatshirt. T. 19-20.

27.     Ms. Rambert gave police a detailed accounting of Mr. Sambolah's "problem" with a neighborhood man in a nightclub that morning and of his warning

---

[9]     On February 5, 2014, the prosecutor stated on the record: "We did not finish the hearing, and there has been no decision with defense counsel. We are reserving. We haven't done Sandoval, that has been reserved, so we can expedite and get this witness on the case. So we are actually beginning the trial with this witness, and follow up with defense counsel['s cross examination]." T. 71. The Court then took trial testimony from one witness, Detective Anthony Ribustello, an officer from the NYPD Crime Scene Unit.

[10]     *See* Ex. 21 (Photos of Mr. Sambolah's Sweatshirt), at A. 78-83.

to her that trouble was still brewing. T. 65-66. According to Det. O'Connell, Ms. Rambert said that Mr. Sambolah came to her early in the morning on September 24th and told her that he had a problem at the club with "O.G.," from the neighborhood, and that he anticipated more trouble because O.G. was hanging around outside. T. 65-66. Ms. Rambert also told police that when she went outside, she saw O.G. walk by Mr. Sambolah getting close enough to him that she thought they might have a "fist fight" and giving him a hard look "like they had a problem," right before she saw a white Hispanic man with braids wearing a blue sweater approach Mr. Sambolah, pull a gun out of his waistband, and shoot Mr. Sambolah several times. T. 66-67, 124.

28.     Later that day—at around 9 p.m.—police from the 49th Precinct arrested a man named Carl, who told police that he heard that a guy named "Pure" shot Mr. Sambolah. T. 132.

29.     On October 3, 2011, sometime after 4 p.m., another detective received an anonymous tip that Pure was known to frequent the area of Grand and Burnside Avenues. T. 22. That evening, Det. O'Connell drove to the area and "spotted the individual" who "fit the description" of "[m]ale Hispanic, braids, heavy – kind of chubby, stocky." T. 23. Det. O'Connell testified that this individual, Guillermo Villa, gave his identification, and Det. O'Connell wrote down Mr. Villa's name, date of birth, and address. T. 23-24. Det. O'Connell testified that he had no notes and no memory of asking Mr. Villa whether his nickname was Pure. T. 137-38. After

patting him down to search for a weapon, Det. O'Connell found nothing and let Mr. Villa go. T. 23, 25.

30.     Back at the 49th Precinct, Det. O'Connell created a photo array with a prior arrest photo of Mr. Villa and five other arrestees who he believed looked "similar to the defendant." T. 26-28; *see* Ex. 13 (Photo Array), at A. 43. On cross examination, Det. O'Connell conceded that Mr. Villa is not white. T. 135.

31.     On October 4, 2011, at approximately 5 p.m., Ms. Rambert identified Mr. Villa in the photo array as the person who shot Mr. Sambolah. T. 32, 34-35, 37. Det. O'Connell called Ms. Rambert back into the precinct, shortly after he arrested Mr. Villa on October 5, 2011, to view a lineup. T. 39-40. In the lineup, Mr. Villa and four fillers—all seated so that height could not be determined—were given black hats to put on their heads and black plastic sheets to hold under their chins. T. 44-46; *see* Ex. 14 (Lineup Photo), at A. 45. Det. O'Connell testified that Ms. Rambert observed the lineup for "[l]ess than five seconds" and identified Mr. Villa as the shooter. T. 55.

32.     The defense argued that the photo array and lineup were suggestive. T. 141-42. Although Ms. Rambert told the detective that the perpetrator was a 5'9" tall white Hispanic man, all of the men in the photo array were Black. T. 141; Ex. 13 (Photo Array), at A. 43. Defense counsel argued that the photo of Mr. Villa, a brown-skinned Hispanic man, stood out. *Id.* Defense counsel also pointed out that his client was placed in the lineup with men of varying ages, heights, and with varying skin tones. T. 141-42; *see also* Ex. 14 (Lineup Photo), at A. 45.

14

33.    The prosecution, in turn, argued that the identification procedures were conducted without impermissible suggestiveness and that the witness identified Mr. Villa in the photo array and lineup. T. 142-44. Immediately after the argument, Justice Massaro denied the motion to suppress. T. 144.

B. Trial

34.    Prior to the conclusion of the suppression hearing on February 11, 2014, trial began on January 31, 2014 with testimony from a law enforcement officer. Opening statements were made on February 11, 2014. The Court rendered its guilty verdict on February 24, 2014, T2. 2-4, and Mr. Villa was sentenced on April 23, 2014, S. 14-15, 19.

35.    The prosecution presented five witnesses, including Police Officer Anthony Ribustello from the NYPD Crime Scene Unit and Police Officer Karen Solomon, the first-responding officer to the scene of the crime; Edwin Sambolah, Sedrick Sambolah's father; the medical examiner; and the eyewitness Ms. Rambert. Additionally, the prosecution and defense entered a stipulation that the three shell casings recovered from the crime scene had all been fired from the same firearm. Defense counsel did not present any evidence.

a. Law Enforcement Testimony

36.    Police Officer Karen Solomon—the first officer, along with her partner, to arrive at the crime scene—testified to her initial observations and to the timing of the arrival of EMS. On September 24, 2011, at about 2:25 p.m., Officer Solomon received a radio call of "shots fired" quickly followed by a call of "male

15

shot." T. 165-66. Two minutes later, Officer Solomon and her partner arrived at 1240 Burke Avenue in the Bronx. T. 165-66, 182, 184. Officer Solomon discovered Mr. Sambolah face down on the ground in the area near the fence. T. 170. He had been shot several times at close range. T. 392. Mr. Sambolah was wearing a shirt and jeans with one shoe on and one shoe off. T. 173, 176, 183-84. It was a hectic and crowded scene, with about 25 to 30 people, many crying and screaming, around Mr. Sambolah's unresponsive body. T. 167, 172-73.

37.    Unable to find a pulse, Officer Solomon immediately called for an ambulance, asking the dispatcher to put "a rush on the bus." T. 173. However, it took the ambulance "a little while" to arrive. T. 174. More precisely, on cross examination, Officer Solomon testified that it took "maybe a half hour to 45 minutes, I'm not sure," and then again, "[t]he time we got there until the ambulance came it was about 45 minutes." T. 182-83. When the ambulance did finally arrive, EMS workers placed Mr. Sambolah on a stretcher, tried to revive him, and took him to the hospital. T. 174. Officer Solomon's partner rode in the ambulance while Officer Solomon continued to safeguard evidence at the scene. T. 176.

38.    Officer Solomon testified that she did not recall any eyewitnesses approaching her, during the approximately 45 minutes that she spent on the scene with Mr. Sambolah, to tell her what happened. T. 182. From her recollection, no woman identified herself as Mr. Sambolah's girlfriend or wife. T. 185.

39.    Mr. Sambolah was pronounced dead at 3:03 p.m. T. 376. The medical examiner testified, describing the four gunshot wounds suffered by Mr. Sambolah,

16

including a fatal gunshot wound to the right side of the chest, which perforated both lungs, the heart, the stomach, and the spleen, T. 379-80, 382, a gunshot wound to the right arm, T. 382, a gunshot wound near the genitalia that exited through the left thigh, T. 386, and a gunshot wound through the right hand, T. 388. The medical examiner collected one bullet that had been lodged in the left side of Mr. Sambolah's chest. T. 384. The medical examiner also testified that Mr. Sambolah suffered injuries and abrasions to the front of his face that were consistent with falling and striking his face on the sidewalk. T. 380-81.

40.    Police collected physical items of evidence from the crime scene, including Mr. Sambolah's blood-stained sweatshirt, one sneaker, headphones found by a fire hydrant, and three shell casings. T. 80, 89. Per a stipulation entered at trial, an NYPD firearms analyst would have testified that the three shell casings had been fired from the same firearm and that the deformed bullet found in Mr. Sambolah's body could not be compared to the shell casings. T. 397-98.

b.    The Testimony of Mr. Sambolah's Father

41.    Edwin Sambolah, Mr. Sambolah's father, testified that around 2 p.m. on September 24, 2011, he was on the phone with his wife, Mr. Sambolah's mother, as she made her way to the bus stop. T. 157. He said his wife told him that "they are fighting"—but could not see how many people were involved. T. 157, 159-60. He said he heard her scream, "[O]h, Sedrick's on the floor." T. 157-58. Edwin Sambolah testified that he did not hear any gunshots through the phone and opined that his

17

son had been shot before she called. T. 160. He said she couldn't see "[Mr. Villa] or anybody else." T. 160.

      c.   The Eyewitness's Inconsistent and Contradictory Account

42.     Seyquana Rambert, Mr. Sambolah's girlfriend and the prosecution's only purported eyewitness, gave inconsistent testimony at trial that often contradicted her prior statements to police and to the grand jury. When confronted with these inconsistencies, Ms. Rambert quibbled with the accuracy of the prior police reports and grand jury minutes calling them mistaken and wrong. *See, e.g.*, T. 272-74, 369-70; *see also* Ex. 15 (Grand Jury Testimony of Seyquana Rambert), at A. 47-57.

43.     Ms. Rambert said that Mr. Sambolah arrived at her house on September 24, 2011 at 4 or 5 a.m. but that she did not speak with him until she woke up around 10 or 11 a.m. T. 197. She said that he stayed in her house and talked to her for about an hour and 30 or 45 minutes—from about 11 a.m.–12:30 p.m. T. 198, 266. He told her that he was involved in a fight with a man around 5 a.m. and that the same man wanted to fight with him again. T. 198, 270, 282. On cross examination, Ms. Rambert agreed that she previously told police that the man involved in the earlier bar fight with Mr. Sambolah was O.G. T. 270. Mr. Sambolah kept getting phone calls to go outside, and when Ms. Rambert asked him to stay in the house, he refused. T. 198, 282.

44.     Ms. Rambert said that after Mr. Sambolah left the house, she called her best friend and told her that she would stop by after she went to the store. T.

198. Ms. Rambert then showered and left the house. T. 199. Ms. Rambert estimated that she was in the house for about an hour and 20 or 30 minutes after Mr. Sambolah left. T. 266. She also guessed that it took her three minutes to get to the store and that she spent five to 10 minutes in the store before walking back toward her building. T. 202.

45.     On her way to the store, Ms. Rambert saw Mr. Sambolah by a fire hydrant and his friends, Clifford, Ron, 50, and Nee-Q nearby. T. 200, 285. She also saw O.G., the man with whom Mr. Sambolah had earlier argued, with the group. T. 270, 285. Ms. Rambert claimed that O.G. walked past Mr. Sambolah and "gave him a look," and then left the area and did not return. T. 228-29. Ms. Rambert exchanged some words with her boyfriend on her way to the store. T. 200.

46.     On her way back from the store, Ms. Rambert, who could see her boyfriend by the same hydrant and his friends, suddenly noticed a man in a blue shirt walking toward her. T. 206, 228. She testified that she stared at this man, who was a total stranger to her, because "[b]lue is [her] favorite color." T. 206-07, 341. Ms. Rambert explained that, due to her affinity for blue, she stared at the stranger's face as he got closer and noticed that "he had something on his mind." T. 207.

47.     Ms. Rambert passed the man as she approached the entrance of her building and saw him take out a gun. T. 207-08, 309. She picked up her pace and heard a gunshot about seven seconds later. T. 309.  At this point, near the recycling bins by the building, she dropped her grocery bag, crouched down, and put her arms up over her head. T. 241-44. She heard a second shot five to eight seconds after the

19

first. T. 244, 317. And she heard a third shot about three to seven seconds later. T. 244, 318. Although Ms. Rambert purportedly saw the stranger pull out the gun and point it at her boyfriend, she did not see the first or the second shots. T. 318-19. She testified, however, that at the time of the third shot, she was sitting up and she saw the perpetrator stand over Mr. Sambolah and "pop (indicating) him one more time" before the perpetrator turned around and fled. T. 245, 319. Ms. Rambert testified that she heard three shots in total. T. 244.

48.   While still able to see the shooter walking down the block, Ms. Rambert claimed that she ran over to Mr. Sambolah. T. 210, 328-29. In between her own screaming and crying, she called 911 on her cell phone. 210, 245, 249, 328. Ms. Rambert placed her phone on the ground and continued to scream and attempt to talk to Mr. Sambolah, who was unresponsive, while on the line with the 911 operator. T. 211. Although Mr. Sambolah's friends had mostly scattered, Ron— crying and yelling—returned and jumped on top of Mr. Sambolah's body. T. 209, 332.

49.   Ms. Rambert said that after Mr. Sambolah was shot, she hovered over him and saw that his eyes were still open. T. 211. She said she "dropped down in front of him and put both hands on his chest," she grabbed his head—placing her left hand under his head—so that she could whisper in his ear. T. 211, 330.

