SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: PART 78
--------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,               **AFFIRMATION IN OPPOSITION**
                                                 Indictment No.  3376/2011

        - against -
                                                   Marcus, J.

GUILLERMO VILLA,

                    Defendant.
--------------------------------------------------------------------X

       T. CHARLES WON, an attorney duly admitted to practice before this Court, affirms under penalty of perjury pursuant to CPLR Rule 2106 as follows:

       1.      I am an Assistant District Attorney in the Office of **DARCEL D. CLARK**, District Attorney of Bronx County.  I submit this affirmation in opposition to defendant's motion to vacate the judgment of conviction pursuant to Criminal Procedure Law § 440.10.

       2.      I make this affirmation on personal knowledge and on information and belief based on records of this Office, which I believe to be true and accurate.

       3.      On April 23, 2014, a judgment was rendered in the Supreme Court, Bronx County (Massaro, J.), convicting defendant, following a bench trial, of Murder in the Second Degree (Penal Law § 125.25[1]), and Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03[1]]b]), and sentencing him, as a second felony offender, to an indeterminate term of imprisonment of from twenty-five years to life and a determinate term of fifteen years plus five years of post-release supervision, respectively, to be served concurrently.

       4.      In his direct appeal to the Appellate Division, First Department, defendant, through his appellate counsel, raised the following claims:

POINT I

The evidence was legally insufficient to support murder in the second degree and criminal possession of a weapon in the second degree because the sole eyewitness was incredible as a matter of law; additionally, the verdict was against the weight of the evidence;

POINT II

Guillermo Villa did not knowingly, intelligently, and voluntarily waive his right to a jury trial or his right to testify, and defense counsel was ineffective for failing to protect his client's rights;

POINT III

Seyquana Rambert's photo array, lineup, and in-court identifications of Mr. Villa should have been suppressed where the photo array was unduly suggestive; additionally, the court erred for failing to follow the proper statutory procedures, and defense counsel was ineffective for failing to object;

POINT IV

Mr. Villa was deprived of his right to a fair trial due to the prosecution's improper summation, including a misstatement of key evidence and a false assertion that motive had been proven; and

POINT V

Mr. Villa's sentence is excessive.

(Exhibit 1, Defendant's appellate brief; and Exhibit 2, Respondent's appellate brief).

5.    On July 9, 2019, the Appellate Division, First Department, unanimously affirmed

defendant's judgment of conviction, upon deciding, in part, that:

The verdict was supported by legally sufficient evidence and was not against the weight of the evidence.  There is no basis for disturbing the court's credibility determinations.  The testimony of the sole eyewitness was sufficient to support a finding of guilt beyond a reasonable doubt.  Although there were inconsistencies between the eyewitness's testimony and her out-of-court statements, and between her testimony and that of police witnesses, she never equivocated about her core

testimony identifying defendant as the person who shot the victim.  She consistently testified that her attention was drawn to the shooter because of the color of his shirt, and that she had an opportunity to 'stare at his face' as they walked by each other. She identified defendant in a photo array 10 days after the shooting, and in a lineup the following day, and testified that she immediately recognized him in the lineup and had no doubt about it.

. . . [W]e find nothing in the existing record to cast doubt on . . . waiver[] [of his right to a jury trial], or to suggest that further inquiry by the court was necessary.

People v. Villa, 174 A.D.3d 438, 438-439 (1st Dept. 2019)

6.      On November 22, 2019, a judge of the Court of Appeals denied defendant's application for leave to appeal to that Court.  People v. Villa, 34 N.Y.3d 1019 (2019).

7.      Now, in motion papers dated February 10, 2021, defendant, through his counsel, Mandy E. Jaramillo, Esq., of the Office of the Appellate Defender, seeks a vacatur of the judgment of conviction, pursuant to CPL § 440.10, on the grounds that his trial attorney rendered ineffective assistance of counsel by: (a) "failing to obtain the assistance of an expert on eyewitness identification, the key issue in the case;" (b) "failing to intervene or object where [defendant] stated clearly that he wanted to speak with his family before deciding whether to waive his fundamental right to a jury in a murder case;" (c) "failing to properly counsel [defendant] on the trial rights that he would be waiving in choosing to have a bench trial;" and (d) "improperly consenting to allowing in trial testimony before the suppression hearing had concluded."

8.      For the reasons set forth in the accompanying Memorandum of Law, defendant's motion should be denied without a hearing.

**WHEREFORE**, the People of the State of New York respectfully request that defendant's motion be denied in all respects.

