Indictment No. 3376-2011

SUPREME COURT OF THE STATE OF NEW YORK

BRONX COUNTY: PART 78

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

GUILLERMO VILLA,

*Defendant.*

REPLY MEMORANDUM OF LAW IN SUPPORT OF GUILLERMO VILLA'S
MOTION TO VACATE THE JUDGMENT PURSUANT TO C.P.L. § 440.10

CAPRICE R. JENERSON, ESQ.
Attorney for Defendant-Appellant

By: MANDY E. JARAMILLO, ESQ.
Supervising Attorney

OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100
mjaramillo@appellatedefender.org

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

ARGUMENT ................................................................................1

I.   Contrary to the Prosecution's Claim, Defense Counsel's Errors, Including Failing to Consult with or Present an Expert on Eyewitness Identification, Failing to Intervene or Object on Mr. Villa's Behalf When He Asked to Speak to His Family, Failing to Properly Counsel Mr. Villa on the Rights He Would Be Waiving in Choosing to Have a Bench Trial, and Improperly Allowing in Trial Testimony During the Suppression Hearing, Constituted Ineffective Assistance of Counsel.............................................................1

     A.   Defense Counsel's Failure to Consult with or Call an Expert on Eyewitness Identification Was Ineffective Under the Egregious Circumstances of this Case (replying to Pros. MOL 4-14). ...............................................................................3

     B.   Defense Counsel's Failure to Intervene or Object When Mr. Villa Said that He Wanted to Talk to His Family Before Deciding to Go Forward with a Bench Trial Was Ineffective (replying to Pros. MOL 17-19)....................................... 19

     C.   Defense Counsel's Failure to Properly Counsel Mr. Villa on Waiving His Fundamental Right to a Jury in a Murder Case Was Ineffective (replying to Pros. MOL 17, 19-20)..................... 22

     D.   Defense Counsel's Failure to Object to the Presentation of Trial Evidence before the Suppression Hearing Had Concluded Was Ineffective (replying to Pros. MOL 20-22). ........ 25

CONCLUSION ............................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) ........................................................ 18

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) .......................................... 15

*In re Aranda*, 789 F.3d 48 (2d Cir. 2015) ..................................................... 1 n.1

*In re Aranda*, 138 A.D.3d 142 (1st Dep't 2016) ......................................... 2 n.1

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .................................................. 2

*Matter of Andres M. Aranda*, 2006 N.Y. Slip Op. 04752 (1st Dep't 2006) .. 1 n.1

*People v. Abney*, 13 N.Y.3d 251 (2009) ............................................................. 13

*People v. Beckford*, 141 Misc. 2d 71 (Sup. Ct. Kings Co. 1988) ...................... 12

*People v. Benevento*, 91 N.Y.2d 708 (1998) ................................. 2, 18, 21, 25, 26

*People v. Bennett*, 29 N.Y.2d 462 (1972) ............................................................ 5

*People v. Boone*, 30 N.Y.3d 521 (2017) .............................................................. 8

*People v. Crovador*, 165 A.D.3d 610 (1st Dep't 2018) ..................................... 18

*People v. Drake*, 7 N.Y.3d 28 (2006) ................................................................ 12

*People v. Jackson*, 221 A.D.2d 964 (4th Dep't 1995) ....................................... 25

*People v. Jhagroo*, 186 A.D.3d 741 (2d Dep't 2020) .................................... 4 n.2

*People v. LeGrand*, 8 N.Y.3d 449 (2007) ....................................... 11, 12, 13, 17

*People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977) ............................................. 23

*People v. Nazario*, 100 A.D.3d 783 (2d Dep't 2012) ........................................ 18

*People v. Norstrand*, 35 Misc. 3d 367 (Sup. Ct. Monroe Co. 2011) ................. 12

*People v. Oddone*, 22 N.Y.3d 369 (2013) ........................................... 16

*People v. Oliveras*, 21 N.Y.3d 339 (2013) ...................................... 2, 5

*People v. Santiago*, 17 N.Y.3d 661 (2011) ................................ 4, 8, 11, 13, 17

*People v. Smith*, 6 N.Y.3d 827 (2006) ........................................... 23

*People v. Turner*, 5 N.Y.3d 476 (2005) ........................................... 2

*People v. Wright*, 25 N.Y.3d 769 (2015) ......................................... 2

*People v. Zeh*, 22 N.Y.3d 1144 (2014) ........................................... 21

*Strickland v. Washington*, 466 U.S. 668 (1984) ..................... 2, 18, 21, 25, 26

*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020) ........................... 17, 18

*Young v. Conway*, 715 F.3d 79 (2d Cir. 2013) ............................... 13, 17

**Constitutional Provisions**

U.S. Const. amend. VI ................................................... 2, 18, 21, 25, 26

U.S. Const. amend. XIV ................................................. 2, 18, 21, 25, 26