50.   At trial, the prosecution played a nearly eight-minute-long 911 recording while Ms. Rambert testified about what was happening on the call. T. 251, 257; Ex. 16 (911 Call #3744). Ms. Rambert identified her own voice and Ron's

voice on the call. T. 252-53. According to Ms. Rambert, at some point in the first two and one-half minutes of the call, she was dragged away from Mr. Sambolah's body by friends when the ambulance pulled up in front of the building. T. 253-54. She then stood by while EMS responders began "doing their job." T. 254.[11] Ms. Rambert testified that during this 911 call, she observed an EMS technician cutting off Mr. Sambolah's shirt, while she yelled for people to get off of her because she could not see well through the crowd. T. 212, 254; Ex. 16 (911 Call #3744), at 2:22–4:02. At the end of the call, Ms. Rambert is heard saying, "Some guy just walked up to him in a blue shirt and one of his friends…" and the recording abruptly cut off.[12] Ex. 16 (911 Call #3744), at 7:41-7:43. Ms. Rambert recalled that this was her statement to the police at the crime scene about the identity of the perpetrator. T. 212-13, 257, 352-53; Ex. 16 at 7:41–7:43.

51.     Although two officers approached Ms. Rambert and asked her what she saw, Ms. Rambert testified that she did not tell them that she saw the entire incident, nor did she give a detailed description of the perpetrator, including his

---

[11]     Notably, Ms. Rambert's 911 call does not indicate the presence of EMS responders or the arrival of an ambulance. Although the prosecution argued in summation that the call corroborated Ms. Rambert's testimony because "you hear the operator say E.M.S. is already there" on "minute six or seven" of the call, T. 473, the call itself undermined this argument. The 911 dispatchers can be heard saying, "I hear sirens," and then "I hear somebody talking to her. I don't know if it's the EMS or [inaudible]," to which a dispatcher asked, "EMS is there?" and another dispatcher responded, "No because I don't see [63 (difficult to understand)] here." Ex. 16 (911 Call #3744), at 6:05-6:30. The evidence is just as likely that police officers, not EMS responders, were present during that time.

[12]     On cross examination, Ms. Rambert said that the call ended because "[t]he phone hung up." T. 352.

height, his hair, or his race. T. 212-13, 335-37. She could not recall telling police which direction the shooter ran or that he was Hispanic. T. 335-36. She could not recall whether the shooter was wearing anything on his head. T. 336. She said that she "just kept yelling he has on a blue shirt, blue shirt." T. 212. Further, Ms. Rambert testified that she had no memory of seeing a police officer take Mr. Sambolah's vital signs or call for an ambulance and request that the dispatcher "rush the bus." T. 333-34. She similarly could not remember whether the police or the ambulance arrived first. T. 331.

52.     Ms. Rambert, however, gave a detailed description of the shooter at trial and emphasized that she had never seen him before the shooting. T. 213-14, 341-42. She said he was a black Hispanic, possibly Dominican, man with cornrows in his hair, around 5'10"–5'11" tall and 200 pounds, and in his late twenties or early thirties. T. 213-14, 265. At trial, Ms. Rambert identified Mr. Villa as the shooter. T. 214-15.

53.     Ms. Rambert also testified about the pre-trial identification procedures. She confirmed that she met with the prosecutor on September 24, October 4, and October 5, 2011, and that she testified in the grand jury on October 6, 2011. T. 257-58, 262. She identified Mr. Villa from some photos on October 4, 2011.[13] T. 350-51. Further, she explained that she had "no doubt at all" when she

_____

[13]     Ms. Rambert's testimony about looking at photos of suspects was confusing and inconsistent. On cross examination, she first testified that she only looked at photos on a computer with Det. O'Connell and did not look at photos in any books or on paper. T. 340.

chose Mr. Villa during the lineup on October 5, 2011, after Det. O'Connell told her to do her best and "pick out the guy that did it." T. 259-60. Ms. Rambert then tried to clarify, stating, "I can't specifically say what he said. This is what I was told." T. 259.

54.    Significantly, Ms. Rambert provided testimony that was inconsistent with her prior accounts and contradictory to other evidence. Ms. Rambert testified that her grand jury testimony, on October 6, 2011, was not as "fresh" as her trial testimony, on February 18 and 19, 2014—nearly 2 1/2 years later—because of her emotions, "the confusion and everything else" at the time of the incident. T. 272; *see also* Ex. 15 (Grand Jury Testimony of Ms. Rambert), at A. 47-57. She testified that her memory had improved over time. T. 280-81. When questioned about the statements in Det. O'Connell's police report that contradicted her trial testimony, Ms. Rambert claimed that her words were reported in the wrong order in the report and there were parts of the report that were entirely incorrect. T. 368-71. She agreed, however, that when she was asked at the time of the report "if this is what [she] said, [she] said yes." T. 370. Ms. Rambert's contradictions, of both her prior

---

However, shortly thereafter and still on cross examination, Ms. Rambert testified that she possibly looked at "three or four, five pages" of about six people per page. T. 344. She then identified Mr. Villa as the perpetrator and explained that "[f]rom the pages I seen him on I only seen him on that *paper*." T. 344 (emphasis added). On redirect examination, she seemingly confirmed that she identified Mr. Villa from a paper photo array by identifying the photo array as "[o]ne of the *papers* with the people on them." T. 350. (emphasis added); *see also* Ex. 13 (Photo Array), at A. 43.

23

testimony, and the other trial evidence, ran the gamut between the most minor details to the most important issues in the case.

> *Ms. Rambert Gives a Perpetrator Description at Trial Materially Different than Her Initial Report to Police.*

55.     Ms. Rambert denied that she told Det. O'Connell that the shooter was a white Hispanic man. T. 264-65. Ms. Rambert described the perpetrator at trial as a black, possibly Dominican, Hispanic man. T. 213-14. When confronted with the disparity, Ms. Rambert dismissed the details in the police report as "incorrect information." T. 268.

56.     In addition, when pressed for a more detailed description of the perpetrator's blue shirt, Ms. Rambert said that she did not know whether it was button down, long-sleeved, or short-sleeved, or even whether it was a shirt, a sweater, or a jacket. T. 294, 360-61. She also could not describe the shade of blue or whether it was light or dark. T. 300-01. She affirmed on cross examination that any information in the police report that she said the shooter was wearing a jacket was wrong. T. 294-95, 360-61. In attempting to explain her inconsistent testimony, Ms. Rambert said that when she testified in the grand jury and at trial, she "decided to say a shirt for him to be a human" even though she was not sure that the garment was a shirt. T. 372-73.

> *Ms. Rambert Claims an Ambulance Arrived Within Minutes of the Shooting, While the First Responding Police Officer Maintains that It Took 30-45 Minutes for EMS to Respond.*

57.     Ms. Rambert testified that the ambulance arrived just minutes after she placed a call to 911—shortly after watching the shooter walk away and then

running over to Mr. Sambolah's body. T. 210-11, 253-54. In complete contrast, Officer Solomon testified that the ambulance arrived *30 to 45 minutes* after she and her partner arrived at the scene. T. 182-83.

> *Ms. Rambert Says Mr. Sambolah Fell to the Ground Face-Up, While a Police Officer Says He Was Found Face-Down, and the Medical Examiner Concluded He likely Had Fallen Directly on His Face.*

58.     Ms. Rambert testified that she rushed over to Mr. Sambolah immediately after he had been shot and dropped down in front of him—staring into his still open eyes and placing her hands on his chest. T. 211, 330. Ms. Rambert's testimony about the way Mr. Sambolah fell directly contradicts all of the other trial evidence on this point. Officer Solomon testified that she found Mr. Sambolah face down on the ground. T. 170. The medical examiner confirmed this when she testified that Mr. Sambolah had suffered multiple abrasions on his face consistent with falling directly onto it. T. 380-81.

> *Ms. Rambert Disavows at Trial Her Earlier Report and Her Grand Jury Testimony that O.G. Was Present When Mr. Sambolah Was Shot.*

59.     At trial, Ms. Rambert testified that O.G. left the area where Mr. Sambolah and his friends were standing before the shooter arrived. T. 315. After attempting to refresh her recollection with Det. O'Connell's police report, Ms. Rambert testified that the account in the report—that O.G. was still on the scene when her boyfriend was shot—was a mistake. T. 316.

[Defense Counsel]:          Did you tell the detective that just before you heard the shots, O.G. was on the phone and walked right pass [sic] your boyfriend and give him a [] nasty look?

25

| | |
|---|---|
| [Rambert]: | Are you sure about that? |
| [Defense Counsel]: | Let me give you this and see if it refreshes your recollection. |
| [Rambert]: | I read it. |
| [Defense Counsel]: | Does it refresh your recollection? |
| [Rambert]: | No. |
| [Defense Counsel]: | So, that is a mistake again? |
| [Rambert]: | Yes, it is. |
| | *** |
| [Defense Counsel]: | You told him O.G. was there when the shots rang[] out. |
| [Rambert]: | You asked me if I told [O]fficer O'Connell a story, yes. That's the story on the paper that he wrote. That is a summary of what I told him. There are bits and pieces as a paragraph, that's not what I told him. |

T. 316-17.

60.    In fact, not only had Ms. Rambert told police immediately after the incident that O.G. was still on the scene when her boyfriend was shot, but she testified under oath to this same account to the grand jury. Ex. 15 (Grand Jury Testimony of Ms. Rambert), at A. 53 (testifying that O.G. was on the phone at the scene, and he exchanged a "mean" look with her boyfriend right before the "guy with the blue shirt" walked by, and she heard a gunshot).

26

*Ms. Rambert Contradicts at Trial Her Previous Statements as to the Number of Shots Fired, and Other Important Details.*

61.     On October 6, 2011, less than two weeks after the shooting, Ms. Rambert testified to the grand jury that she had heard four gunshots. T. 323; Ex. 15 (Grand Jury Testimony of Ms. Rambert), at A. 53-55. At trial, Ms. Rambert testified in detail about the three shots that were fired. T. 244; *see supra*. When pressed on which version was the truth, Ms. Rambert said, "The three shots are correct. The four shots are wrong, yes. The four shots are wrong. The three are correct." T. 323.

62.     Ms. Rambert also contradicted herself on even the smallest details when confronted with prior statements.[14]

---

[14]     For example:

(1) Ms. Rambert claimed the police report was incorrect where it stated that she told Det. O'Connell that Mr. Sambolah arrived at her house at 11 a.m. (not 4 or 5 a.m., as she testified at trial) on September 24, 2011. T. 269-70.

(2) On cross examination, Ms. Rambert denied knowing what time Mr. Sambolah arrived "because [she] was [a]sleep" but reiterated that she saw him at 10 or 11 a.m. T. 265.

(3) She asserted that the Grand Jury minutes were "worded wrong" where they stated that Ms. Rambert invited her best friend over to her house rather than inviting herself over to her best friend's house. T. 273, 275. ("[T]hat was a mistake on that paper."); *see also* Ex. 15 (Grand Jury Testimony of Ms. Rambert), at A. 49.

(4) Although Ms. Rambert testified on direct that she spent about five to 10 minutes in the store, on cross examination, when asked the same question, she answered, "[h]onestly I couldn't tell you." T. 202, 293.

(5) Prior to Ms. Rambert's testimony, the prosecutor stated for the record that Ms. Rambert indicated that the word "fight" on one page in the grand jury testimony was incorrect. T. 191-192; *see* Ex. 15 (Grand Jury Testimony of Ms. Rambert), at A. 52 (testifying that as she walked back from the store, she saw her boyfriend "in front of [her] building in a fight").

(6) Ms. Rambert was inconsistent in her accounts of who was at the scene. Despite initially testifying that Nee-Q was *not* with Mr. Sambolah when she returned from the store, T. 204, Ms. Rambert then said that as she was walking back and saw the shooter approach, she passed "Ron, 50, Nee-Q and [Mr. Sambolah]." T.

d.  <u>Defense Case</u>

63.     At the conclusion of the prosecution's case, defense counsel moved for a directed verdict on the ground that Ms. Rambert's testimony was incredible as a matter of law. T. 399, 408. Defense counsel argued that Ms. Rambert's testimony did not make sense in light of Officer Solomon's account and that only one version could be true. T. 399-400. He recounted that Officer Solomon had found Mr. Sambolah face down, took his pulse and tried to revive him. T. 399-400. Whereas, Ms. Rambert indicated that she found her boyfriend face up. T. 404. The officer testified that she "put a rush on the bus," the ambulance, because it had not come yet and ultimately took between 30 to 45 minutes to arrive. T. 400. Whereas, Ms. Rambert testifed that the ambulance arrived shortly after the incident, and she did not know whether the police or the ambulance arrived first. T. 400. Defense counsel also emphasized that Ms. Rambert's description of the perpetrator changed drastically between her statement to police and her testimony at trial. T. 405. He pointed out other inconsistencies between Ms. Rambert's trial testimony and her earlier statements and grand jury testimony. T. 401-03. He pointed out the implausible idea that Ms. Rambert and the police officer could have been at the scene together for 45 minutes waiting for an ambulance without Ms. Rambert

---

207; *see also* T. 209, 228, 229-30, 246 (indicating Nee-Q was still at the scene when Ms. Rambert was walking back from the store).