Dated:  New York, New York
          June 7, 2021

s/ *T. Charles Won*
_____
T. CHARLES WON
Assistant District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: PART 78
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                        Respondent,

           - against -

GUILLERMO VILLA,

                        Defendant.
-----------------------------------------------------------------------X

## **MEMORANDUM OF LAW**

                                        DARCEL D. CLARK
                                        District Attorney
                                        Bronx County
                                        198 East 161st Street
                                        Bronx, New York 10451

NANCY D. KILLIAN
T. CHARLES WON
Assistant District Attorneys
        *Of Counsel*

SUPREME COURT OF THE STATE OF NEW YORK
BRONX COUNTY: PART 78
--------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

        - against -

GUILLERMO VILLA,

                    Defendant.
--------------------------------------------------------------------X


## <u>MEMORANDUM OF LAW</u>

### <u>STATEMENT</u>


       The People submit this memorandum of law in opposition to defendant's motion to vacate his judgment of conviction, pursuant to CPL § 440.10.

## **THE FACTS**

The facts relied upon in this memorandum of law are outlined in the accompanying affirmation of Assistant District Attorney T. Charles Won, dated June 7, 2021, and the exhibits attached thereto.

Briefly, Seyquana Rambert, the sole eyewitness, consistently identified defendant as the individual who shot and killed the victim, her then-boyfriend.  As Ms. Rambert walked towards the victim, defendant, who approached the victim from the opposite end of the street, drew her attention because he wore a blue top -- Ms. Rambert's favorite color.  Ms. Rambert saw defendant walk up to the victim and raise his right hand, while holding a handgun.  Although she turned away, she heard multiple gunshots.  Ms. Rambert then saw the victim lying on the ground and bleeding, as defendant went back in the direction he came.

Ms. Rambert subsequently identified defendant from both a photo array and lineup, and at trial as the individual who had shot and killed the victim.  No testimony was offered at trial that contradicted Ms. Rambert's testimony that she witnessed the shooting.

## ARGUMENT

## POINT ONE

## DEFENDANT'S MOTION TO VACATE THE JUDGMENT OF CONVICTION SHOULD BE DENIED.

Having been convicted after a bench trial, held before an experienced jurist who had recently acquitted one of counsel's other clients, and having had his appeal rejected by the Appellate Division, defendant seeks vacatur of his judgment of conviction, pursuant to CPL § 440.10, on the grounds that his trial attorney rendered ineffective assistance of counsel by: (a) "failing to obtain the assistance of an expert on eyewitness identification, the key issue in the case;" (b) "failing to intervene or object where [defendant] stated clearly that he wanted to speak with his family before deciding whether to waive his fundamental right to a jury in a murder case;" (c) "failing to properly counsel [defendant] on the trial rights that he would be waiving in choosing to have a bench trial;" and (d) "improperly consenting to allowing in trial testimony before the suppression hearing had concluded." These claims can be confidently rejected.

Under the federal standard, defense counsel will be found to have rendered ineffective assistance if his performance fell below prevailing professional norms and, but for counsel's deficient performance, "there is a reasonable probability that . . . the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). The New York standard for ineffective assistance of counsel focuses on the "fairness of the process as a whole." People v. Benevento, 91 N.Y.2d 708, 714 (1998). Hence, the New York standard is more favorable to defendants because it lacks a " but for" prejudice requirement, i.e., the defendant does not have to establish that "but for" counsel's error, the result would have been different. See People v. Turner,

3

5 N.Y.3d 476, 480 (2005).  Instead, it is sufficient for a defendant to establish that a trial was not fair, regardless of whether the outcome would probably be the same.  See People v. Berroa, 99 N.Y.2d 134, 143 (2002).

While the defendant's claim has no merit under either standard, this Court should engage in separate assessments of counsel's performance under both the federal and New York standards.  See, e.g., People v. McNeill, 73 A.D. 3d 504 (1st Dept. 2010), lv. denied, 15 N.Y.3d 922 (2010).  "Such an exercise would ensure that the prejudicial effect of each error is evaluated with regard to outcome, and would guarantee that defendants get the quality of overall representation guaranteed under New York State law." Rosario v. Ercole, 617 F.3d 683, 685 (2d Cir. 2010) (Wesley, J., concurring in the denial of rehearing en banc from Rosario v. Ercole, 601 F.3d 118 [2d Cir. 2010]), cert. denied, Rosario v. Griffin, 563 U.S. 1016 (May 23, 2011).  Here, defendant received effective representation of counsel.

Eyewitness Testimony

At trial, defense counsel pursued a theory that Ms. Rambert, the sole eyewitness, had not actually witnessed the shooting.  Counsel pointed out, for example, alleged discrepancies in the description of the culprit, the timing of when the ambulance arrived, and the details of the shooting (see defense counsel Opening and Summation: T.149-150; 427-452).[1]  Now, dissatisfied with the strategy pursued by counsel, defendant claims that counsel, instead, should have introduced an expert

---

[1]  Numerical references preceded by "W." refer to the minutes of January 30, 2014, when defendant executed his written waiver of his right to a jury trial, attached as defense exhibit 7.  Numerical references preceded by "T." refer to the pre-trial suppression hearing and the trial minutes.  Defendant forwarded the hearing and trial minutes to this Court.

on eyewitness testimony to bolster his  argument of mis-identification before the trial court as trier of fact.