N.Y. Const. art. I, § 6 .................................................. 2, 18, 21, 25, 26

**Statutes**

N.Y. C. P. L. § 440.10 ...................................................... 2, 27

N.Y. C. P. L. § 440.30 ......................................................... 27

iii

**Other Authorities**

Cutler, B. L., "Sources of contamination in lineup identifications," *The Champion*, May, 16-22 (2017) ................................................................... 10 n.3

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D., "Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference," Law & Human Beh., 30, 287-307 (2006) ....... 10 n.3

Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014) ................................................................................... 8

Wise, R. A. & Safer, M. A., "What US Judges Know and Believe about Eyewitness Testimony," Appl. Cogn. Psychol. 18: 427-43 (2004) ............. 14, 15

Wise, R. A., *et al*, "An Examination of the Causes and Solutions to Eyewitness Error," Front. Psychiatry 5:102 (2014) ........................................ 15

## ARGUMENT

**Contrary to the Prosecution's Claim, Defense Counsel's Errors, Including Failing to Consult with or Present an Expert on Eyewitness Identification, Failing to Intervene or Object on Mr. Villa's Behalf When He Asked to Speak to His Family, Failing to Properly Counsel Mr. Villa on the Rights He Would Be Waiving in Choosing to Have a Bench Trial, and Improperly Allowing in Trial Testimony During the Suppression Hearing, Constituted Ineffective Assistance of Counsel.**

Guillermo Villa did not receive meaningful representation or the effective assistance of counsel. The prosecution's attempts to defend counsel's serious lapses as either strategic decisions or benign mishaps fail on all counts and completely disregard the prosecution's lack of evidence—other than the sole cross-racial identification by the victim's girlfriend, who initially told police that the shooter was a white man—as well as defense counsel's long disciplinary history.[1] While even "a single failing" can

---

[1]    Defense counsel Andres Aranda has a protracted disciplinary history related to his license to practice law in New York. Mr. Aranda's license was suspended both before and after his representation of Mr. Villa. On July 13, 2006, counsel's license was suspended for one year for "neglecting…client matters." *Matter of Andres M. Aranda*, 2006 N.Y. Slip. Op. 04752 (1st Dep't 2006) (detailing three additional prior admonitions Mr. Aranda received over a seven-year period). On May 15, 2015, Mr. Aranda was also publicly reprimanded and suspended for 18 months from practice in the Second Circuit due to "numerous defaults" and misconduct regarding criminal appeals in that court. *In re Aranda*, 789 F.3d 48, 49, 53 (2d Cir. 2015) (noting that his conduct in the Second Circuit "is part of a wider pattern of misconduct, and that he may be unable to conform to expected professional norms in future appeals in this Court"). The Departmental Disciplinary Committee then moved to impose reciprocal discipline on Mr. Aranda, and the First Department

constitute ineffectiveness, *People v. Turner*, 5 N.Y.3d 476, 480 (2005), *accord Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986), defense counsel, here, committed multiple sufficiently egregious and injurious errors that "alter[ed] the entire evidentiary picture," *Strickland v. Washington*, 466 U.S. 668, 696 (1984), and undermined the fairness of the proceedings, *see People v. Oliveras*, 21 N.Y.3d 339, 348 (2013). Because the prosecution's case was exceedingly weak, had counsel not made these errors, for which he provides no legitimate strategic reasons, there is a reasonable probability that there would have been a different outcome. *See People v. Wright*, 25 N.Y.3d 769, 779 (2015). Where Mr. Villa was deprived of the effective assistance of counsel and meaningful representation, his conviction must be vacated. N.Y. C.P.L. § 440.10(1)(h); U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *People v. Benevento*, 91 N.Y.2d 708, 713 (1998).

---

granted the motion and imposed an 18-month suspension, *nunc pro tunc*, to May 15, 2015. *In re Aranda*, 138 A.D.3d 142, 143 (1st Dep't 2016). Counsel's license to practice law remains suspended. Ex. 20 (Attorney Detail Report on NYS Unified Court System, Jan. 27, 2021), at A. 77.

A.  Defense Counsel's Failure to Consult with or Call an Expert on Eyewitness Identification Was Ineffective Under the Egregious Circumstances of this Case (replying to Pros. MOL 4-14).

The *only* evidence that the prosecution presented that tied Mr. Villa to this crime was the cross-racial single eyewitness testimony of a stranger. Furthermore, not only did Ms. Rambert's testimony contradict her past statements to law enforcement *and* law enforcement's testimony of what actually occurred at the scene of the crime, but there were also many factors at play that cumulatively affected the reliability of her identification. Yet, defense counsel conceded that even though he was aware that the case involved "a single eyewitness—the girlfriend of the deceased—who gave testimony that was inconsistent with the information she gave to police during the investigation of the case," and that she was "a light-skinned Black woman, and Mr. Villa is a brown-skinned Hispanic man," he "did not consult with an eyewitness identification expert about the sole eyewitness's identifications of Mr. Villa to determine how the eyewitness's memory and perception along with the police identification procedures could have affected the reliability of the identifications in this case." Ex. 8 (Aranda Affirmation), at A. 32-33. The prosecution claims, however, that counsel was not ineffective in this regard because he pursued an alternate defense theory—that "Ms.