(7) After using Det. O'Connell's police report to refresh her recollection at trial, Ms. Rambert said she did not remember telling police that the shooter used a semi-automatic .40 caliber handgun. T. 301-02.

approaching the police to tell them what she saw. T. 404. The Court denied defense counsel's motion. T. 408-09.

64.     After the defense rested, having presented no evidence, defense counsel again requested a directed verdict of acquittal stating that the prosecution failed to prove all of the elements of the crime. T. 416. Although the court allowed counsel to incorporate Mr. Villa's height—defense counsel asked Mr. Villa to stand to show the court that he was about 5'5.5" tall[15]—the court still denied the motion stating that factual questions would be determined by the factfinder. T. 415, 417.

      e.  <u>Summations</u>

65.     On summation, defense counsel argued that in this single eyewitness case, Ms. Rambert's inconsistent testimony that directly contradicted Officer Solomon's testimony was not proof beyond a reasonable doubt. T. 430-31, 452-53. Defense counsel theorized that the contradictory testimony at the crime scene could be explained in a scenario where Ms. Rambert did not actually witness the shooting but arrived after Mr. Sambolah had been shot. T. 429, 438-39.

66.     Defense counsel again compared the ambulance-timing testimony of Officer Solomon, a disinterested, reliable witness, with the testimony of Ms. Rambert, who, he argued, wanted to be "the hero." T. 428, 430-31, 450. He asserted that Ms. Rambert changed her story several times, did not identify herself as an eyewitness at the crime scene, gave police a description of the perpetrator at odds

---

[15]     Ms. Rambert testified that the shooter was around 5'10-11" tall. T. 213.

with Mr. Villa's appearance, and was unable to say whether the blue top that the perpetrator wore was a shirt or a sweater or another article of clothing. T. 430-35.

67.     Defense counsel pointed out that there was no other evidence tying Mr. Villa to the scene—no DNA, no fingerprints, and no video. T. 429.

68.     Defense counsel also addressed the prosecution's lack of motive evidence. Although Ms. Rambert testified about O.G.'s earlier fight with Mr. Sambolah and O.G's presence at the scene, there was no evidence of why Mr. Villa would have been involved in the shooting. T. 436-37, 450-51.

69.     During the prosecutor's summation, the prosecutor misstated key evidence relating to when the ambulance arrived at the scene and asserted that motive had been proven, even though there had been no motive evidence that was at all connected to Mr. Villa. Instead, the prosecutor conflated the issue of a motive for the killing with the intent of the shooter.

70.     First, the prosecutor insisted, with no basis in the record,[16] that Officer Solomon testified that the ambulance arrived in four to five minutes. T. 473, 475. The prosecutor contended that there was a mistake in the minutes because "[i]t makes no sense for 45 minutes to have passed for an ambulance to arrive." T. 473.

71.     Second, in an attempt to respond to defense counsel's argument on summation that evidence of motive had not been presented, the prosecutor stated

---

[16]     Officer Solomon testified clearly that it took "maybe a half hour to 45 minutes, I'm not sure," and then again, "[t]he time we got there until the ambulance came it was about 45 minutes." T. 182-83.

simply, "The People have proved motive in this case. And it's clear from this incident that the defendant, as he drew the weapon clearly wanted to shoot and kill Sedrick Sambolah and that was his intent." T. 479.

72.     But, no evidence of motive relating to Mr. Villa had been presented at trial. The prosecution arguably presented motive testimony *as to O.G.*, a neighborhood man who had gotten into an early morning fight with Mr. Sambolah at a nightclub. T. 198, 270-71, 282. In stark contrast, the prosecution theorized that Mr. Villa—a complete stranger, wearing a blue shirt—inexplicably shot Mr. Sambolah at point blank range in public in the middle of the afternoon. *See* T. 206-07, 341-42.

     f.   Verdict and Sentence

73.     On February 24, 2014, the Court found Mr. Villa guilty of murder in the second degree and criminal possession of a weapon in the second degree. T2. 2. The court also adjudicated Mr. Villa a second violent felony offender.[17] T2. 3-4.

74.     On April 23, 2014, prior to sentencing, Mr. Sambolah's brother and father made statements. S. 11-13. The prosecution requested that the Court sentence Mr. Villa to the maximum on both convictions. S. 14-15, 19.

---

[17]     Mr. Villa was convicted of assault in the second degree in Bronx County on February 24, 2005 and was sentenced to three years of incarceration and three years of post-release supervision on March 14, 2005. T2. 3; *see also* Ex. 17 (Predicate Felony Statement), at A. 59. The incident that led to this conviction occurred on December 19, 2002, just a couple of weeks after Mr. Villa turned 18 years old. *See* Ex. 18 (Rap Sheet of Guillermo Villa), at A. 60-68.

75.     In a statement to the Court, Mr. Villa unequivocally declared his innocence. S. 18.[18] In addition to stating, "I'm innocent," he said, "This is not me. I know I might fit the description or whatever, but this is not me. I did not commit this crime, and I ask for you to declare a righteous sentence. That's all." S. 18-19. Mr. Villa conveyed his "deepest condolences" to the Sambolah family. S. 18.

76.     The Court sentenced Mr. Villa to an indeterminate term of 25 years to life for the count of murder in the second degree and a determinate term of 15 years of incarceration and five years of post-release supervision for the count of criminal possession of a weapon in the second degree, sentences to run concurrently. S. 20.

C. The Direct Appeal

77.     Undersigned counsel filed Mr. Villa's direct appeal brief on March 19, 2018, arguing that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence; Mr. Villa did not voluntarily waive his fundamental rights to a jury trial and to testify; Mr. Villa was deprived of his right to a fair trial where the prosecutor misrepresented the evidence in summation; the Court erred in failing to suppress the eyewitness's identifications of Mr. Villa; and defense counsel was ineffective for failing to protect Mr. Villa's fundamental rights

---

[18]     Mr. Villa's defense counsel Andres Aranda also expressed concern over whether the right person was convicted for this crime. *See* S. 16-18. Mr. Aranda explained that he had located a witness, Raheim Wright, who had given him an affidavit stating that he witnessed the shooting, observed that the shooter was a Black man wearing a black hoodie, and that the shooter was not Mr. Villa. S. 2-3. Mr. Aranda requested more time to look for two other witnesses at the scene; however, the Court denied this request. S. 3-5. 9-10. In his affirmation, Mr. Aranda recalls that this witness "apparently had given conflicting versions of events." Ex. 8 (Aranda Affidavit), at A. 33.

to a jury trial and to testify and for allowing trial testimony to be presented before the Court's decision on a case-dispositive suppression motion. On March 20, 2019, the prosecution filed its response brief. Mr. Villa's reply brief was filed on April 18, 2019. His conviction was affirmed on July 9, 2019, *see People v. Villa*, 174 A.D.3d 438 (1st Dep't 2019), with leave to appeal to the Court of Appeals denied on November 22, 2019, *see People v. Villa*, 34 N.Y.3d 1019 (2019).

D. <u>The Instant Motion</u>

78.     I make this affirmation in support of Mr. Villa's motion to vacate the judgment of conviction on the ground that he was denied his right to the effective assistance of counsel. N.Y. C.P.L. § 440.10(1)(h). Mr. Villa's trial counsel was ineffective under both the federal and state constitutions. *See* U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Baldi,* 54 N.Y.2d at 146*; Benevento*, 91 N.Y.2d at 713-14. To vacate a conviction based on ineffective assistance of counsel, a defendant must show (i) that "counsel's performance was deficient" and (ii) that "the deficient performance prejudiced the defense. *Strickland*, 466 U.S. 668 at 687. The New York State Constitution requires counsel to have provided a defendant with "meaningful representation." *People v. Baldi*, 54 N.Y.2d 137, 146 (1981). The New York State constitutional standard "offers greater protection than the federal test" because it "does not require a defendant to fully satisfy the prejudice test of *Strickland*." *People v. Caban*, 5 N.Y.3d 143, 155 (2005) (internal quotations omitted).

33

79.     For reasons discussed in the accompanying memorandum of law, defense counsel's legal representation was deficient under both federal and state standards because he (1) failed to consult with an eyewitness identification expert or present at trial expert testimony on factors that can adversely affect the reliability of eyewitness identifications in this cross-racial identification case where the sole eyewitness contradicted police trial testimony and her own prior statements related to the description of the shooter; (2) failed to intervene or object where Mr. Villa stated clearly that he wanted to speak with his family before deciding whether to waive his fundamental right to a jury in a murder case; (3) failed to properly counsel Mr. Villa on the trial rights that he would be waiving in choosing to have a bench trial; and (4) improperly consented to allowing in trial testimony before the suppression hearing had concluded.

        a.  Eyewitness Identification Expert Affidavit

80.     From October through November of 2020, undersigned counsel consulted with Dr. Brian L. Cutler, Professor of Social Science and Humanities at University of Ontario Institute of Technology and a leading expert on psychological research on eyewitness memory,[19] requesting that Dr. Cutler provide an overview

---

[19]    Dr. Cutler holds a Ph.D. in psychology from the University of Wisconsin (1987). Ex. 19, A. at 70. Dr. Cutler has consulted on and testified as an expert witness in cases involving risk factors for mistaken eyewitness identifications and mistaken eyewitness memories in more than 250 cases. *See* website for Dr. Cutler at http://coralcoastgroup.com/eyewitness-memory. He is the author or editor of nine books, including *The APA Handbook of Forensic Psychology*; *Encyclopedia of Psychology and Law*; *Reform of Eyewitness Identification Procedures*; and *Conviction of the Innocent: Lessons*

34

and summary of psychological research on factors that "affect the risk of mistaken eyewitness identification." *See, generally,* Ex. 3 (Dr. Cutler Affidavit), at A. 3-5; Ex. 19 (*Curriculum Vita* of Dr. Cutler), at A. 70-76.

81.    In his report, Dr. Cutler underscored that "information from an eyewitness identification expert on the factors that affect the risk of mistaken eyewitness identification in a particular case can assist juries and other factfinders in evaluating eyewitness identifications in the cases before them, for many of the factors [involved in mistaken identifications] defy common sense." Ex. 3, at A. 5.

82.    Dr. Cutler detailed: viewing factors that may "increase the risk of error in identification," *Id.* at A. 6-8; memory storage factors, including post-event information, that, when misleading, "can lead to witnesses misremembering details about the crime," A. 8; identification procedures, which, depending on how they are conducted, "can encourage or discourage identification by inference processes," A. 9; memory contamination in serial identifications, *see* A. 11-12; and, the malleability of eyewitness confidence—rising deceptively when "eyewitnesses learn information that validates their identifications," which "render eyewitnesses more persuasive to factfinders," A. 12-13.

83.    First, Dr. Cutler explained that viewing factors, the conditions under which eyewitnesses view perpetrators, will increase the risk of error in an

---

*from Psychological Research.* He has authored more than 25 book chapters, 65 peer-reviewed articles in psychology, law, and interdisciplinary journals, and 25 articles in professional newsletters, and has given over 100 presentations at professional conferences and universities. *See* Ex. 3, at A. 3; Ex. 19, at A. 71-76.

identification when the conditions are unfavorable. *Id.* at A. 6. Viewing factors include:

- **Exposure Time**—This is "the amount of time that an eyewitness has an unobstructed view of the perpetrator's face," not "the total amount of time for which an eyewitness was with a perpetrator." *Id.* If this time is fleeting, this leads "to a greater risk of mistakes in eyewitness identification." *Id.* Furthermore, eyewitnesses tend to overestimate "exposure duration," especially where "eyewitnesses are told by investigators that they identified the suspect from a photoarray." *Id.* This also inflates the eyewitness's confidence in her identification. *See id.*

- **Cross-Racial Identification**—This occurs when "the witness…is of one race and the perpetrator is a different race." *Id.* at A. 8. Psychological research shows that "people are more accurate at recognizing members of their own race and make more mistakes when recognizing members of another race." *Id.* Cross-race effects increase the risk of a mistaken identification, especially where the exposure time is reduced, where a larger number of fillers is used in the initial identification test, and where "the perpetrator is seen in a group as opposed to alone." *Id.*

- **Level of Stress**—In situations involving high levels of stress, this "impair[s] an eyewitness's ability to encode information, such as crime details and perpetrator characteristics." *Id.* at A. 7. "High stress is associated with reporting fewer correct descriptors of the perpetrator, more incorrect details, and making fewer correct identifications from lineups." *Id.* at A. 7-8.