Trial counsel's "strategy constituted a legitimate and reasonable defense, and trial counsel cannot now be faulted simply because the defense was unsuccessful." <u>People v. Jhagroo</u>, 186 A.D.3d 741, 743 (2d Dept. 2020), <u>lv. denied</u>, 35 N.Y.3d 1113 (2020).  Moreover, as will be discussed below, "[t]here is nothing to indicate that the strategy proposed by defendant on appeal had any greater chance of success than the strategy actually employed by trial counsel." <u>People v. Robins</u>, 177 A.D.3d 571, 572 (1st Dept. 2019).

Having opted for a bench trial, defendant was tried before a highly experienced trial judge, who presided over both the suppression hearing and the trial.  Yet, defendant claims that trial counsel rendered ineffective assistance of counsel by not having called or consulted an expert on risk of mistaken eyewitness identification to advise the experienced judge on how to evaluate eyewitness credibility.  The claim is meritless.

In cases where a defendant seeks to introduce expert testimony on eyewitness identification where eyewitness testimony is sole evidence establishing the defendant's culpability, the trial court must consider "whether the proposed testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) <u>on a topic beyond the ken of the average juror</u>." <u>People v. Santiago</u>, 17 N.Y.3d 661, 669 (2011) (internal quotation marks and citation omitted) (emphasis added); <u>People v. LeGrand</u>, 8 N.Y.3d 449, 452 (2007).

Defendant was tried before an experienced judge, who acted as the fact finder.  As noted by defendant himself (see defendant's memorandum of law, pp. 10-11), by the time of defendant's trial

5

in 2014, the Court of Appeals had issued multiple rulings regarding the admissibility of expert testimony on eyewitness identification.  See, e.g., People v. Santiago, 17 N.Y.3d 661 (2011); People v. LeGrand, 8 N.Y.3d 449 (2007).  Therefore, the trial judge presumably already was familiar with the issue and the factors cited in the defense expert's affidavit.  Whereas this issue may arguably have been "beyond the ken of the average juror," the same cannot necessarily be said of the experienced trial judge who presided as the trier of fact in this case.

The expert testimony is admissible at the trial judge's discretion upon considering all the above-mentioned factors.  Santiago, 17 N.Y.3d at 668-669.  Having the power to decide whether the expert testimony would benefit the average juror and, thus, should be admitted at trial, trial judges, including the judge who presided as a finder of fact here, should be viewed as already possessing and understanding the knowledge and information that the expert witness would have testified to at trial.

Yet, in claiming that trial counsel rendered ineffective assistance by not having consulted an expert, defendant fails to show how it would have benefitted his defense.  Although defendant provides an affidavit from Mr. Brian L. Cutler, a private consultant, it merely lays out his "opinion as to how certain factors . . . can affect the risk of mistaken eyewitness identifications" (see defense Exhibit 3, Brian L. Cutler Affidavit, p. 3).  Notably, Mr. Cutler states that he is "not opining on the existence of any particular fact in the case before the Court" (see id.).  Neither defendant nor Mr. Cutler claims that Mr. Cutler would have provided any information that was beyond the knowledge of the experienced trial judge who presided over defendant's case.

Defendant had the opportunity to have Mr. Cutler review the trial and the hearing transcripts -- which he forwarded to this Court as exhibits -- and make case-specific arguments faulting the eyewitness testimony.  Yet, in claiming that trial counsel should have raised a defense of mistaken

6

eyewitness identification at trial, defendant's own expert provides no reasons to doubt the eyewitness testimony in this case.  Mr. Cutler offers no opinion that the facts in this case align with any of the factors that would call into question the credibility of the eyewitness identification.  He only offers generalities that, as noted, likely would already have been familiar and known to the trial judge.

Nevertheless, here, many of the factors cited by Mr. Cutler and other experts were not relevant in assessing the credibility of the eyewitness testimony.

Here, in the early afternoon hours of September 24, 2011, the victim Cedric Sambolah's girlfriend, eyewitness, Seyquana Rambert, saw defendant under stress-free circumstances.  As Ms. Rambert returned home from a store, she saw defendant -- a black Hispanic,[2] with braids, in his 20s to 30s, around 200 to 210 pounds, and "wasn't that tall, but he was a good, around 5-10 inches" tall, and wearing a blue shirt -- walk towards the victim, who was near her building.  Ms. Rambert stared at defendant as they walked towards each other because his shirt was blue, her favorite color.