Rambert, the sole eyewitness, had not actually witnessed the shooting." Pros. MOL 4.[2] The prosecution's position is meritless.

By the time of Mr. Villa's suppression hearing and trial, in January and February 2014, reasonably competent counsel defending a violent felony case involving a cross-racial identification resting entirely on the testimony of a single stranger eyewitness would have, at a minimum, consulted with an expert. *See People v. Santiago*, 17 N.Y.3d 661, 664, 669, 671-72, 673 (2011) (endorsing the admission of expert eyewitness testimony in a case where the remaining evidence did not sufficiently corroborate the identification). In doing so, counsel would have been prepared to make any necessary strategic decisions at all stages of the case based on a thorough understanding of the scientific studies and findings underlying eyewitness memory and perception. Moreover, reasonably competent counsel would have sought to call an expert at trial to educate the factfinder—in this case, the judge—about the factors that called into question the reliability of Ms. Rambert's identification.

---

[2]    The prosecution's reliance on *People v. Jhagroo*, 186 A.D.3d 741, 742-43 (2d Dep't 2020) for this proposition is inapposite. Pros. MOL 5. In *Jhagroo*, counsel made a strategic decision not to contest the prosecution's improper bolstering testimony in order to use that testimony to argue that a show-up identification was unduly suggestive. *Id.* Whereas, here, defense counsel simply did not research the only viable defense in Mr. Villa's case—misidentification.

Contrary to the prosecution's assertion, an attorney cannot provide effective representation with a strategy "born in the blind." *Oliveras*, 21 N.Y.3d at 347. Because strategy is "shaped in significant part by the results of the investigation stage of the representation," effective representation *requires* counsel to "conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed." *Id.* at 346 (citing *People v. Bennett*, 29 N.Y.2d 462, 466 (1972)). Here, where the only evidence was a cross-racial identification by a stranger, defense counsel's "gut feeling" defense strategy—that the sole eyewitness, the decedent's girlfriend, is a liar, who was not actually present at the scene—fell flat. *See Oliveras*, 21 N.Y.3d at 345, 348. Had counsel, instead, consulted with an eyewitness identification expert to determine whether there were factors involved in the identification that could affect its reliability, he would have learned that Ms. Rambert, who gave contradictory description details with high-confidence at trial, had been subjected to a multitude of influences and factors leading up to her identifications that could have ultimately contributed to the misidentification of Mr. Villa.

The testimony that an eyewitness identification expert, such as Dr. Cutler, could have provided concerning the risk factors for mistaken

identifications would have been critical to the factfinder's assessment of the reliability of Ms. Rambert's identification.

First, Dr. Cutler explained that adverse "viewing factors" will increase the risk of a mistaken identification. Here, Ms. Rambert had low **exposure time**, which is the "amount of time that an eyewitness has an unobstructed view of the perpetrator's face," Ex. 3 (Dr. Cutler Affidavit), at A. 6, where she and the shooter passed each other quickly on the sidewalk, and during that time, she stared at the color of the man's shirt, rather than studied his facial characteristics, *see* T. 207, 237-40. Also, and significantly, this was a complicated **cross-racial identification**, A. 8, where Ms. Rambert, a Black woman, is of a different race and ethnic background than the perpetrator, who she initially described as a white Hispanic man. Only after picking Mr. Villa out of a photo array and a lineup did Ms. Rambert describe the shooter as a Black Hispanic man, which more accurately describes Mr. Villa. *See* T. 19, 67, 128, 134-35, 213-14, 265. In addition, Ms. Rambert was under a high **level of stress**, and was subjected to **weapon focus**, which can "impair an eyewitness's ability to encode information, such as crime details and perpetrator characteristics," and draws the focus of the eyewitness to the

weapon—here, a gun—and away from the perpetrator's facial and physical characteristics. A. 7-8.

The prosecution suggests that Ms. Rambert had plenty of time to view the shooter's face "under calm circumstances, before [the shooter] pulled out his weapon." Pros. MOL 7-8. However, the prosecution does not cite to the record for this conclusion. Indeed, Ms. Rambert herself testified that she and the man, who was walking "[w]ith a fast pace," passed each other on the sidewalk and that she initially stared at his shirt, which was blue, her favorite color, and only began to "stare at his face as he [was] getting closer." T. 207, 238. Notably, the prosecution makes no argument to counter the contention that this identification was negatively impacted by cross-race effects, where "people…make more mistakes when recognizing members of another race," especially here where the cross-race and cross-ethnic effects were multi-layered. Similarly, the prosecution makes no argument to counter the proposition that Ms. Rambert was under a high level of stress and was focused on the gun once the perpetrator began shooting. Thus, the prosecution seemingly argues that Ms. Rambert's viewing conditions were not adversely affected because Ms. Rambert first saw the perpetrator in the blue shirt "prior to the shooting, as they walked towards each other," and in

7

these few moments, studied the perpetrator's facial characteristics. Pros. MOL 8.