- **Weapon Focus**—This occurs when there is the "visual presence of a weapon." *Id.* at A. 8. A weapon draws the focus of the eyewitness to the weapon and away from the perpetrator's facial and physical characteristics. *Id.* "Eyewitness identifications, therefore, tend to be less accurate when a weapon was visually present at the time of the crime." *Id.*

84.    Second, Dr. Cutler discussed memory storage factors—that "[o]nce a memory has been encoded and stored in an eyewitness's memory system, the memory does not remain immutable." Ex. 3, at A. 8. Further, stored memories can

be affected by (a) **time interval**, the time between the crime and the identification, where there is a "sharp[] decline in accuracy soon after the crime"; and (b) **post-event information**, where eyewitnesses who are told misleading post-event information may misremember details about the crime, incorporating incorrect details of the crime into their memories. *Id.* at A. 8-9. Indeed, eyewitnesses may earnestly believe that details that they learned *after* the crime from another source are their own memories of the crime. *Id.* at A. 9.

85.     Third and relatedly, Dr. Cutler described how "[s]cientific research in eyewitness identification provides strong evidence that inference processes serve as the basis for identification in substantial numbers of cases," and that eyewitnesses often "identify the suspect by inference processes" or "on a combination of memory and inference processes." Ex. 3, at A. 9. Dr. Cutler detailed three types of inference processes: (1) **deduction**—where the eyewitness may think "this one fits my description of the perpetrator, the police think he is the perpetrator so it must be him"; (2) **process of elimination**—where the eyewitness may think "he is the only one that looks like the perpetrator"; or (3) **relative-judgment processing**—where the eyewitness may think "he looks more like the perpetrator than do the others." *Id.* Dr. Cutler also pointed out that using fillers, "the individuals or photos selected for inclusion in [identifications procedures] together with the suspect," who do not closely "match the description of the perpetrator given by the eyewitness," will lead to "more suspect identifications, regardless of whether or not the suspect was the perpetrator." *Id.* at A. 10. Additionally, Dr. Cutler emphasized that where the

37

eyewitness is instructed that the suspect is in the lineup, the risk of false identification increases. *Id.* at A. 11. And finally, when multiple, serial identification procedures take place, "the first one affects the results of subsequent ones." *Id.* "Innocent suspects identified from one procedure are therefore at higher risk for mistaken identification from subsequent procedures" because an eyewitness tends to "remain committed to [her] identifications even when the identifications are incorrect." *Id.* at A. 12.

86.     Finally, Dr. Cutler explained in his report that eyewitness confidence is malleable. Ex. 3, at A. 12. "When eyewitnesses learn information that validates their identifications, confidence rises independently of accuracy." *Id.* Thus, suggestive identification procedures both increase the risk of mistaken identification *and* distort confidence. *See id.*

   b.  Guillermo Villa's Affidavit

87.     On January 11, 2021, Mr. Villa signed an affidavit for this motion. *See* Ex. 6 (Affidavit of Guillermo Villa), at A. 22-24. He explained that his family retained defense counsel Andres Aranda to represent him for trial in this case. Mr. Villa further stated that:

> Mr. Aranda told me that we should have a bench trial in front of Judge Massaro. I remember that he first said this to me after he had received some of the grand jury minutes in my case. He told me that there was very little evidence against me, so it was better to have a bench trial where I would just be dealing with the judge, who has to follow the law.
>
> I had never heard of a bench trial before and did not know what it was. Mr. Aranda seemed very confident and told me that it was a good idea.

I trusted Mr. Aranda because he had represented some of my family members on other matters.

Mr. Aranda, however, did not explain to me that by choosing to have a bench trial, I would be giving up my right to have a jury of twelve people to determine the verdict. Mr. Aranda did not go into detail about what a bench trial is, nor did he explain what I would be giving up in order to have a bench trial.

On January 30, 2014, I had a hard time taking in everything that the judge was telling me about the differences between a bench trial and a jury trial in those few minutes. I was very nervous. This was my first trial. I had two previous arrests from when I was a teenager, but I had never gone to trial before.

At the end of the appearance, the judge told me that I could still think about whether I wanted to go forward with a bench trial and that I could let him know the next day. When the judge said that, I turned around and saw many of my family members, including my mother, Aunt Margaret, and my younger sister, in the courtroom, and I wanted to talk to them about this decision.

The next day, when the judge asked me whether I wanted to talk to anyone before going forward with the bench trial, I said I wanted to talk to my family. At this point, I was not certain that I wanted to have a bench trial. In particular, I wanted to talk to Aunt Margaret to ask her for her advice. She is the backbone of our family and a second mother to me.

However, the judge did not address my request and said that we were going to go ahead with the bench trial. Mr. Aranda did not object or ask the judge to allow me to speak with my family members. Mr. Aranda never brought up this decision with me again. He did not ask me why I wanted to speak to my family or what I wanted to say to them.

If, after the January 30, 2014 court appearance, Mr. Aranda had carefully explained to me what the judge was saying about what I had to give up to have a bench trial, I would not have chosen a bench trial and would have asked for a jury trial.

Ex. 6 (Affidavit of Guillermo Villa), at A. 22-24.

39

c.   Defense Counsel's Affirmation and Disciplinary History

88.   On January 27, 2021, Andres Aranda, Mr. Villa's trial defense counsel, signed an affirmation related to his recollections of his representation of Mr. Villa at trial. Ex. 8 (Affirmation of Andres Aranda), at A. 32-33. Mr. Aranda is licensed to practice in New York but is currently under an order of suspension related to his disciplinary history. *Id.* at 32.

89.   First, Mr. Aranda stated that he "did not consult with an eyewitness identification expert about the sole eyewitness's identifications of Mr. Villa to determine how the eyewitness's memory and perception along with the police identification procedures could have affected the reliability of the identifications in this case." *Id.* Mr. Aranda said that he did not have a specific reason that he could recall for not consulting with an eyewitness identification expert, even where the case "involved a single eyewitness—the girlfriend of the deceased—who gave testimony that was inconsistent with the information she gave to police during the investigation of the case." *Id.* at A. 32-33. In addition, Mr. Aranda recalled that this case involved a cross-race identification, noting that the eyewitness "was a light-skinned Black woman, and Mr. Villa is a brown-skinned Hispanic man." *Id.* at A. 33.

90.   Further, Mr. Aranda said that while he could not specifically recall "the details around the decision for Mr. Villa to waive a jury trial and have a bench trial," nor "exactly what [he] said to Mr. Villa about having a bench trial versus having a jury trial," he did remember that he "had a discussion about it" with Mr.

40

Villa. *Id.* at A. 33. Mr. Aranda said that he neither dissuaded nor encouraged Mr. Villa to waive his right to a jury trial. *Id.* However, Mr. Aranda did remember clearly that he "had recently obtained an acquittal in a prior bench trial in front of Judge Massaro, *People v. Andy Esteves*, in which [his] client was accused of the assault of his girlfriend" and that he discussed this prior bench trial with Mr. Villa and told Mr. Villa that Judge Massaro was a fair judge. *Id.*

91.     Mr. Aranda did not remember why he failed to object to "the judge's inquiry into whether Mr. Villa wanted to go forward with a bench trial when the judge ignored or failed to hear Mr. Villa's request to speak to his family." *Id.*

92.     Finally, while Mr. Aranda did not specifically recall why he "consented to allowing trial testimony prior to the resolution of the suppression hearing," he "believe[s] that it had to do with the unavailability of a witness." *Id.*

93.     In addition to his affirmation acknowledging many of his errors in this case, Mr. Aranda has a protracted disciplinary history related to his license to practice law in New York. To start, Mr. Aranda's license was suspended both before and after his representation of Mr. Villa. On July 13, 2006, counsel's license was suspended for one year for "neglecting…client matters." *Matter of Andres M. Aranda*, 2006 NY Slip Op 04752 (1st Dep't 2006) (detailing three additional prior admonitions Mr. Aranda received over a seven-year period, including a May 1986 admonition based on a finding that he made misrepresentations to the court about his engagement in another matter and a misrepresentation to the Disciplinary

41

Committee during a deposition; an April 1989 admonition for "neglecting a criminal matter"; and a June 1993 admonition for failing to appear in court).

94.   On May 15, 2015, Mr. Aranda was also publicly reprimanded and suspended for 18 months from practice in the Second Circuit due to "numerous defaults" and misconduct regarding criminal appeals in that court. *In re Aranda*, 789 F.3d 48, 49, 53 (2d Cir. 2015) (noting that Mr. Aranda's conduct in the Second Circuit "is part of a wider pattern of misconduct, and that he may be unable to conform to expected professional norms in future appeals in this Court"). The Second Circuit emphasized that this disciplinary action was not "Aranda's first wake-up call," and that the "alarm ha[d] repeatedly sounded over the years—in 1986, 1989, 1993, 2006, and every time in the past several years that he received an order or telephone call from this Court requiring him to address his many defaults—but Aranda's conduct remained unchanged." *Id.* at 58. The Second Circuit further noted that Mr. Aranda would not be able to "conform his conduct to expected professional norms," especially given "his prior disciplinary history…the pattern of misconduct…[and] the fact that his defaults occurred in criminal appeals, where significant liberty interests were at risk". *Id.* at 59.

95.   The Departmental Disciplinary Committee then moved to impose reciprocal discipline on Mr. Aranda, and the First Department granted the motion and imposed an 18-month suspension, *nunc pro tunc*, to May 15, 2015. *In re Aranda*, 138 A.D.3d 142, 143 (1st Dep't 2016); *see also* Motion Decision, *In re Aranda*, 2016 WL 636414 (1st Dep't 2016).

96.     Counsel's license to practice law remains suspended. Ex. 20 (Attorney Detail Report on NYS Unified Court System, Jan. 27, 2021), at A. 77.

*     *     *

97.     Where defense counsel was ineffective for his failures to: consult with or present at trial the testimony of an eyewitness identification expert on the many factors in this cross-race stranger identification case that adversely affected the reliability of the eyewitness's identifications; properly explain the jury rights that Mr. Villa would be giving up by having a bench trial; intervene or object when Mr. Villa expressed doubts to the Court about waiving his fundamental right to a jury; and, object to allowing in trial testimony prior to the conclusion of the case-dispositive suppression hearing, Guillermo Villa's Motion to Vacate Judgment should be granted. *See* N.Y. C.P.L. § 440.10(1)(h). In the alternative, a hearing should be ordered to resolve any disputed issues of fact. *See* N.Y. C.P.L. § 440.30(5).

Dated:          New York, New York
                February 10, 2021

                        *Mandy E. Jaramillo*
                        Mandy E. Jaramillo, Esq.
                        Office of the Appellate Defender.
                        11 Park Place, Suite 1601
                        New York, N.Y.  10007
                        mjaramillo@oadnyc.org
                        (212) 402-4100

43

Indictment No. 3376-2011

SUPREME COURT OF THE STATE OF NEW YORK

BRONX COUNTY

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

GUILLERMO VILLA,

*Defendant.*

MEMORANDUM OF LAW IN SUPPORT OF GUILLERMO VILLA'S
MOTION TO VACATE THE JUDGMENT PURSUANT TO C.P.L. § 440.10

CAPRICE R. JENERSON, ESQ.
Attorney for Guillermo Villa

ANASTASIA HEEGER, ESQ.
Supervising Attorney

By: MANDY E. JARAMILLO, ESQ.
    Senior Staff Attorney

OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100
mjaramillo@oadnyc.org

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

QUESTION PRESENTED ............................................................ 1

STATEMENT OF FACTS ........................................................... 2

ARGUMENT ............................................................................. 3

    GUILLERMO VILLA WAS DENIED HIS RIGHT TO THE
    EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY
    THE STATE AND FEDERAL CONSTITUTIONS............................ 3

    A.    By Failing to Obtain the Assistance of an Expert on
        Eyewitness Identification, the Key Issue in the Case,
        Defense Counsel Deprived Mr. Villa of Effective and
        Meaningful Representation. ................................................... 6

        1.    *Defense counsel had an obligation to investigate the*
              *value and admissibility of eyewitness identification*
              *expert testimony in this case.* ......................................... 7

        2.    *The Court of Appeals has held repeatedly that*
              *expert eyewitness identification testimony is*
              *admissible in cases that turn on the accuracy of an*
              *eyewitness's identification of a stranger where there*
              *is little to no corroborating evidence. Thus, it would*
              *have been an error in this case for the Court to*
              *exclude expert testimony.* ............................................ 10

        3.    *Had defense counsel consulted with an expert and*
              *moved to present eyewitness identification expert*
              *testimony, there is a reasonable probability that the*
              *outcome of the proceeding would have been*
              *different. Furthermore, defense counsel has offered*
              *no strategic reason for this significant failure.* .......................... 14