As he neared the victim, defendant reached into his pocket and pulled out a gun.  Upon hearing a gunshot -- Ms. Rambert did not see the gunshot -- she turned and ran.  She then heard two additional gunshots -- a total of three gunshots.  Ms. Rambert then ran back towards the victim and saw defendant walking away.

Ms. Rambert saw defendant's face prior to the shooting.  She was not under any stress nor was she focused on any weapon, which was still in defendant's pocket at the time.  Moreover, defendant was not wearing any mask nor disguise.

Subsequently, on October 4, 2011, Ms. Rambert identified defendant from a photo array as

---

[2] On cross-examination, Ms. Lambert denied having told Detective O'Connell that the shooter was white Hispanic (T. 265, 268).

the shooter. The following day, Ms. Rambert selected defendant from a lineup. Prior to viewing the lineup, Detective O'Connell read instructions to Ms. Rambert from a pre-printed lineup viewing instruction sheet: "That I was going to lift the blinds, she was going to look, there would be some individuals in front of her, look to see if she recognized anybody. If she did, indicate which number and where she recognized him from" (T. 53).

Distorting Ms. Rambert's testimony, defendant contends that she "was in a highly-stressful situation with limited time to view the shooter's facial characteristics, especially where she was focused on the gun as soon as he pulled it out" (defendant's memorandum of law, p. 14). As noted, Ms. Rambert first saw defendant prior to the shooting, as they walked towards each other. Her view was drawn to defendant because he wore a blue shirt, her favorite color. Ms. Rambert saw defendant's face under calm circumstances, before defendant pulled out his weapon. In fact, she turned away when defendant fired his gun at the victim. Ms. Rambert's identification or viewing of defendant's face occurred before the crime happened.

Indeed, in affirming defendant's conviction, the First Department determined that Ms. Rambert "never equivocated about her core testimony identifying defendant as the person who shot the victim," and "consistently testified that her attention was drawn to the shooter because of the color of his shirt, and that she had an opportunity to 'stare at his face' as they walked by each other." People v. Villa, 174 A.D.3d 438, 438-439 (1st Dept. 2019), lv. denied, 34 N.Y.3d 1019 (2019).

Again, ignoring Ms. Rambert's testimony, defendant claims that she "described the shooter -- on the day of the crime -- to police as a 5'9" tall white Hispanic man, and only changed that description after she had picked [defendant] out of a photo array and then out of a lineup -- well over a week after the crime -- where all of the men in the identification procedures were Black and

8

brown" (defendant's memorandum of law, p. 20).  While Detective O'Connell had written in his memo book that Ms. Rambert described defendant as being white, she denied it.  She was adamant that she said defendant was black Hispanic, possibly Dominican.

The issue of whether Ms. Rambert had initially described defendant as white Hispanic or black Hispanic essentially was one of credibility, which the trial court, as the fact finder, was well-equipped to decide without the aid of the expert testimony on generalities of eyewitness testimonies. This was essentially the holding of the First Department, a holding that should bind this court on this factual issue.  See CPL § 440.10(2)(a).

While defendant faults the ten days time period between the crime and the photo array and the lineups as having been unduly lengthy, Mr. Cutler's affidavit does not make such an assertion. Instead, as noted, he merely generalizes that the accuracy of the identification declines as time passes without any specifics on how many days would be considered too long.  Again, the experienced trial judge would have been well versed on how to evaluate identifications made ten days after the incident.

Defendant contends that "Ms. Rambert's identification of [defendant] at trial was fortified by her prior identifications, and she earnestly and confidently believed that her updated description of the shooter -- details that she had picked up after the crime from participating in a photo array with only Black and brown men -- was from her own memories of the crime" (defendant's memorandum of law, p. 21).  Defendant, however, does not explain what details Ms. Rambert supposedly "picked up" after the photo array and lineup allegedly to have misidentified defendant as the culprit.  At most, Ms. Rambert would have learned that the culprit was not white, assuming, arguendo, that she truly had initially described the shooter as a white male.  Still, that would not explain how Ms.

9

Rambert consistently identified defendant as the shooter when she did not learn any other new detail pointing to defendant.

In his affidavit, Mr. Cutler argues that, "[w]hen an eyewitness identifies a suspect from one identification procedure and then identifies the suspect from a second identification procedure, there is no way to know whether the eyewitness's second identification is the product of the eyewitness's memory for the perpetrator from the time of the crime or, in contrast, the product of the eyewitness's memory for the suspect" (defense exhibit 3, Brian Cutler Affidavit, A. 12). This faulty premise basically seeks to penalize law enforcement for having witnesses make multiple pre-trial identifications of defendants. The argument is pure non-substantiated conjecture that multiple identifications should not be trusted. It seeks to falsely discredit witnesses who consistently identify the same individual as the culprit.