The prosecution's contention, however, is not grounded in science. The Court of Appeals has highlighted time and again the prevalence of misidentifications in wrongful convictions, including "the likelihood of misidentification [being] higher when an identification is cross-racial," *People v. Boone*, 30 N.Y.3d 521, 527-28 (2017), especially where exposure time was limited, *see Santiago*, 17 N.Y.3d at 672. Here, it is much more likely that the adverse viewing conditions endured by Ms. Rambert affected her ability to reliably identify the shooter, particularly where she initially told police that the shooter was a 5'9" tall *white* Hispanic man, T. 19, 67, 128, 134-35, but later testified at trial that the shooter was a 5'10"-11" tall *Black* Hispanic man, T. 213, 265. Furthermore, Mr. Villa, who was visible to Ms. Rambert while she testified at trial, is a brown-skinned Hispanic man, *who is no taller than 5'6" tall*. T. 415; *see* Ex. 4 (Mugshot Pedigree Form), at A. 19; Ex. 5 (Inmate Information Form), at A. 20.

Second, Dr. Cutler explained that stored memories can be affected by **post-event information** and the **elapsed time** between the crime and the identification. Ex. 3 (Dr. Cutler Affidavit), at A. 8-9. Here, Ms. Rambert's

memory of the shooter certainly did not remain immutable between the day of the crime, when she described the shooter as a white Hispanic man, and over a week later, when she first identified Mr. Villa in a photo array and, the next day, in a lineup. In fact, as the prosecution points out, Ms. Rambert was subjected to the post-event information that the pool of potential suspects included in the photo array were only Black and brown men. Pros. MOL 9; *see* Ex. 13 (Photo Array), at A. 43. Additionally, Ms. Rambert herself testified that the detective at the lineup told her to "pick out the guy who did it," indicating that the suspect was in the lineup. T. 259.

Third, Dr. Cutler explained that eyewitnesses often "identify the suspect by inference processes," including the process of deduction; the process of elimination; and **relative-judgment processing**. Ex. 3 (Dr. Cutler Affidavit), at A. 9. Where Ms. Rambert chose an individual out of a photo array that only included Black and brown men, Ex. 13 (Photo Array), at A. 43, even though she initially described the perpetrator as a white Hispanic man, it is likely that Ms. Rambert used relative-judgment processing—where she determined that Mr. Villa "looks more like the perpetrator than do the others," A. 9—to choose Mr. Villa. Moreover, this type of inference processing can be exacerbated by instructions that suggest

9

the suspect is in the lineup and by the use of multiple, serial identification procedures. *See* A. 10-12. "Innocent suspects identified from one procedure are therefore at higher risk for mistaken identification from subsequent procedures" because an eyewitness tends to "remain committed to [her] identifications even when the identifications are incorrect." A. 12.

The prosecution—citing to no authority whatsoever—calls Dr. Cutler's contention related to serial identification procedures a "faulty premise" and "pure non-substantiated conjecture," which "seeks to falsely discredit witnesses who consistently identify the same individual as the culprit." Pros. MOL 10. Conversely, Dr. Cutler, Professor of Social Science and Humanities at University of Ontario Institute of Technology and a leading expert on psychological research on eyewitness memory, cites to studies dating back to 2006 authored by prominent experts in the field of eyewitness identification for this contention.[3] *See* A. 14. Dr. Cutler emphasizes that "[w]hen an eyewitness mistakenly identifies a suspect on one occasion, [her] memory for the suspect may replace [her] memory for the perpetrator, so future identifications lead to repeated identifications of the innocent suspect." A. 12.

---

[3]     *See* Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D., "Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference," *Law and Human Behavior*, 30, 287-307 (2006); Cutler, B. L., "Sources of contamination in lineup identifications," *The Champion*, May, 16-22 (2017).