B.    By Failing to Intervene or Object Where Mr. Villa Stated
      Clearly that He Wanted to Speak with His Family Before
      Deciding Whether to Waive His Fundamental Right to a
      Jury in a Murder Case, Defense Counsel Was Ineffective. .................. 25

C.    By Failing to Properly Counsel Mr. Villa on the Trial
      Rights that He Would Be Waiving in Choosing to Have a
      Bench Trial, Defense Counsel Further Deprived Mr. Villa
      of Effective Representation. .................................................................... 28

D.    By Improperly Consenting to Allowing in Trial Testimony
      Before the Suppression Hearing Had Concluded, Defense
      Counsel's Representation Was Ineffective. ........................................... 32

CONCLUSION ......................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007)....................................................................8

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) .............................................8, 23

*In re Aranda*, 789 F.3d 48 (2d Cir. 2015)...........................................................24 n.6

*In re Aranda*, 138 A.D.3d 142 (1st Dep't 2016) .................................................24 n.6

*Matter of Andres M. Aranda*, 2006 N.Y. Slip Op. 04752 (1st Dep't 2006)...........24 n.6

*People v. Abney*, 13 N.Y.3d 251 (2009)....................................................11, 13, 15, 16

*People v. Baldi*, 54 N.Y.2d 137 (1981)..........................................................................4, 5

*People v. Benevento*, 91 N.Y.2d 708 (1998) .......................................4, 5, 25, 26, 32, 34

*People v. Boone*, 30 N.Y.3d 521 (2017) ..................................................................16 n.4

*People v. Caban*, 5 N.Y.3d 143 (2005) .............................................................................5

*People v. Crovador*, 165 A.D.3d 610 (1st Dep't 2018).........................................13 n.3

*People v. Davis*, 49 N.Y.2d 114 (1979)............................................................................26

*People v. Droz*, 39 N.Y.2d 457 (1976) ......................................................................8, 15

*People v. Fisher*, 18 N.Y.3d 964 (2012) .........................................................................5

*People v. Flores*, 84 N.Y.2d 184 (1994).........................................................................6

*People v. Jackson*, 221 A.D.2d 964 (4th Dep't 1995) ...................................................33

*People v. LeGrand*, 8 N.Y.3d 449 (2007) .......................................................11, 12, 17

*People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977) .........................................................26

*People v. Muhammad*, 17 N.Y.3d 532 (2011).......................................................11, 15

*People v. Oathout*, 21 N.Y.3d 127 (2013).................................................................... 5, 6

*People v. Oddone*, 22 N.Y.3d 369 (2013) ..................................................................... 17

*People v. Oliveras*, 21 N.Y.3d 339 (2013) ................................................................. 5, 8

*People v. Santiago*, 17 N.Y.3d 661 (2011) ................................ 10, 11, 12, 13, 15-16, 17

*People v. Santiago*, 35 Misc. 3d 1239(A) (N.Y. Sup. Ct., June 8, 2012) .................... 13

*People v. Saunders*, 19 A.D.3d 744 (3d Dep't 2005)................................................... 26

*People v. Smith*, 6 N.Y.3d 827 (2006).................................................................... 26, 31

*People v. Turner*, 5 N.Y.3d 476 (2005) ......................................................................... 5

*People ex rel. Rohrlich v. Follette*, 20 N.Y.2d 297 (1967)........................................... 26

*Strickland v. Washington*, 466 U.S. 668 (1984)........................... 4, 5, 8, 25, 26, 32, 34

*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020)........................................... 6-7, 8-9

## Constitutional Provisions

U.S. Const. amend. VI ....................................................... 4, 25, 26, 32, 34

U.S. Const. amend. XIV...................................................... 4, 25, 26, 32, 34

N.Y. Const. art. I, § 2........................................................................... 26

N.Y. Const. art. I, § 6 ....................................................... 4, 5, 25, 26, 32, 34

iv

**Statutes**

N.Y. C. P. L. § 320.10 ............................................................................................. 26

N.Y. C. P. L. § 440.10 ......................................................................................... 6, 34

N.Y. C. P. L. § 440.30 ............................................................................................. 34

**Other Authorities**

Chris Herring, "Bronx Acquittals Set Record, The Wall Street Journal,
May 4, 2010 ............................................................................................................. 28

Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness
Identification* (2014) ............................................................................................. 16

## **QUESTION PRESENTED**

In a murder case where the only evidence against Guillermo Villa—a Black Hispanic man who had never had a trial before—was the inconsistent and often contradictory testimony of a single stranger eyewitness—a Black woman who initially described the perpetrator as a white Hispanic man—was Mr. Villa denied the effective assistance of counsel and meaningful representation where defense counsel: (1) failed to consult with an eyewitness identification expert or to present at trial expert testimony on factors that adversely affect the reliability of eyewitness identification; (2) failed to intervene or object where Mr. Villa stated clearly that he wanted to speak with his family before deciding whether to waive his fundamental right to a jury in a murder case; (3) failed to properly counsel Mr. Villa on the trial rights that he would be waiving in choosing to have a bench trial; and (4) improperly consented to allowing in trial testimony before the suppression hearing had concluded?

1

## **STATEMENT OF FACTS**

The facts relied on in this memorandum of law are contained in the attached affirmation of Mandy E. Jaramillo, Esq., dated February 10, 2021, and its attached exhibits, and the transcripts from Mr. Villa's hearings, trial, and sentencing proceeding.

<u>**ARGUMENT**</u>

**GUILLERMO VILLA WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS.**

The conviction of Guillermo Villa for the September 24, 2011 shooting of Sedrick Sambolah rests entirely on the cross-racial testimony of a single stranger eyewitness. By her own account, Seyquana Rambert, the eyewitness and the girlfriend of Mr. Sambolah, had only moments to view a total stranger while crossing paths on the sidewalk when she was subjected to an unimaginably stressful event where she heard gunshots and saw the man pull out a weapon and fatally shoot her boyfriend. Ms. Rambert, a Black woman, initially described the shooter as a 5'9" tall white Hispanic man. A full 10 days after the shooting, she picked Mr. Villa, a 5'6" tall Black Hispanic man out of a photo array, and then again, the next day, out of a lineup, and finally again, two and one-half years later, at trial.

Mr. Villa's defense counsel, who was retained by Mr. Villa's family and already had a long disciplinary history, including the suspension of his law license for neglecting client matters, did not fully investigate the best defense available to Mr. Villa—misidentification—in a case with no corroborating evidence. Defense counsel failed to consult with or to present testimony from an eyewitness identification expert to educate himself and to instruct the fact finder on the high probability of a mistaken identification in a case such as this, involving significant

3

factors that could adversely affect an eyewitness's ability to accurately identify the perpetrator. To make matters worse, Mr. Villa then made an uninformed decision to waive a jury trial. His attorney failed to fully and meaningfully explain the potential risks of waiving a jury, and the benefits of having 12 factfinders decide the question of guilt. Instead, counsel simply emphasized a prior victory he had before the trial judge and assured Mr. Villa that the judge was fair. Incredibly, when Mr. Villa expressed his doubt directly to the Court over whether to waive his jury right—by asking if he could avail himself of the Court's offer to consult with family members—defense counsel did not intervene or object when the Court failed to hear or ignored Mr. Villa's request. Defense counsel also failed to protect the basic structure of the trial process, allowing in trial testimony before the case-dispositive suppression hearing had concluded.

These errors deprived Mr. Villa of meaningful representation and the effective assistance of counsel. U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Benevento*, 91 N.Y.2d 708 (1998); *People v. Baldi*, 54 N.Y.2d 137 (1981). The right as secured by the Sixth Amendment of the United States Constitution is denied when defense counsel's actions fall "below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A

"reasonable probability" is one sufficient to "undermine confidence in the outcome" of a proceeding. *Id.* at 694.

The right as secured by the Constitution of the State of New York is denied when "the evidence, law, and the circumstances of a particular case, viewed in totality and as of the time of representation" show that the defendant did not receive "meaningful representation." *People v. Oliveras*, 21 N.Y.3d 339, 346 (2013) (quoting *Baldi*, 54 N.Y.2d at 147); *People v. Fisher*, 18 N.Y.3d 964, 967 (2012)); N.Y. Const. art. I, § 6. The key issue under New York law is whether counsel's "tactics and strategies were consistent with those of a reasonably competent attorney." *People v. Oathout*, 21 N.Y.3d 127, 128 (2013) (citation and quotations omitted). While New York courts will consider prejudice as a factor when determining whether an error deprived a defendant of meaningful representation, the prejudice component "focuses on the fairness of the process as a whole rather than its particular impact on the outcome of the case." *People v. Caban*, 5 N.Y.3d 143, 156 (2005) (citations omitted). Because the New York standard does not require the "but for" showing of *Strickland*, it is "somewhat more favorable to defendants." *People v. Turner*, 5 N.Y.3d 476, 480 (2005) (citation omitted). "The question is whether the attorney's conduct constituted egregious and prejudicial error such that defendant did not receive a fair trial," *Benevento*, 91 N.Y.2d at 713 (internal quotation marks and citation omitted).

Even "[a] substantial, single 'blunder' could, of course, qualify" as sufficiently prejudicial. *People v. Flores*, 84 N.Y.2d 184, 188 (1994). That said, "[e]ven where counsel's errors 'individually may not constitute ineffective assistance, the cumulative effect of [defense] counsel's action can deprive defendant of meaningful representation.'" *People v. Wright*, 25 N.Y.3d 769, 779 (2015) (quoting *Oathout*, 21 N.Y.3d at 132). Thus, this Court should grant Mr. Villa's motion to vacate his judgment of conviction pursuant to N.Y. C.P.L. § 440.10(1)(h). Defense counsel's errors, both singularly and cumulatively, deprived Mr. Villa of meaningful representation and the effective assistance of counsel.

**A.    By Failing to Obtain the Assistance of an Expert on Eyewitness Identification, the Key Issue in the Case, Defense Counsel Deprived Mr. Villa of Effective and Meaningful Representation.**

In a case that rested on the cross-racial single eyewitness testimony of a stranger, defense counsel failed to provide effective or meaningful representation when he neglected to consult with an eyewitness identification expert and to present expert testimony at trial. Here, "the eyewitness testimony was sufficiently unreliable in ways not readily apparent" to the fact-finding Court, and defense counsel's failure to consult with or present an expert on eyewitness identification was unreasonable and ineffective "under the egregious circumstances presented." *United States v. Nolan*, 956 F.3d 71, 75, 81 (2d Cir. 2020) (reversing conviction where "even though many of the typical causes of mistaken eyewitness identifications were apparent, defendant's trial counsel did almost nothing to

6

challenge the introduction of such identifications or combat these problems").[1] Had defense counsel presented an expert, such as Dr. Brian L. Cutler, there is a reasonable probability that the outcome of the trial would have been different. Counsel's failure to pursue this compelling defense deprived Mr. Villa of meaningful representation and the effective assistance of counsel.

1. *Defense counsel had an obligation to investigate the value and admissibility of eyewitness identification expert testimony in this case.*

Defense counsel failed to fulfill the well-established obligation to investigate the value and admissibility of expert testimony in a case such as this, which relied on a cross-racial, single, stranger eyewitness identification. An expert on psychological research on eyewitness memory and factors that affect the risk of mistaken eyewitness identification could have provided valuable information to the Court about the adverse viewing conditions, the factors that may have affected the eyewitness's memory storage, the likely use of inference processes during the initial serial identification procedures, the lineup instructions indicating that the suspect was in the lineup, and the fact that the eyewitness's confidence at trial almost certainly rose independently of her ability to accurately identify the perpetrator. *See* Ex. 3 (Dr. Cutler Affidavit), at A. 6-13.

---

[1] The Second Circuit also held that counsel was ineffective for failing to "pursue a pre-trial motion to preclude the in-court identification testimony by the four victims" and for failing to seek a limiting instruction for a photograph of the defendant posing with what appeared to be a gun. *Nolan*, 956 F.3d at 79, 83.