To the contrary, in deciding that there was legally sufficient evidence of defendant's guilt, the First Department noted, in part, that Ms. Rambert "identified defendant in a photo array 10 days after the shooting, and in a lineup the following day, and testified that she immediately recognized him in the lineup and had no doubt about it." Villa, 174 A.D.3d at 439. The First Department found Ms. Rambert consistently identifying defendant in multiple identification procedures as a positive and supportive of the guilty verdict.

The hearing court denied defendant's suppression motion upon finding that both the photo array and the lineup were not unduly suggestive -- that the fillers closely matched defendant. Moreover, the First Department held that, "[a]n examination of the photo array reveals that defendant and the other participants were similar in appearance, and the discrepancy in skin tone was not so noticeable as to create a substantial likelihood that defendant would be singled out for

identification." Villa, 174 A.D.3d at 439. Having decided that the photo array and the lineup were both admissible and conducted properly, the court, as the trier of fact, would not have found Mr. Cutler's proposed testimony about the fallacies of identification procedures and fillers to be persuasive, nor of much merit.

At trial, upon being asked if the detective had said anything to her before she viewed the lineup, Ms. Rambert replied "I remember he asked me, I remember him telling me do your best. You are going -- there's going to be some people. They can't see you. You can only see them. Take your time and pick out the guy that did it, in my words. Those are my words" (T. 259). She further iterated that she could not specifically repeat what the detective had said, but that he read from a sheet of paper (T. 259).

In his testimony,[3] Detective O'Connell stated that he read the instructions to Ms. Rambert from a pre-printed lineup viewing instruction sheet: "That I was going to lift the blinds, she was going to look, there would be some individuals in front of her, look to see if she recognized anybody. If she did, indicate which number and where she recognized him from" (T. 53).

Yet, ignoring the detective's preceding testimony and focusing only upon the initial part of Ms. Rambert's testimony, defendant now contends that "it is clear from Ms. Rambert's testimony that Det. O'Connell told her or strongly implied that the suspect was in the lineup" (defendant's memorandum of law, pp. 22-23). To the contrary, the record makes it evident that Ms. Rambert merely paraphrased what the detective had read to her from the lineup instruction sheet.

---

[3] During trial, the prosecutor stated, "Your Honor, for the record the People have the lineup that was testified to by the detective. Since we are incorporating testimony into the trial, I ask what was exhibit three, the lineup photograph be deemed and marked into evidence at trial as People's Exhibit 18 on consent" (T. 186). The court responded, "Yes, so done there being no objection" (T. 187). The above colloquy demonstrates that Detective O'Connell's hearing testimony was adopted for trial purposes.

Nevertheless, even if such remark indicated that the police had a suspect in custody (which they did not, even as testified to by Ms. Rambert), the trial judge would have recognized that such remarks did not render the procedure unduly suggestive "because they merely conveyed what a witness of ordinary intelligence would have expected under the circumstances." People v. Williams, 15 A.D.3d 244, 246 (1st Dept. 2005). Indeed, "[i]nherent in any [identification procedure] is the likelihood that an identifying witness will realize that the police are displaying a person they suspect of committing the crime, rather than a person selected at random." People v. Caesar, 91 A.D.3d 503, 503 (1st Dept. 2012) (internal quotation marks and citations omitted). In denying the motion to suppress, the trial judge concluded that the detective's lineup instruction had not rendered the identification unduly suggestive.

Defendant's reliance upon United States v. Nolan, 956 F.3d 71 (2d Cir. 2020), is misplaced. In arguing that this case presented many similarities to Nolan, defendant fails to establish any connection to a number of the factors cited in Nolan (see defendant's memorandum of law, p. 9).

The Second Circuit observed that, "certain circumstances surrounding a crime -- including the perpetrator's wearing a disguise, the presence of a weapon, the stress of the situation, the cross-racial nature of the crime, the passage of time between observation and identification, and the witness's exposure to [the] defendant through multiple identification procedures -- may impair the ability of a witness . . . to accurately process what she observed." Nolan, 956 F.3d at 80 (citations omitted). In Nolan, all of the above factors were present:

> The perpetrators were wearing disguises that partially obscured their facial features . . . . They were armed . . . . The aggressive behavior of the robbers toward their victims plainly placed the latter under stress . . . . Also, while the victims were black . . . and Hispanic . . . , the individual identified as a robber . . . was white. . . . Further still, many weeks elapsed between the

12

time of the robbery and the time the victims were shown the photo array
containing [the defendant's] photo . . . .  Finally, and perhaps most
egregiously, the police employed highly irregular procedures in pursuing the
witnesses' identification of [the defendant], potentially biasing the victims'
identifications by, for example, allowing them to talk among themselves
about [the defendant's] identification and allowing them to view his photos
on Facebook.

Nolan, 956 F.3d at 80-81.  The Court found trial counsel ineffective for not failing to call or consult

an expert about the unreliability of the eyewitness identification despite such egregious

circumstances.  Id. at 81.