Fourth, Dr. Cutler explained that **eyewitness confidence is malleable** and that **confidence is not valuable as an indicator of accuracy**. A. 12. When eyewitnesses "learn information that validates their identifications," their "confidence rises independently of accuracy." *Id.* Ms. Rambert, who testified that her grand jury testimony, on October 6, 2011, was not as "fresh" as her trial testimony almost 2 1/2 years later, T. 272, and that she believed that her memory had improved over time, T. 280-81, is a clear example of an eyewitness with an inflated confidence level, which rose independently of the accuracy of her memory, due to suggestive identification procedures. And because, as the prosecution enthusiastically points out, Ms. Rambert testified confidently about her identification of Mr. Villa at trial and about her prior identifications of Mr. Villa in out-of-court identification procedures, *see* Pros. MOL 8, she was a more persuasive witness to the fact-finding judge. *See* Ex. 3, at A. 13. The Court of Appeals has repeatedly found that concepts like the correlation between witness confidence and the accuracy of an identification and confidence malleability are generally accepted within the relevant scientific community and are admissible to aid the factfinder on this counterintuitive matter. *See Santiago*, 17 N.Y.3d at 666, 672; *People v. LeGrand*, 8 N.Y.3d 449, 458 (2007).

11

While the prosecution quibbles that Dr. Cutler's report does not specifically discuss the facts of this case, Pros. MOL 6-7, an eyewitness identification expert is not required to apply the scientific principles to the facts of a given matter. *See id.* at 453-54 (trial court erred in excluding expert who would "testify as to research findings regarding several factors that may influence the perception and memory of a witness and affect the reliability of eyewitness identifications," but who "would not…opine on the accuracy of any specific eyewitness identification"). Such a function is properly reserved for the factfinder. *See People v. Drake*, 7 N.Y.3d 28, 33 (2006) ("Where there has been expert testimony on the reliability of eyewitness identification," the factfinder must "be permitted to apply the identified psychological factors to the facts of the case"). Consistent with that recognition, courts have *precluded* eyewitness identification experts from opining on the facts of the case. *See, e.g., People v. Norstrand*, 35 Misc. 3d 367, 373 (Sup. Ct. Monroe Co. 2011); *People v. Williams*, 14 Misc. 3d 571, 572 & n.2 (Sup. Ct. Kings Co. 2006); *People v. Drake*, 188 Misc. 2d 210, 215 (Sup. Ct. N.Y. Co. 2001); *People v. Beckford*, 141 Misc. 2d 71, 73-74 (Sup. Ct. Kings Co. 1988).

The prosecution additionally contends that "the judge who presided as a finder of fact [in Mr. Villa's trial], should be viewed as already possessing

12

and understanding the knowledge and information that the expert witness would have testified to at trial." Pros. MOL 6; *see also* Pros. MOL 13. The prosecution is mistaken. While case law generally refers to the need for educating "the average juror," on topics that are "beyond the [juror's] ken," judges acting as factfinder are no exception to the rule. As New York has recognized time and again, the principles of social science research relating to perception, memory, and recall are *counterintuitive*, and not within the average factfinder's knowledge. *See Santiago,* 17 N.Y.3d at 672 (finding that factors affecting the reliability of an identification, such as witness confidence, confidence malleability, post-event information, and cross-race effect, were "beyond the ken of the average juror") (citing *People v. Abney*, 13 N.Y.3d 251, 268 (2009) and *LeGrand*, 8 N.Y.3d at 458); *see also Young v. Conway*, 715 F.3d 79, 81 (2d Cir. 2013) (Parker, J., concurring) ("Many of these [eyewitness identification] factors are counterintuitive and therefore cannot be deduced by the application of [] 'common sense.'").

Many, if not all, of the factors adversely affecting the reliability of an eyewitness identification in Mr. Villa's case are not only counterintuitive to "the average juror," but also, generally, to judges acting as factfinder. Indeed, studies specifically examining judges' knowledge on the topic of eyewitness

13

misidentification have produced eye-opening results. In a survey of 160 U.S. judges indicating their knowledge and beliefs about eyewitness testimony, "judges were often wrong on important issues such as whether at trial eyewitness confidence is a good indicator of eyewitness accuracy, and if jurors can distinguish accurate from inaccurate witnesses." Richard A. Wise & Martin A. Safer, "What US Judges Know and Believe about Eyewitness Testimony," App. Cogn. Psychol. 18: 427-43, 427 (2004). The report concluded that "[a]lthough educating all the participants in the criminal justice system appears to be an essential step in reducing wrongful convictions, *educating judges appears to be especially critical*." *Id.* at 440 (emphasis added).

In a similar study surveying 157 Norwegian judges, the "Norwegian judges, like the US judges, frequently differed from eyewitness experts in their responses to such important issues as whether eyewitness confidence is related to identification accuracy at trial and what is the best method for conducting identification procedures." Svein Magnussen *et al*, "What judges know about eyewitness testimony: A comparison of Norwegian and US judges," Psychol., Crime & Law, Vol. 14, No. 3, June 2008, 177-88, 177. And finally, in a report discussing what "the principal participants in the criminal justice system" know about eyewitness testimony and memory, the authors

14

found that "judges, like jurors, have difficulty integrating their knowledge of eyewitness testimony into the facts of a criminal case." Richard A. Wise *et al*, "An Examination of the Causes and Solutions to Eyewitness Error," Front. Psychiatry 5:102, 5 (2014). Indeed, "judges, who have the primary responsibility for minimizing the impact of erroneous eyewitness identification, have *limited* knowledge of the eyewitness factors and procedures that affect the validity of eyewitness testimony. With increased knowledge about eyewitness testimony, judges may be able to meaningfully address the problem of wrongful convictions." Wise & Safer, App. Cogn. Psychol. 18: 427-443, at 441 (emphasis added).