7

The right to effective assistance of counsel includes "the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense and who is familiar with, and able to employ at trial basic principles of criminal law and procedure." *People v. Droz*, 39 N.Y.2d 457, 462 (1976) (citations omitted); *see also Strickland*, 466 U.S. at 691. This includes investigating the value of expert testimony on key issues, *Bell v. Miller*, 500 F.3d 149, 155-56 (2d Cir. 2007), and the law governing the handling of expert or other specialized evidence, *see Oliveras*, 21 N.Y.3d at 345-48. The Court of Appeals has found counsel ineffective for failing to obtain and evaluate exculpatory evidence on which an expert could base an opinion—concluding that "at a bare minimum" effective counsel must review the evidence. *Id.* at 348. While there is no *per se* rule that counsel must consult an expert in every case, counsel must at least have a "reasoned basis to conclude" that investigation of expert testimony would be "fruitless." *Gersten v. Senkowski*, 426 F.3d 588, 610 (2d Cir. 2005) (no deference for decision to forego consultation with expert in absence of adequate investigation); *see also Bell*, 500 F.3d at 156-57.[2]

The Second Circuit recently held that counsel was ineffective for failing "to call or even consult an expert witness who could have informed the judge…about

---

[2]     To put it another way, counsel cannot justify a failure to pursue expert testimony on the grounds that the defense is categorically "better off . . . without having . . . experts on the witness stand and getting bogged up in that," or that it is better to "giv[e] the [factfinder] a good gut feeling" using lay evidence, when an expert could have offered an admissible opinion on an issue. *Oliveras*, 21 N.Y.3d at 345.

the multiple, well-established ways in which [the] identifications were unreliable." *Nolan*, 956 F.3d at 76. The similarities between *Nolan* and Mr. Villa's case are striking, and the circumstances indicating a potential misidentification in Mr. Villa's case are just as egregious. In *Nolan*—an armed-robbery case that involved two perpetrators with guns, who entered an apartment occupied by five family members—four of the complainants identified the defendant at trial. *Id.* at 75-77. The indicia of unreliability included: cross-race and "cross-ethnic" effect; weapon focus; high stress; a failure by the complainants to give a detailed description of the perpetrators—describing them as "light-skinned or Hispanic"; and, problematic serial identification procedures involving post-event information, where the four complainants did not identify the defendant "until they saw his photo in a photo array," weeks after the crime. *Id.* at 75-77, 80. Comparably, here, where the eyewitness, a Black woman, who described the perpetrator as a white Hispanic man, but then identified Mr. Villa, a Black Hispanic man, in a photo array—a full 10 days after the shooting—that only included brown and Black men, and then again the next day in a lineup where the detective told her "to pick out the guy that did it," the eyewitness's identification of Mr. Villa at trial is not reliable. *See* T. 19, 67, 128, 134-35, 257-70, 262.

Defense counsel has affirmed that he failed to investigate the value and admissibility of eyewitness identification expert testimony. *See* Ex. 8 (Aranda Affirmation), at A. 32. Counsel "did not consult with an eyewitness identification

9

expert about the sole eyewitness's identifications of Mr. Villa to determine how the eyewitness's memory and perception along with the police identification procedures could have affected the reliability of the identifications in this case." *Id.* Further, Mr. Aranda does "not recall having a specific reason for not consulting with an eyewitness identification expert" here, but does recall that the single eyewitness, who was "the girlfriend of the deceased," "gave testimony that was inconsistent with the information she gave to police during the investigation of the case," and that she was a "light-skinned Black woman," and Mr. Villa is a "brown-skinned Hispanic man." *Id.* at 32-33. Defense counsel's failure to evaluate this exculpatory evidence at the time of trial deprived Mr. Villa of meaningful representation.

> 2. *The Court of Appeals has held repeatedly that expert eyewitness identification testimony is admissible in cases that turn on the accuracy of an eyewitness's identification of a stranger where there is little to no corroborating evidence. Thus, it would have been an error in this case for the Court to exclude expert testimony.*

By the time of Mr. Villa's suppression hearing and trial, in January and February 2014, the Court of Appeals had repeatedly endorsed the admission of expert testimony concerning the reliability of eyewitness identifications in cases, similar to this one, where the remaining evidence did not sufficiently corroborate the identification, and where there were many concerning factors that likely affected the reliability of such identifications. *See People v. Santiago,* 17 N.Y.3d 661, 664, 669, 671-72, 673 (2011) (expert identification testimony admissible when the case turns on the accuracy of eyewitness identification and the remainder of the

10

evidence does not sufficiently corroborate the identification); *People v. Abney*, 13 N.Y.3d 251, 267 (2009) (same); *People v. LeGrand*, 8 N.Y.3d 449, 452 (2007) (same).

In *Santiago*, the Court affirmed its previous holding in *LeGrand* and *Abney* governing the discretion of trial courts for deciding a motion to admit expert testimony on eyewitness identification. 17 N.Y.3d at 669. Where "the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime," the trial court is then obligated to consider four factors. *Id.* If the testimony is: "(1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror," then it is an abuse of discretion for a trial court to exclude the expert eyewitness testimony. *Id.*; *see also Abney*, 13 N.Y.3d at 267. This rule springs from a concern that "mistaken eyewitness identifications play a significant role in many wrongful convictions" and a conclusion that "expert testimony on the subject of eyewitness recognition memory can educate a jury concerning the circumstances in which an eyewitness is more likely to make such mistakes." *Santiago*, 17 N.Y.3d at 669. Mistakes are of particular concern when "a person observes an assailant—usually a stranger—for the first time in a highly stressful environment." *People v. Muhammad*, 17 N.Y.3d 532, 546 (2011) (ten-year "prior relationship took any issue regarding human memory formation and recollection out of the case").

11

In *Santiago*, 17 N.Y.3d at 666, 672, the "primary evidence against defendant…was the victim's identification," which was expressed with "subjective certainty" but was likely unreliable due to "*postevent information* ([where] eyewitness testimony about an event often reflects not only what the witness actually saw but also information the witness obtained later)," "*cross-racial and cross-ethnic inaccuracy* ([where] non-Hispanic Caucasian eyewitnesses are generally less accurate in identifying Hispanic people than in identifying other non-Hispanic Caucasians)," and other factors that can adversely affect the reliability of an identification, such as weapon focus, unconscious transference, and confidence malleability.

Similarly, the Court of Appeals found in *LeGrand* that concepts like the correlation between witness confidence and the accuracy of an identification; confidence malleability; and the effect of post-event information on the accuracy of an identification are generally accepted within the relevant scientific community and otherwise admissible. 8 N.Y.3d at 458; *see also Santiago*, 17 N.Y.3d at 672 (noting that these are factors "beyond the ken of the average juror"). Since then, and before Mr. Villa's case went to trial, courts have permitted expert testimony regarding a progressively broader range of factors that scientific research has found can affect the reliability of eyewitness identifications, including: errors associated with cross-race identifications; the impact of exposure time; the use of non-blind identification procedures, unconscious transference; weapon focus; and event stress.

*People v. Santiago*, 35 Misc. 3d 1239(A), *7-9 (N.Y. Sup. Ct., June 8, 2012) (admitting expert identification testimony). **All of these factors are present in Mr. Villa's case**.[3]

Mr. Villa's case fits squarely into this case law because it is a particularly problematic single stranger eyewitness case with no corroborating evidence. If defense counsel had moved the Court to present an expert on eyewitness testimony, the proposed expert testimony would have been admitted. *See Santiago*, 17 N.Y.3d at 672, *Abney*, 13 N.Y.3d at 267-68. Ms. Rambert, a Black woman, initially described the shooter as a white Hispanic man of stocky build, around 5'9" tall. T. 19, 67, 128, 134-35. Mr. Villa, however, is Black Hispanic and only about 5'6" tall. Ex. 4 (Mugshot Pedigree Form), at A. 19. The question, then, is how the eyewitness began at point A—her description—and arrived at point B—her identifications of Mr. Villa.

The answer almost certainly lies in information that "def[ies] common sense" that could be provided by an eyewitness identification expert. Ex. 3, at 5. There were myriad factors that could have increased the chance of a mistaken identification, including a combination of: **poor viewing conditions**, where Ms.

---

[3]     Moreover, since Mr. Villa's trial, the First Department has held that it is an error for a court to deny a defendant's motion to introduce eyewitness expert testimony to the "effect that witnesses are less likely to accurately identify persons of other racial groups than persons of their own race" in cases turning on the accuracy of the victim's cross-racial identification of the defendant where there is little corroborating evidence. *People v. Crovador*, 165 A.D.3d 610, 610 (1st Dep't 2018).

Rambert was in a highly-stressful situation with limited time to view the shooter's facial characteristics, especially where she was focused on the gun as soon as he pulled it out, and where she was subject to own-race and own-ethnicity bias, *see* Ex. 3, at A. 6-8; **memory storage problems**, where Ms. Rambert's memories of the perpetrator's face were likely affected by the time between the crime and the initial identification and by post-event information, at A. 8-9; and **problematic serial identification procedures**, which also likely included Ms. Rambert's use of relative-judgment processing in determining which man looked the most like the perpetrator, at A. 9-12. In addition, "confidence is malleable," and all of these factors affected Ms. Rambert's highly-inflated confidence at trial. *See* Ex. 3, at A. 12. "When eyewitnesses learn information that validates their identifications, confidence rises independently of accuracy." *Id.*

3.    *Had defense counsel consulted with an expert and moved to present eyewitness identification expert testimony, there is a reasonable probability that the outcome of the proceeding would have been different. Furthermore, defense counsel has no strategic reason for this significant failure.*

This case turned on Ms. Rambert's identifications of Mr. Villa after she gave a description of the shooter that did not resemble him. Ms. Rambert, generally, was not a consistent or comprehensible witness, and, at trial, her testimony contradicted the straightforward account of the first-responding law enforcement officer concerning what occurred at the crime scene, including the timing of the

14

ambulance's arrival and the way Mr. Sambolah fell to the ground after he was shot. *See* T. 170, 182-83, 210-11, 330, 380-81.

In light of the law governing the admissibility of expert testimony concerning eyewitness identifications, which defense counsel had a general duty to know, *see Droz*, 39 N.Y.2d at 462-63, defense counsel's failure to even consult with, much less present testimony from, an expert deprived Mr. Villa of exculpatory evidence in a stranger eyewitness identification case. Furthermore, there is a reasonable probability that had a qualified eyewitness identification expert testified at trial, the outcome would have been different.

First, the prosecution's only evidence against Mr. Villa was the eyewitness identification made by a stranger. *See* T. 207 (Ms. Rambert testifying that she had "[n]ever seen him before in [her] life" when asked if she recognized "that man in blue," who she said had shot her boyfriend). This is neither a case like *Muhammad*, 17 N.Y.3d at 546, in which the witness had known the perpetrator for 10 years prior to the crime and recognized him at the time of the attack, nor a case like the latter of the two at issue in *Abney*, 13 N.Y.3d at 262, in which a witness recognized a defendant's voice and body type, and had "encountered [him] regularly in the neighborhood."

Thus, this case is precisely the type where "mistaken identifications play a significant role in many wrongful convictions," and where the Court of Appeals has emphasized that an expert can play a valuable role educating factfinders about the

factors affecting the reliability of eyewitness identifications. *Santiago*, 17 N.Y.3d at 669; *see also* Ex. 3 (Dr. Cutler Affidavit), at A. 6 ("[E]yewitnesses are more accurate at recognizing others with whom they have prior familiarity and more prone to mistakes when recognizing strangers.").

Second, not only was the sole eyewitness identification made by a stranger, but it was made by a Black woman of a Hispanic man, who was not white, as she initially described. By the time of Mr. Villa's trial, the Court of Appeals recognized that cross-racial and cross-ethnic identifications could potentially exacerbate the potential for misidentifications in cases turning on eyewitness identifications by strangers, and that the trial court abused its discretion when refusing to hold a *Frye* hearing in cross-racial cases. *See Santiago*, 17 N.Y.3d at 672; *Abney*, 13 N.Y.3d at 268. Indeed, cross-racial identifications are notoriously unreliable, playing a role "in 42 percent of the cases in which an erroneous eyewitness identification was made." *See* Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014), at 96.[4]

---

[4]     In *People v. Boone*, the Court of Appeals highlighted the "prevalence of eyewitness misidentifications in wrongful convictions and the danger they pose to the truth-seeking function and integrity of our justice system," especially in cases with a single cross-racial eyewitness identification. 30 N.Y.3d 521, 528 (2017) (holding that the defendant is entitled to a charge on cross-racial identification where identification is at issue and where the defendant and the witness appear to be of different races). "Mistaken eyewitness identifications are the single greatest cause of wrongful convictions in this country, responsible for more wrongful convictions than all other causes combined," and "the likelihood of misidentification is higher when an identification is cross-racial." *Id.* at 527-28.

To complicate matters further, the cross-race effect in Mr. Villa's case is multi-layered. First, Mr. Villa, a Black Hispanic man, and the eyewitness Ms. Rambert, a Black woman, are of different ethnic backgrounds. In *Santiago*, the Court of Appeals found that the proposed expert testimony about the "cross-ethnic" effect being detrimental to accuracy in eyewitness identifications was relevant and "beyond the ken of the average juror." 17 N.Y.3d at 666, 672. Second, Ms. Rambert initially described the *perpetrator* as a **white** Hispanic man. *See* T. 19, 67, 128, 134-35. However, 10 days after the shooting, after Ms. Rambert viewed a photo array that did not include any white men, she chose Mr. Villa, a Black Hispanic man. *See* Ex. 13 (Photo Array), at A. 43. Significantly, the classic definition of a cross-racial identification is one that occurs where the eyewitness "is of one race and the *perpetrator* is a different race." Ex. 3 (Dr. Cutler Affidavit), at A. 8 (emphasis added). Here, to get to her end result, Ms. Rambert likely used relative-judgment processing and picked the man from the photo array who looked more like her memory of the perpetrator than the others did. *See* Ex. 3, at A. 9.