Many of the factors cited to in Nolan, a jury trial, are not applicable in the instant bench trial

before an experienced judge.  Here, as noted, defendant did not wear a mask, and Ms. Rambert

observed defendant's face prior to the shooting -- before defendant pulled out his weapon.  Ms.

Rambert saw defendant's face under calm, non-chaotic, pre-incident circumstances.  She viewed the

photo array and the lineup mere ten days after the shooting -- it did not take place weeks later as in

Nolan.

None of the irregularities in the identification procedures in Nolan took place here.  The

police did not show defendant's Facebook photographs nor any other photographs to Ms. Rambert.

As she was the sole eyewitness, she did not discuss the identification procedures with any other

witnesses.

Here, in a bench trial before a highly experienced trial judge, defense counsel did not err by

not having consulted an expert in the field of witness identification, since much of the information

such an expert would testify to was either irrelevant or already known by the judge.  Counsel did not

render ineffective assistance by not having pursued a meritless argument.  See People v. Caban, 5

N.Y.3d 143, 152 (2005) ("There can be no denial of effective assistance of trial counsel arising from

13

counsel's failure to make a motion or argument that has little or no chance of success) (internal

quotation marks and citation omitted); <u>People v. Dray</u>, 193 A.D.3d 551 (1st Dept. 2021).


<u>Waiver of Jury Trial</u>

Before starting the pre-trial hearings, the court below confirmed with both defense counsel

and defendant that defendant desired to proceed with a bench trial.  Afterwards, the court below

explained to defendant the rights he would be forfeiting by choosing to forego a jury trial, and

instead, to have a bench trial:

| | |
|---|---|
| The Court: | First of all, you'll get a fair trial, no question about that.  However, you should be aware that there will be no opportunity since you are waiving it, for you to participate in the picking of a jury that will sit in judgment over you. |
| | No opportunity for your counsel to argue to twelve people.  All you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted.  Going before the bench those odds shrink a little bit.  Now you're only one on one as opposed to one to twelve. |
| | Do you feel enough confidence in your case, have you discussed it enough with the people you think you should discuss it with and [sic] your attorney before coming to this decision?  Do you feel strong enough to go forward before the bench? |
| The defendant: | Yes |
| The Court: | All right.  I will ask you to review a waiver . . . and if you find it in order, you may execute it and we will proceed accordingly.  But here again I want to emphasize the right to go to trial by jury.  You have the right to pick people that you will actually help to |

14

|                 | pick and choose, and you have the right for the representation of counsel to treat [sic] with all court-related matters, but now you're placed solely in the hands of the Court.  Do you understand that again? |
|-----------------|---|
| The defendant:  | Yes. |
| The Court:      | I emphasize that to you. |
|                 | Okay.  Look at this paper, review it with your counsel and see whether or not you find it in order. |

(W. 3-4).  The court further sought confirmation from counsel that defendant knew the sentence exposure -- a maximum of 25 years to life and a minimum of 15 years to life -- for a murder conviction (W. 5).

Afterwards, defendant reviewed the written waiver of jury trial form with his attorney.  Upon deciding that the waiver was executed properly, the court accepted it (W. 5).  The court went further to state to defendant, "I'll reserve for you, Mr. Defendant . . . that should you have any reflections [sic] in it and wish to proceed otherwise, you may share that with counsel.  So you may have a full opportunity to consider this as far as you wish to consider it" (W. 6).

The following day, after the pre-trial suppression hearing had started, the court engaged in following colloquy with defendant:

|                 | |
|-----------------|---|
| The Court       | . . . I suggested to you, [defendant], that I would allow you to reflect overnight, what I want to ascertain, yesterday when we allocuted you, you were not under any drugs or medication or under anything along that line, alcohol, anything at all is that correct. |
| The defendant:  | That's correct. |
| The Court:      | And has anyone in any way, and I include everyone, in any way twisted your arm, put your back to the |

15

|                 | wall in any way, tried to force you or coerce you into going forwards as a bench rather than a jury trial?? |
|-----------------|----------------------------------------------------------|
| The defendant:  | No. |
| The Court:      | And the last thing, giving you that time to reflect, is there anyone you wish further to discuss with, talk to get advice from before going forward as we've planned to do? |
| The defendant:  | Talk to my family. |
| The Court:      | Everything stays in place. |
| The defendant:  | Yes. |
| The Court:      | And again, you are going forward with the bench trial as you, you already wish to do and informed the Court, correct. |
| The defendant:  | Yes. |

(T. 69).