Thus, defense counsel's failure to present eyewitness identification expert testimony, or, at the very least, consult with an eyewitness identification expert, was objectively unreasonable. "[C]ounsel may not fail to conduct an investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence." *Gersten v. Senkowski*, 426 F. 3d 588, 611 (2d Cir. 2005). Defense counsel gave no strategic reason for this egregious oversight, *see* Ex. 8 (Aranda Affirmation), at A. 32-33, which deprived Mr. Villa of meaningful and effective representation.

Moreover, there is a reasonable probability that an expert's testimony on the many factors calling into question the reliability of Ms. Rambert's identification would have changed the result of the proceeding. The prosecution's only evidence against Mr. Villa was the cross-racial eyewitness identification made by a stranger. Cross-racial identifications play a role "in 42 percent of the cases in which an erroneous eyewitness identification was made." *See* Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014), at 96. There was absolutely no other evidence connecting Mr. Villa to this crime—no other witnesses, no forensic evidence, and no evidence of motive. Thus, this is exactly the type of case in which "it is unfair to deprive the [factfinder] of expert testimony about the reliability of eyewitness observations." *People v. Oddone*, 22 N.Y.3d 369, 379 (2013).

The prosecution, however, argues that Mr. Villa has not shown how the expert testimony would have "benefitted his defense" where Dr. Cutler "provides no reasons to doubt the eyewitness testimony in this case." Pros. MOL 6-7. This is patently incorrect. As noted above, Dr. Cutler explains the same scientific principles that appellate courts have repeatedly recognized. Ex. 3 (Dr. Cutler Affidavit), at A. 3-13; *see, e.g., United States v. Nolan*, 956

F.3d 71, 75-77, 80-81 (2d Cir. 2020) (noting that the indicia of unreliability included cross-race and cross-ethnic effect; weapon focus; high stress; a failure by the complainants to give a detailed description of the perpetrators—describing them as "light-skinned or Hispanic"; and, problematic serial identification procedures involving post-event information, where the complainants did not identify the defendant "until they saw his photo in a photo array," weeks after the crime); *Young*, 698 F.3d at 82 (discussing serial identification procedures where an eyewitness "having identified that person as the perpetrator," may "become[] attached to her prior identification"); *Santiago*, 17 N.Y.3d at 666, 672 (noting that the indicia of unreliability included post-event information, cross-racial and cross-ethnic effects, weapon focus, unconscious transference, and confidence malleability); *LeGrand*, 8 N.Y.3d at 458 (noting that concepts like the correlation between witness confidence and the accuracy of an identification, confidence malleability, and the effect of post-event information on the accuracy of an identification are generally accepted within the relevant scientific community and otherwise admissible).

    In this case, it is clear that, by informing the judge as factfinder about multiple "impairing factors" that are "not readily apparent," *Nolan*, 956 F.3d

at 80-81, an expert would have "vastly increased the opportunity to cast doubt" on the single cross-racial identification of Mr. Villa, *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007). Given that the prosecution's entire case hinged on Ms. Rambert's identification, the absence of expert testimony was prejudicial. *See Nolan*, 956 F.3d at 75-76 (failure to call or consult with identification expert was prejudicial "given the obvious materiality of the eyewitness testimony"); *People v. Crovador*, 165 A.D.3d 610, 610-11 (1st Dep't 2018) (absence of identification expert testimony was harmful where prosecution's case rested on single eyewitness identification); *People v. Nazario*, 100 A.D.3d 783, 784-85 (2d Dep't 2012) (same). Thus, defense counsel's failure to consult with and call an eyewitness identification expert deprived Mr. Villa of effective and meaningful representation. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

B.   Defense Counsel's Failure to Intervene or Object When Mr. Villa
Said that He Wanted to Talk to His Family Before Deciding to Go
Forward with a Bench Trial Was Ineffective (replying to Pros. MOL
17-19).

Contrary to the prosecution's argument, defense counsel was ineffective

for failing to object to the court's refusal to honor Mr. Villa's desire to confer

with his family and to ask the court to ensure that Mr. Villa was making a

knowing, intelligent, and voluntary waiver. *See* Pros. MOL 17-19. Although

Mr. Villa signed a jury trial waiver form the day before trial began, the Court

made it clear to Mr. Villa that the waiver was not complete, and that Mr.