Finally, aside from the one cross-racial, stranger identification, there was not a whit of evidence connecting Mr. Villa to the crime. "*LeGrand*…can be read to stand for the broader principle that there are cases in which it is unfair to deprive the [factfinder] of expert testimony about the reliability of eyewitness observations." *People v. Oddone*, 22 N.Y.3d 369, 379 (2013). In any such case, it is an abuse of discretion to exclude expert testimony. *See LeGrand*, 8 N.Y.3d at 456. Here, there

17

were no other witnesses, no forensic evidence, and no evidence of motive. Nothing else linked Mr. Villa to the shooting.

Thus, the testimony that an eyewitness identification expert, such as Dr. Cutler, could have offered concerning the risk factors for mistaken identifications would have been critical to the Court's evaluation of the credibility of Ms. Rambert. Given the number of factors that could have negatively affected the reliability of Ms. Rambert's identifications, there is a reasonable probability that expert testimony would have affected the outcome of the trial.

First, Dr. Cutler explained in his report that the conditions under which eyewitnesses view perpetrators, called "viewing factors," will increase the risk of a mistaken identification when the conditions are unfavorable. Ex. 3 (Dr. Cutler Affidavit), at A. 6. The adverse viewing factors in Mr. Villa's case include:

- **Exposure Time**—"[T]he amount of time that an eyewitness has an unobstructed view of the perpetrator's face," not "the total amount of time for which an eyewitness was with a perpetrator." *Id.* A shorter amount of time leads "to a greater risk of mistakes in eyewitness identification." *Id.* Plus, eyewitnesses tend to overestimate "exposure duration," especially where they are told by law enforcement that they identified the suspect from a photoarray. *Id.* This positive feedback then inflates the eyewitness's confidence in her identification. *See id.*

- **Cross-Racial Identification**—"[T]he witness…is of one race and the perpetrator is a different race." *Id.* at A. 8. "[P]eople are more accurate at recognizing members of their own race and make more mistakes when recognizing members of another race." *Id.* Cross-race effects increase the risk of a mistaken identification, especially where the exposure time is reduced, where a larger number of fillers is used in the initial identification test, and where "the perpetrator is seen in a group as opposed to alone." *Id.*

18

- **Level of Stress**—Highly-stressful situations "impair an eyewitness's ability to encode information, such as crime details and perpetrator characteristics." *Id.* at A. 7. "High stress is associated with reporting fewer correct descriptors of the perpetrator, more incorrect details, and making fewer correct identifications from lineups." *Id.* at A. 7-8.

- **Weapon Focus**—The "visual presence of a weapon." *Id.* at A. 8. A weapon draws the focus of the eyewitness to the weapon and away from the perpetrator's facial and physical characteristics. *Id.* "Eyewitness identifications, therefore, tend to be less accurate when a weapon was visually present at the time of the crime." *Id.*

The extremely adverse viewing conditions endured by the only eyewitness in this case undoubtedly negatively affected her ability to make an accurate identification. This is especially clear where Ms. Rambert's initial description of the shooter did not align with Mr. Villa's physical characteristics. She described the shooter as a 5'9" tall white Hispanic man. T. 19, 67, 128, 134-35. Mr. Villa is Black Hispanic and no taller than 5'6". *See* Ex. 4 (Mugshot Pedigree Form), at A. 19; Ex. 5 (Inmate Information Form), at A. 20; T. 415. Furthermore, even after observing Mr. Villa at trial, she still described the perpetrator as a man who was 5'10"-11" tall— far taller than Mr. Villa. T. 213, 265.

Also, Ms. Rambert was under an unimaginable amount of stress when she first heard a gunshot and ran for cover. *See* T. 243. She had only seen the perpetrator's face for a few moments while they were moving quickly past each other, and during this time, she was staring at the color of the man's shirt, rather than studying his facial characteristics. *See* T. 207, 237-40. Additionally, while taking cover closer to the building, Ms. Rambert was only able to take another

19

fleeting glance towards the shooter, but she focused in on his gun. *See* T. 208-10. The "visual presence of a weapon" draws the focus of the eyewitness to the weapon and away from the perpetrator's facial and physical characteristics. Ex. 3, at A. 8. Moreover, Ms. Rambert, a Black woman, *see* Ex. 8, at A. 33, was subject to cross-race and cross-ethnic effects, which is particularly relevant where she initially described the shooter as a white Hispanic man—only later describing him as Black Hispanic. *See* T. 19, 67, 128, 134-35, 213-14, 265.

Second, Dr. Cutler described that memory storage factors are also often at issue, and "[o]nce a memory has been encoded and stored in an eyewitness's memory system, the memory does not remain immutable." Ex. 3 (Dr. Cutler Affidavit), at A. 8. Stored memories can be affected by (a) the time between the crime and the identification, where there is a "sharp[] decline in accuracy soon after the crime"; and (b) post-event information, where eyewitnesses who are told misleading post-event information may misremember details about the crime, incorporating incorrect details of the crime into their memories. *Id.* at A. 8-9.

Here, Ms. Rambert described the shooter—on the day of the crime—to police as a 5'9" tall white Hispanic man, and only changed that description *after* she had picked Mr. Villa out of a photo array and then out of a lineup—well over a week after the crime—where *all* of the men in the identification procedures were Black and brown. Thus, it is clear that Ms. Rambert's memory of the shooter did not remain immutable, and her identification of Mr. Villa was likely affected both by

20

the significant amount of time between her initial description and the identification procedures, and by misleading post-event information. *See* Ex. 3, at A. 8-9; Ex. 13 (Photo Array), at A. 43; Ex. 14 (Lineup Photo), at A. 45. Additionally, Ms. Rambert's identification of Mr. Villa at trial was fortified by her prior identifications, and she earnestly and confidently believed that her updated description of the shooter— details that she had picked up *after* the crime from participating in a photo array with only Black and brown men—was from her own memories of the crime.[5] *See* Ex. 3, at A. 9.

Third, Dr. Cutler discussed how the use of inference processes by the eyewitness, the use of fillers who do not closely match the description of the perpetrator, the use of instructions that indicate that the suspect is in the lineup, and the use of serial identification procedures result in a high risk for mistaken identification. *See id.* at A. 9-12. Initially, Dr. Cutler explained that eyewitnesses often "identify the suspect by inference processes" or "on a combination of memory and inference processes." *Id.* at A. 9. Dr. Cutler detailed three types of inference processes: (1) deduction—where the eyewitness may think "this one fits my description of the perpetrator, the police think he is the perpetrator so it must be him"; (2) process of elimination—where the eyewitness may think "he is the only one that looks like the perpetrator"; or (3) relative-judgment processing—where the eyewitness may think "he looks more like the perpetrator than do the others." *Id.*

---

[5]    Ms. Rambert testified at trial that her memory had improved from the time of the incident until now—two and one-half years later. *See* T. 280-81.

Dr. Cutler also pointed out that using fillers, "the individuals or photos selected for inclusion in [identifications procedures] together with the suspect," who do not closely "match the description of the perpetrator given by the eyewitness," will lead to "more suspect identifications, regardless of whether or not the suspect was the perpetrator." *Id.* at A. 10.

Additionally, Dr. Cutler emphasized that where the eyewitness is instructed that the suspect is in the lineup, the risk of false identification increases. *Id.* at A. 11. And finally, when multiple, serial identification procedures take place, "the first one affects the results of subsequent ones." *Id.* "Innocent suspects identified from one procedure are therefore at higher risk for mistaken identification from subsequent procedures" because an eyewitness tends to "remain committed to [her] identifications even when the identifications are incorrect." *Id.* at A. 12.

Here, there were likely several errors related to inference processing. First, none of the men in the photo array or in the lineup closely aligned to Ms. Rambert's initial description of the shooter. *See* Ex. 13 (Photo Array), at A. 43; Ex. 14 (Lineup Photo), at A. 45. Thus, it is likely that Ms. Rambert used relative-judgment processing to determine which man looked more like her memory of the shooter than the others. *See* Ex. 3 (Dr. Cutler Affidavit), at A. 9.

Likewise, it is clear from Ms. Rambert's testimony that Det. O'Connell told her or strongly implied that the suspect was in the lineup. T. 259-60 (Ms. Rambert testifying that prior to the lineup, the detective told her to "pick out the guy that did

it"). Ms. Rambert was also subject to serial identification procedures—on October 4, 2011, she viewed a photo array with all Black and brown-skinned men; and, the very next day, she viewed a lineup. T. 257-58, 262.

Finally, Dr. Cutler explained that eyewitness confidence is malleable and that when eyewitnesses "learn information that validates their identifications," their "confidence rises independently of accuracy." Ex. 3, at A. 12. Therefore, not only does the risk of mistaken identifications increase when identification procedures are suggestive, but eyewitnesses also become more confident when their identifications are validated. *See id.* While Ms. Rambert testified confidently at trial that Mr. Villa was "the man who [she] described as the shooter, the man with the blue shirt," T. 214, and that she had "no doubt at all" when she picked Mr. Villa out of the lineup on October 5, 2011, T. 260, this testimony was given two and one-half years after Ms. Rambert's initial description of the shooter, which was not a close match to Mr. Villa. Because Ms. Rambert testified confidently—even if inconsistently—throughout the trial, she was a more persuasive witness to the factfinder. *See* Ex. 3, at A. 13.

Moreover, defense counsel's failure to present eyewitness expert testimony was objectively unreasonable and cannot be justified as a legitimate strategic or tactical decision. "[C]ounsel may not fail to conduct an investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence." *Gersten*, 426 F.3d at 611. Mr. Aranda had

23

no strategic reason for his oversight. He admitted in his affirmation that he "did not consult with an eyewitness identification expert about the sole eyewitness's identifications of Mr. Villa to determine how the eyewitness's memory and perception along with the police identification procedures could have affected the reliability of the identifications in this case." Ex. 8 (Aranda Affirmation), at A. 32. Mr. Aranda could not recall "having a specific reason for not consulting" with an expert. *Id.* And yet, he was well aware of the specific facts that would have necessitated such a consultation. Mr. Aranda recalled that the case involved "a single eyewitness—the girlfriend of the deceased—who gave testimony that was inconsistent with the information she gave to police during the investigation of the case," and that she was "a light-skinned Black woman, and Mr. Villa is a brown-skinned Hispanic man." *Id.* at 32-33.

Defense counsel's inexplicable and unjustifiable error in failing to consult with and present expert eyewitness testimony[6] deprived Mr. Villa of the effective assistance of counsel guaranteed by the United States and New York Constitutions.

---

[6]    Defense counsel Andres Aranda has a history of neglecting criminal matters. *See Matter of Andres M. Aranda*, 2006 NY Slip Op 04752 (1st Dep't 2006) (suspending Mr. Aranda's license for one year for "neglecting…client matters" and detailing three additional prior admonitions Mr. Aranda received over a seven-year period); *In re Aranda*, 789 F.3d 48, 49, 53 (2d Cir. 2015) (publicly reprimanding and suspending Mr. Aranda for 18 months from practice in the Second Circuit and noting that "the fact that his defaults occurred in criminal appeals, where significant liberty interests were at risk" established that he would not be able to "conform his conduct to expected professional norms"); *In re Aranda*, 138 A.D.3d 142, 143 (1st Dep't 2016) (granting the motion to impose reciprocal discipline on Mr. Aranda and imposing an 18-month suspension from practice).

U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 688, 694; *Benevento*, 91 N.Y.2d at 713.

> **B.    By Failing to Intervene or Object Where Mr. Villa Stated Clearly that He Wanted to Speak with His Family Before Deciding Whether to Waive His Fundamental Right to a Jury in a Murder Case, Defense Counsel Was Ineffective.**

Although Mr. Villa signed a jury trial waiver form the day before trial began, the Court, which had not asked Mr. Villa any questions about whether the decision was voluntary at that time, gave him time to "reflect overnight." Ex. 7 (Transcript of Jan. 30, 2014), at A. 30; T. 69. The next day, accordingly, when the Court acknowledged that Mr. Villa's decision was not considered final, and asked Mr. Villa if he would like to speak with anyone for advice on this issue, Mr. Villa answered unequivocally that he wanted to speak with his family. T. 69. Rather than honor that request and allow Mr. Villa to reconsider his decision—as the Court explicitly promised the day before—the Court either failed to hear or simply ignored Mr. Villa's response and stated that he would move forward with the bench trial. Ex. 7, at A. 30; T. 69.