Here, as evidenced by the record, defendant signed the written waiver in open court upon being advised of the differences between a jury and a non-jury trial and having consulted with his attorney. The court stated that, by waiving his right to a jury trial, defendant and his attorney would not have the opportunity to select twelve jurors who would all have to be convinced of his guilt beyond a reasonable doubt. The court explained, "All you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted" (W. 3-4). The court further informed defendant that, "Going before the bench those odds shrink a little bit. Now you're only one on one as opposed to one to twelve" (W. 4). The court explained the key difference between a jury and a non-jury trial and emphasized that defendant should review the written waiver form with his attorney (W. 4-5). As

16

noted, upon reviewing the waiver with his attorney, defendant signed it (W. 5).

Now, in a highly self-serving affidavit, defendant claims that he did not understand the court's instructions and that defense counsel failed to explain the differences between a bench and a jury trial. Defendant further faults trial counsel for not having objected on defendant's behalf when the court did not respond to his purported request to speak to his family.

Although understandably not recalling every detail of the conversations he had with defendant over six years ago, trial counsel remembered discussing the issue with defendant. Counsel further recalled telling defendant that counsel previously had obtained an acquittal following a bench trial before the same trial judge, and that the judge was fair. Counsel also affirmed that he had not "dissuade[d]" nor "encourage[d]" defendant from pursuing a bench trial (see defense exhibit 8, Andres Aranda, Esq., affirmation).

In fact, defendant admits that trial counsel had discussed opting for a bench trial prior to the court appearance. While stating that trial counsel told him that "it was better to have a bench trial where [he] would just be dealing with a judge," defendant asserts that he did not know it meant to waive a jury trial (see defense Exhibit 6, defendant's affidavit). Defendant, however, offers no reason why he never spoke up during the two days of colloquy that he did not understand what it meant to waive a jury trial, even after the court's inquiry, his affirmative answers to the court's questions, and his signing of the written waiver.

Additionally, in asserting that he wanted to discuss the waiver with his family, he does not explain why he never discussed it with his family before when counsel already had mentioned it to him. As noted, defendant never spoke up first that he wanted to talk with his family before waiving his right to a jury trial. If the trial court had not, sua sponte, adjourned the matter, defendant would

17

have had no such opportunity.  Again, defendant makes no mention of having discussed it with his family over the adjournment, or why he had not talked with them.  Nor has he supplied any affirmation by any family member present as to what their input would have been, had defendant consulted with them.

 Through two days of the trial court explaining and affirming that defendant wanted to proceed with a bench trial, defendant never objected that he did not understand the meaning of proceeding with a bench trial.  On the second day of the court verifying that defendant voluntarily and knowingly waived a jury trial, defendant further did not protest when the trial court did not respond to his request to talk to his family.  Instead, he affirmed that he opted for a bench trial over a jury trial.

In fact, it was the court that had allowed defendant additional time to consider whether he truly wanted to proceed with a bench trial.  Defendant never asked for additional time to re-consider his decision, despite his current claims of confusion.  Again, his affidavit contains no mention of him having sought any guidance prior to the next court appearance.  Presumably, defendant could have called his family members over night.  He also could have approached trial counsel for further explanations or to express any concerns or misgivings he had over waiving a jury trial.  Yet, defendant does not claim to have taken any action prior to the second day of waiver.  He merely argues that, at the end of the court's instructions, he asked to speak to his family, and then, remained silent and agreed to the waiver.

The record is lacking on why the court did not respond, at least on the record, to defendant presumably wanting to speak with his family.  In any event, when the court then immediately asked defendant "you are going forward with the bench trial as you, you already wish to do and informed

the Court, correct," defendant gave an affirmative response.  He did not seek to withdraw his waiver nor insist on speaking to his family (T. 69).

Moreover, defendant does not claim to have expressed any concerns he had to trial counsel, either in court or following the first day of the waiver proceedings.  As stated in his affirmation, counsel believed that defendant understood.  Under the circumstances, counsel had no reason to object when defendant himself expressed that he waived his right to a jury trial, immediately after asking to speak to his family.

Although defendant claims that his counsel failed to advise him that he would be forfeiting his right to a jury trial by proceeding with a bench trial, he raised no objections when the court informed him of this very fact during the waiver colloquy.  Moreover, the written waiver defendant signed also would have stated this fact.  Again, defendant did not express any confusion in court.

Defendant contends that the trial court confused the issue by advising him, that, "All you need is one of those twelve to not be convinced beyond a reasonable doubt as to each and every element of one or more of the crimes and you would find yourself acquitted" (W. 3-4).  Defendant faults the statement as erroneously stating that the outcome would be an acquittal, instead of a hung jury (defendant's memorandum of law, pp.29-30).   Regardless of whether the court had stated acquittal or hung jury, the emphasis was that all twelve jurors had to believe that defendant's guilt was proven beyond a reasonable doubt to return a guilty verdict -- a single "not guilty" vote was needed to avoid a conviction.