Villa could continue—overnight—to consider whether he wanted to waive his

fundamental right to a jury trial and could make his final decision on the

following day. *See* Ex. 7 (Transcript of Jan. 30, 2014), at A. 30; T. 69. In fact,

on the day that Mr. Villa signed the waiver form, the Court had not yet

fulfilled its obligation to ensure that Mr. Villa's waiver of a jury trial was

knowing, intelligent, and voluntary where the Court asked no questions

related to voluntariness. *See* Ex. 7, at A. 27-30. Thus, the next day, when Mr.

Villa answered the Court's direct question of whether he would like to speak

with anyone for advice on this issue by stating unequivocally that he wanted

to speak with his family, T. 69, defense counsel—who offers no justification

for this failure[4]—completely dropped by the ball by failing to object or intervene on Mr. Villa's behalf.

The prosecution nitpicks that Mr. Villa did not "protest" *after* the Court failed to respond to his request to speak to his family, and that Mr. Villa, in his own affirmation, did "not explain why he never discussed [the jury trial waiver] with his family before when counsel already had mentioned it to him" or during the overnight adjournment just prior to the beginning of trial. Pros. MOL 17-18. Here, Mr. Villa, who "had a hard time taking in everything that the judge was telling [him] about the differences between a bench trial and a jury trial" during the short colloquy on January 30, 2014, Ex. 6 (Mr. Villa Affidavit), at A. 23, directly answered the Court's question the next day— when his decision was due—that he needed more time to speak to his family. This, in and of itself, was more than enough to alert defense counsel that he should intervene on Mr. Villa's behalf. However, when both the Court and defense counsel failed to respond to Mr. Villa's clear request, Mr. Villa, who was "very nervous" at his first and only criminal trial, A. at 23, simply responded "yes" to the Court's remaining questions, *see* T. 69.

---

[4]     In his affirmation, defense counsel simply stated that he cannot recall why he "did not object during the judge's inquiry into whether Mr. Villa wanted to go forward with a bench trial when the judge ignored or failed to hear Mr. Villa's request to speak to his family." Ex. 8 (Aranda Affirmation), at A. 33.

Moreover, to the extent that the affirmation of defense counsel or Mr. Villa leaves open disputed questions of fact, this Court should order an evidentiary hearing to further develop the record. *See People v. Zeh*, 22 N.Y.3d 1144, 1145-46 (2014) (reversing and remanding to allow for evidentiary hearing to resolve questions of fact raised by affirmation from defense counsel submitted by prosecution).

Defense counsel's error in failing to intervene when Mr. Villa needed the counsel of his family on this fundamental right was prejudicial where Mr. Villa "would not have chosen a bench trial and would have asked for a jury trial" if, after the initial court appearance, he had a comprehensive understanding of what he was giving up to have a bench trial. Ex. 6 (Mr. Villa Affidavit), at A. 24. There is a reasonable probability that the outcome of the case would have been different if Mr. Villa had chosen to invoke his right to a jury trial—requiring 12 people to agree as to his guilt, as opposed to just one factfinder—where the only evidence tying Mr. Villa to the crime was the contradictory cross-racial identification testimony of Ms. Rambert. This significant failure also denied Mr. Villa effective and meaningful representation. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

21

C. Defense Counsel's Failure to Properly Counsel Mr. Villa on Waiving His Fundamental Right to a Jury in a Murder Case Was Ineffective (replying to Pros. MOL 17, 19-20).

Additionally, defense counsel was ineffective for failing to fully counsel Mr. Villa on the advantages and disadvantages of having a bench trial rather than a jury trial. Not only did defense counsel fail to go into detail about what a bench trial is, but he also failed to "explain what [Mr. Villa] would be giving up in order to have a bench trial," and did not tell him "that by choosing to have a bench trial, [he] would be giving up [his] right to have a jury of twelve people to determine the verdict." Ex. 6 (Mr. Villa Affidavit), at A. 22-23.

The prosecution complains that "in a highly self-serving affidavit," Mr. Villa now states "that he did not understand the court's instructions and that defense counsel failed to explain the differences between a bench and a jury trial," even though Mr. Villa "admits that trial counsel had discussed opting for a bench trial prior to the court appearance." Pros. MOL 17; *see also* Pros. MOL 19 (contending that Mr. Villa "claims that his counsel failed to advise him that he would be forfeiting his right to a jury trial by proceeding with a bench trial" but "raised no objections when the court informed him of this very fact during the colloquy"). The prosecution entirely misses the point.