Incredibly, defense counsel failed to protect his client's fundamental right to a jury trial and did not intervene to ensure that the Court followed through on its promise. While defense counsel recently affirmed that he did not object "when the judge ignored or failed to hear Mr. Villa's request to speak to his family," counsel was unable to provide a strategic reason for this failure, stating that he could not recall. Ex. 3 (Aranda Affirmation), at A. 33. Where counsel failed to protect Mr.

25

Villa and ensure that he did not involuntarily waive his right to a jury in a murder trial, Mr. Villa did not receive meaningful representation under both state and federal standards. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

A waiver of the right to a trial by jury can only be accepted by the court if it is knowing, intelligent, and voluntary. *People v. Smith*, 6 N.Y.3d 827, 828 (2006). In fact, this right is so fundamental that criminal defendants were not originally allowed to waive it. *People ex rel. Rohrlich v. Follette*, 20 N.Y.2d 297, 300 (1967). Today, a defendant's right to waive a trial by jury is recognized as both a statutory and a constitutional right. *People v. Davis*, 49 N.Y.2d 114, 119 (1979) ("It can no longer be disputed that defendant had a constitutional right to waive trial by jury . . ."); *People v. Saunders*, 19 A.D.3d 744, 744 (3d Dep't 2005) ("Defendants have a statutory right to waive trial by jury . . ."). *See also* N.Y. Const. art. I, § 2; N.Y. C.P.L. § 320.10 (the Court must approve a signed jury trial waiver unless it determines "that the defendant is not fully aware of the consequence of the choice he is making"). In recognition of the importance of the waiver, the prosecution bears the burden of proving that the defendant has waived his right to a jury trial. *See People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977).

Here, once Mr. Villa communicated his doubt about waiving a jury, by stating that he wanted to confer with his family, it was defense counsel's responsibility, as Mr. Villa's zealous advocate, to protect his client's fundamental right. Mr. Villa was

26

"nervous" because he had never had a trial before, and he "had a hard time taking in everything that the judge was telling [him] about the differences between a bench trial and a jury trial" during the short colloquy on January 30, 2014. Ex. 6 (Mr. Villa Affidavit), at A. 23. Mr. Villa further recalls that after the judge told him that he could still think about his decision, he "turned around and saw many of [his] family members, including…Aunt Margaret…and he wanted to talk to them about this decision." *Id.* He recalls that the next day, when the judge asked him if wanted to talk to anyone before going forward with the bench trial, he asked "to talk to [his] family." *Id.* He stated that he "was not certain that [he] wanted to have a bench trial" at this point, and he wanted to "talk to Aunt Margaret to ask her for her advice. She is the backbone of [his] family, and a second mother to" Mr. Villa. *Id.* Mr. Villa said that after Mr. Aranda failed to intervene or object, Mr. Aranda never asked Mr. Villa why he wanted to speak to his family or what he wanted to say to them." *Id.* at A. 24. Here, defense counsel clearly failed to fulfill his role in the adversarial context of a criminal trial. Mr. Aranda could have easily asked the Court for a little more time so that Mr. Villa could speak to his family and so that Mr. Aranda could ensure that Mr. Villa still wanted to carry through with such an important decision. Mr. Aranda did not have a strategic reason for failing to intervene.

As it turns out, Mr. Villa "would not have chosen a bench trial and would have asked for a jury trial" if, after the initial court appearance, "Mr. Aranda had

27

carefully explained to [Mr. Villa] what the judge was saying about what [he] had to give up to have a bench trial." *Id.* Had Mr. Villa chosen to invoke his right to a jury trial, the outcome of the case might well have been different, especially where the only evidence tying Mr. Villa to the crime was the contradictory and inconsistent testimony of Ms. Rambert, whose identifications were at high risk for error.

Indeed, prior to Mr. Villa's trial, it was well-known that Bronx juries were skeptical about cases with scant evidence. *See* Chris Herring, "Bronx Acquittals Set Record," The Wall Street Journal, May 4, 2010[7] (reporting that "Bronx jurors in felony cases found defendants guilty only 43% of the time [in 2010], the lowest conviction rate in New York City since the state began tracking such data" and, according to one juror, that "verdicts were based on scant evidence, not a mistrust of law-enforcement officials"). But, even putting that aside, by waiving a jury, Mr. Villa was giving up the chance to require 12 people to agree as to his guilt, as opposed to just one factfinder. Counsel's failure to intervene in order to protect Mr. Villa's right to a jury trial denied Mr. Villa effective and meaningful representation.

**C.    By Failing to Properly Counsel Mr. Villa on the Trial Rights that He Would Be Waiving in Choosing to Have a Bench Trial, Defense Counsel Further Deprived Mr. Villa of Effective Representation.**

Not only did defense counsel fail to intervene when Mr. Villa stated that he wanted to talk to his family before determining whether to have a bench trial, he failed to fully counsel Mr. Villa on the pros and cons of having a bench trial rather

---

[7]    Https://www.wsj.com/articles/SB10001424052748704608104575221271762806324.

than a jury trial. *See* Ex. 6 (Mr. Villa Affidavit), at A. 23. Mr. Aranda's failure to ensure that Mr. Villa understood the trial rights that he would be waiving in choosing to have a bench trial and to ensure that Mr. Villa was knowingly, intelligently, and voluntarily waiving his right to a jury deprived Mr. Villa of effective and meaningful representation.

On January 30, 2014, the judge made a minimal inquiry into Mr. Villa's understanding of the consequences of his waiver of his right to a jury trial. The judge asked Mr. Villa whether he understood that he was giving up a jury of 12 people and whether he had discussed the decision with counsel. Ex. 7 (Transcript of Jan. 30, 2014), at A. 27-28. The judge stated that "all you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted" and that "[g]oing before the bench those odds shrink a little bit" because it would be "only one on one as opposed to one to twelve." *Id.*

This was inaccurate information, and the Court failed to convey the actual import of foregoing a jury. Contrary to what the Court said, if one juror was not convinced of guilt, Mr. Villa would not have been acquitted; there would have been a hung jury. The only path for *one* person's decision to lead to an acquittal—an outcome highlighted by the Court—would be through a bench trial. Certainly, where defense counsel highlighted a bench trial win before this judge, this could have been appealing to Mr. Villa. But this was not complete information, and the

29

Court's subsequent explanation was even more confusing. The Court suggested only that the "odds" of acquittal were at issue when deciding whether to forego a jury. But what was not conveyed by the Court was that the "odds" that were changing also included the odds of a guilty verdict because there was only one factfinder in a bench trial.

Then, during the time the judge had given Mr. Villa to review the waiver, the judge "emphasize[d]" the right to go to jury by trial and to pick his own jurors." *Id.* at A. 28. But this was of little help to Mr. Villa in understanding the right at issue. Immediately after Mr. Villa signed the jury trial waiver form, the judge promised him that he could still change his mind and make a decision to "proceed otherwise." *Id.* at A. 30. The judge did not, however, at any point during this initial colloquy, inquire into whether Mr. Villa was voluntarily giving up his right to a jury trial. *See id.* at A. 27-30.

Mr. Aranda does not "specifically recall the details around the decision for Mr. Villa to waive a jury trial and have a bench trial," except that he recalls that he had "recently obtained an acquittal in a prior bench trial in front of Judge Massaro, *People v. Andy Esteves*, in which [his] client was accused of the assault of his girlfriend," and he "remember[s] discussing this prior bench trial with Mr. Villa." Ex. 8 (Aranda Affirmation), at A. 33. Mr. Aranda remembers having a "discussion" about "having a bench trial versus having a jury trial," but he does not remember any specifics from that conversation. *Id.* He stated that he "did not dissuade Mr.

30

Villa from having a bench trial, nor did [he] encourage him to. [He] told him that the judge is fair." *Id.*

Mr. Villa, on the other hand, recalls that Mr. Aranda not only encouraged him to have a bench trial, but that he failed to explain to him "that by choosing to have a bench trial, [he] would be giving up [his] right to have a jury of twelve people to determine the verdict." Ex. 6 (Mr. Villa Affidavit), at A. 22-23. Mr. Aranda "did not go into detail about what a bench trial is, nor did he explain what [Mr. Villa] would be giving up in order to have a bench trial." *Id.* at A. 23. Finally, Mr. Villa explained that he was "very nervous," he "had never gone to trial before," and he "had never heard of a bench trial before," but he trusted Mr. Aranda, who "seemed very confident and told [him] that it was a good idea." *Id.* at A. 22-23.

Here, Mr. Aranda was duty-bound to ensure that Mr. Villa's waiver of his right to a jury trial was knowing, intelligent, and voluntary. *See Smith*, 6 N.Y.3d at 828. Mr. Aranda, however, does not recall explaining to Mr. Villa the consequences of giving up his jury rights in order to have a bench trial. *See* Ex. 8 (Aranda Affirmation), at A. 33. Instead, Mr. Aranda remembers telling Mr. Villa about his prior acquittal in a bench trial in front of the same judge, who is "fair." *Id.* Mr. Aranda, thus, did not have an objectively reasonable strategic justification for failing to properly counsel Mr. Villa about the differences between a bench trial and a jury trial. That Mr. Aranda discussed with Mr. Villa an acquittal in a bench-trial

31

case that did *not* involve a misidentification defense[8] may offer some insight into why Mr. Aranda did not dissuade Mr. Villa from having a bench trial, but it does not offer a tactical reason for Mr. Aranda's failure to ensure that Mr. Villa understood the full implications of the rights that he was waiving.

Again, if Mr. Villa had simply gone forward with a jury trial (which he would have done if "Mr. Aranda had carefully explained to [him] what the judge was saying about what [he] had to give up to have a bench trial," *see* Ex. 6, at A. 24), there is a reasonable probability that the outcome of the case would have been different in this single cross-racial eyewitness identification case fraught with adverse factors that affect the risk of mistaken identification. Thus, defense counsel's further failure, in addition to failing to intervene or object when Mr. Villa expressed doubt about waiving his right to a jury trial, to properly counsel his client on the precise trial rights that he would be giving up in order to have a bench trial denied Mr. Villa effective and meaningful representation. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

**D.   By Improperly Consenting to Allowing in Trial Testimony Before the Suppression Hearing Had Concluded, Defense Counsel's Representation Was Ineffective.**

Defense counsel consented to allowing in trial testimony prior to a decision being made on the suppression motion. *See* T. 71. Along with the trial testimony

---

[8]     Mr. Aranda's prior bench trial that resulted in an acquittal apparently involved allegations that his client assaulted his girlfriend. *See* Ex. 8 (Aranda Affirmation), at A. 33.

from a crime scene unit detective, several trial exhibits were admitted into evidence, including close-up photos of Mr. Sambolah's bloodied yellow sweatshirt. *See* Ex. 21 (Photos of Mr. Sambolah's Sweatshirt), at A. 78-83. Once again, Mr. Aranda did not have a strategic or other legitimate explanation for this serious error—failing to protect Mr. Villa's right to a decision on a case-dispositive motion prior to starting the trial. *See People v. Jackson*, 221 A.D.2d 964, 965 (4th Dep't 1995) (finding that it is error to not determine a suppression motion prior to commencing a trial).

Mr. Aranda stated that he believed his actions "had to do with the unavailability of a witness." Ex. 8 (Aranda Affirmation), at A. 33. And while there was some discussion that the parties had agreed to "expedite and get this [trial] witness on the case" prior to finishing the suppression hearing, T. 71, this in itself does not explain why Mr. Aranda failed to object to this arrangement.

Here, in a bench trial on a murder case, if the Court, without first hearing any trial testimony and viewing photos of the deceased's bloody sweatshirt, had determined during the suppression hearing that the cross-racial identification of the sole eyewitness was not reliable, the case would have been over. However, this trial evidence certainly could have influenced the fact-finding Court's perspective of the case. Thus, defense counsel's failure to fulfill his role in the adversarial context by not objecting to the presentation of trial testimony before a decision was rendered on the suppression motion left Mr. Villa without meaningful representation under

33

both state and federal standards. *See* Const. amends. VI, XIV; N.Y. Const. art. I, §

6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

## **CONCLUSION**

For the reasons set forth above, and in the 440 Affirmation, this Court should

grant Guillermo Villa's motion to vacate his judgment of conviction pursuant to

N.Y. C.P.L. § 440.10(1)(h). Defense counsel's errors, both singularly and

cumulatively, deprived Mr. Villa of meaningful representation and the effective

assistance of counsel.

In the alternative, if this Court determines that there is any factual dispute

to resolve, necessary to the determination of the motion, this Court should grant a

hearing, pursuant to N.Y. C.P.L § 440.30(5).


Dated:      New York, New York
            February 10, 2021


                        By:    *Mandy E. Jaramillo*
                               MANDY E. JARAMILLO, ESQ.
                               mjaramillo@oadnyc.org
                               Senior Staff Attorney

                        OFFICE OF THE APPELLATE DEFENDER
                        11 Park Place, Suite 1601
                        New York, NY 10007
                        (212) 402-4100

34