Defendant further erroneously contends that, the "[c]ourt's subsequent explanation was even more confusing.  The Court suggested only that the 'odds' of acquittal were at issue when deciding whether to forego a jury.  But what was not conveyed by the Court was that the 'odds' that were

changing also included the odds of a guilty verdict because there was only one factfinder in a bench trial" (id.).

The court had further informed defendant that, "Going before the bench those odds shrink a little bit.  Now you're only one on one as opposed to one to twelve" (W. 4).  The court correctly informed defendant bench trial required one vote for a guilty verdict, as opposed to twelve votes following a jury trial.

Importantly, while deciding that the claim on direct appeal challenging the validity of the waiver of his right to a jury trial was unpreserved, the Appellate Division, alternatively held that it found "nothing in the existing record to cast doubt" upon the waiver.  Villa, 174 A.D.3d at 439. Consequently, it is understandable that trial counsel did not raise any objections to the court's colloquy.

As defendant's claim is based entirely upon his own self-serving, unsubstantiated allegations, and, based upon the trial record, are not likely to be true, it should be summarily denied pursuant to CPL §§ 440.30(4)(b) and (d).

Trial testimony during suppression hearing

In the middle of Wade/Dunaway hearing, the court heard trial testimony from Detective Anthony Ribustello, with NYPD crime scene unit, that on September 24, 2011, at approximately 5:40 p.m., he recovered three shell casings, a sweat shirt, a sneaker, and head phones from the vicinity of 1240 Burke Avenue in the Bronx (T. 72-113).  Defendant now claims that trial counsel rendered ineffective assistance of counsel by having consented to have the crime scene unit detective give his trial testimony before the suppression hearing was concluded and the court issued its

20

decision.  Especially in the context of this bench trial, the claim is meritless.

According to defendant, the trial testimony by the crime scene detective regarding the items he recovered at the scene, such as the ballistics and the victim's bloody sweatshirt, may have unduly influenced the hearing court's suppression ruling -- especially on whether "the cross-racial identification of the sole eyewitness was not reliable" (defendant's memorandum of law, p. 33). Defendant, however, offers no rationale to support his highly conclusory, self-serving, allegation. Defendant does not explain how the detective's testimony would have had any impact on the hearing court's determination that the identification procedures were not unduly suggestive, and that the police had probable cause for arresting defendant.

Defendant's claim is entirely speculative and based upon unjustified and unsubstantiated fear that the experienced judge who presided over the case had failed to separately consider the hearing and trial evidence in denying defendant's suppression motion.  Defendant seemingly rejects the trial court's announcement that it had "bifurcated" the trial evidence presented in denying the suppression motion.  At the conclusion of the hearing and respective arguments by both counsel, the court remarked, "Upon due reflection, having reviewed the Court's trial notes bifurcated as appropriate herein and having considered the testimony and the exhibits, likewise in evidence, the court denies, the suppression is denied" (T. 144).

In People v. Jackson, 221 A.D.2d 964, 965 (4th Dept. 1995), a case cited by defendant, the Fourth Department did hold that the trial court had erred by starting the trial before deciding the suppression issue, but the Court ultimately found no reversible error, in part, because "there was no prejudice to defendant's substantial rights."  Here, defendant fails to specify what prejudice he suffered from having the crime scene detective give his trial testimony prior to the conclusion of the

suppression hearing.

Consenting to have partial trial testimony heard prior to the conclusion of the suppression hearing, by itself, does not constitute ineffective assistance of counsel.  The First Department has upheld such instances where defense counsels had consented.  See People v. Hanson, 256 A.D.2d 74, 74 (1st Dept. 1998) ("With defendant's consent, the court properly conducted a combined suppression hearing and nonjury trial") (citation omitted); People v. Orkabi, 160 A.D.2d 644, 645 (1st Dept. 1990) ("[T]he requirement that suppression motions be determined before trial [CPL 710.40 (3)] is not inviolate, and the record herein shows that defense counsel consented to the court's proposal to proceed with jury selection" before ruling upon the suppression motion).  Thus, "[c]ounsel's consent to the procedure employed by the court did not deprive him of effective assistance of counsel" (Hanson, 256 A.D.2d at 74), especially since such proceedings are accepted by the First Department.  Moreover, the First Department deemed the trial testimony at issue to be "inconsequential," in denying defendant's claim on direct appeal that the trial court failed to follow proper procedures.  Villa, 174 A.D.3d at 439.  Therefore, defendant suffered no prejudice from counsel's consent.

In sum, defendant received effective representation of counsel.

## <u>CONCLUSION</u>

**DEFENDANT'S APPLICATION TO HAVE HIS JUDGMENT
OF CONVICTION VACATED SHOULD BE DENIED.**


                                        DARCEL D. CLARK
                                        District Attorney
                                        Bronx County
                                        Attorney for Respondent



NANCY D. KILLIAN
T. CHARLES WON
Assistant District Attorneys
        *Of Counsel*

JUNE 2021