Mr. Villa does not argue that defense counsel failed to mention the option of having a bench trial. Rather, Mr. Villa states plainly that defense

22

counsel failed to *advise* him about what a bench trial is and what it is not—to ensure that he understood the full implications of the rights that he was waiving. *See* Ex. 6 (Mr. Villa Affidavit), at A. 23-22 (affirming that defense counsel encouraged him to have a bench trial where he "would just be dealing with the judge," while failing to explain to him that waiving a jury trial meant giving up his right to have a jury of twelve people determine the verdict). The right to a jury trial is fundamental and a waiver of this right can only be accepted by the court if it is knowing, intelligent, and voluntary. *People v. Smith*, 6 N.Y.3d 827, 828 (2006). Because this right is deep-seated and significant, the prosecution bears the burden of proving that the defendant has waived it. *See People v. Meyer*, 56 A.D.2d 937 (2d Dep't 1977). To be certain, defense counsel was also duty-bound to ensure that Mr. Villa waived his right to a jury trial voluntarily. *See Smith*, 6 N.Y.3d at 828.

Here, however, defense counsel did no such thing. Defense counsel "did not go into detail about what a bench trial is." Ex. 6, at A. 23. Mr. Aranda does not recall explaining to Mr. Villa the consequences of giving up his jury rights in order to have a bench trial but does remember telling Mr. Villa about his prior acquittal in a bench trial in front of the same judge. *See* Ex. 8 (Aranda Affirmation), at 33. This prior case, however, was a very different

23

type of case, involving a domestic violence situation and *not* involving a misidentification defense. *See id.*

Furthermore, contrary to the prosecution's contention, the Court's colloquy, which imparted inaccurate and confusing information that failed to convey the actual import of foregoing a jury, did not ensure that Mr. Villa voluntarily waived his fundamental right to a jury. *See* Pros. MOL 19-20. Not only did the Court incorrectly state that Mr. Villa would "find [him]self *acquitted*" if "one of those twelve" jurors was "not [] convinced beyond a reasonable doubt," but then the Court suggested that only the "odds" of acquittal were at issue when deciding whether to forego a jury, failing to mention that the "odds" that were changing also included the odds of a guilty verdict because there is only *one factfinder* in a bench trial. Ex. 7 (Transcript of Jan. 30, 2014), at A. 27-28 (emphasis added).

Here, again, there is a reasonable probability that the outcome of the case would have been different in this single cross-racial eyewitness identification case fraught with adverse factors that affect the risk of mistaken identification if Mr. Villa had gone forward with a jury trial—as he would have done if he had understood the full import of the rights that he was giving up. *See* Ex. 6, at A. 24. Moreover, counsel has provided no tactical

reason for his failure to counsel his client on choosing a bench trial in a murder case, and this error, singularly and cumulatively, denied Mr. Villa effective and meaningful representation. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

D. **Defense Counsel's Failure to Object to the Presentation of Trial Evidence before the Suppression Hearing Had Concluded Was Ineffective (replying to Pros. MOL 20-22).**

Defense counsel consented to allowing in testimony and photos of the decedent's bloodied clothes prior to the conclusion of the suppression hearing in a bench trial on a murder case. *See* T. 71; 78-83; Ex. 21 (Photos of Mr. Sambolah's Sweatshirt). This was not only error,[5] but also, in combination with defense counsel's other errors, this was not a harmless error.

The prosecution argues that Mr. Villa has not shown prejudice "from having the crime scene detective give his trial testimony prior to the conclusion of the suppression hearing." Pros. MOL 21-22. However, the prosecution fails to acknowledge that this error—allowing in trial evidence that certainly could have influenced the fact-finding Court's perspective of the case right from the start—alongside defense counsel's other egregious errors of failing to consult with and call an expert on eyewitness

---

[5]     *See People v. Jackson*, 221 A.D.2d 964, 965 (4th Dep't 1995) (finding that it is error to not determine a suppression motion prior to commencing a trial).

identification to explore the only viable defense in the case; and failing to properly counsel Mr. Villa on the rights he would be giving up in order to have a bench trial or to intervene when Mr. Villa expressed his desire to speak with his family about giving up these rights—left Mr. Villa without meaningful representation under both state and federal standards. *See* Const. amends. VI, XIV; N.Y. Const. art. I, § 6; *Strickland*, 466 U.S. at 687; *Benevento*, 91 N.Y.2d at 713.

## **CONCLUSION**

For these reasons and those set forth in Mr. Villa's prior submission, his conviction must be vacated pursuant to C.P.L. § 440.10(1)(h). Defense counsel's errors, both singularly and cumulatively, deprived Mr. Villa of meaningful representation and the effective assistance of counsel. In the alternative, if this Court determines that there is any factual dispute to resolve, necessary to the determination of the motion, this Court should grant a hearing, pursuant to N.Y. C.P.L. § 440.30(5).


Dated:      New York, New York
            June 28, 2021



            By:   _Mandy E. Jaramillo_
                  MANDY E. JARAMILLO, ESQ.
                  mjaramillo@appellatedefender.org
                  Supervising Attorney

            OFFICE OF THE APPELLATE DEFENDER
            11 Park Place, Suite 1601
            New York, NY 10007
            (212) 402-4100

27